**REID COLLINS & TSAI LLP**
Angela J. Somers
Jeffrey E. Gross
Yonah Jaffe
One Penn Plaza, 49th Floor
New York, New York  10119
212.344.5200 (telephone)

*Special Counsel for Yann Geron, Chapter 7 Trustee*
*of the Estate of Thelen LLP*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

| | |
|---|---|
| In re: | Chapter 7 |
| THELEN LLP, | |
| Debtor. | Case No. 09-15631 (ALG) |

-------------------------------------------------------------------X

| | |
|---|---|
| Yann Geron, Chapter 7 Trustee of the Estate of Thelen LLP, | |
| Plaintiff, | |
| - v - | Adv. Pro. No. 11-02648 (ALG) |
| GARY L. FONTANA, *et al.*, | |
| Defendants. | |

-------------------------------------------------------------------X

| | |
|---|---|
| Yann Geron, Chapter 7 Trustee of the Estate of Thelen LLP, | |
| Plaintiff, | |
| - v - | Adv. Pro. No. 11-02674 (ALG) |
| FREDERICK COHEN, | |
| Defendant. | |

-------------------------------------------------------------------X

| | |
|---|---|
| Yann Geron, Chapter 7 Trustee of the Estate of Thelen LLP, | |
| Plaintiff, | |
| - v - | Adv. Pro. No. 11-02690 (ALG) |
| ALLEN J. ROSS, | |
| Defendant. | |

-------------------------------------------------------------------X

| | |
|---|---|
| Yann Geron, Chapter 7 Trustee of the Estate of Thelen LLP, | |
| Plaintiff, | |
| - v - | Adv. Pro. No. 13-01444 (ALG) |
| GREGORY P. O'HARA, | |
| Defendant. | |

-------------------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO DATE OF TRANSFER AND REASONABLY EQUIVALENT VALUE UNDER PARTNERSHIP AGREEMENTS**

## Table of Contents

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ................................................................................... 3

ARGUMENT ........................................................................................................... 6

   I.   The Draw Payments and the Loan Advances Were Made on December 31, 2008
      When The Netting Process Was Complete. ...................................................... 7

     A.   The Transfer Occurred on the Netting Date .................................................. 8

     B.   Even if the Draw Payments, the Loan Advances and the Netting
        Process are Distinct Steps, They Are Part of One Integrated Transaction ................... 11

     C.   Even if the Court Finds that the Draw and Loan Advances
        Were Transfers under Section 548 of the Bankruptcy Code, the Dates
        of the Transfers at Issue Are in the Latter Half of 2008 ................................................ 13

  II.   To the Extent the Defendants Retained Amounts in Excess of What Was Due to Them
      Pursuant to the Partnership Agreements, They Received More Than REV ..................... 13

     A.   The Partnership Agreements Were Entered Into in Good Faith
        and at Arms-Length So the Market Value of Defendants' Services
        Was Established in Those Agreements ........................................................................ 14

     B.   Payments Made by Thelen in Excess of the Final
        ANSI Were Not Made for REV ................................................................................. 16

CONCLUSION ....................................................................................................... 19

## Table of Authorities

**Cases**

*Ames Dep't Stores, Inc. v. Wertheim Schroder & Co., Inc. (In re Ames Dep't Stores, Inc.),*
    161 B.R. 87, 90 (Bankr. S.D.N.Y. 1993) ................................................................ 8

*Angell v. Montague Farms (In re Tanglewood Farms, Inc. of Elizabeth City),*
    No. 10-06719-8-JRL, 2013 WL 1619390, at *4 (Bankr. E.D.N.C. Apr. 15, 2013)................... 9

*Bayonne Med. Ctr. V. Boyonne/Omni Dev., LLC (In re Bayonne Med. Ctr.),*
    No. 07-15195 MS, 2011 WL 5900960, at *33 (Bankr. D.N.J. Nov. 1, 2011) ........................ 15

*Big V Supermarkets, Inc. v. Wakefern Food Corp. (In re Big V Holding Corp.),*
    267 B.R. 71, 92–93 (Bankr. D. Del. 2001) .......................................................... 11

*Boyd v. Sachs (In re Auto Specialties Mfg. Co.),*
    153 B.R. 457, 499 (Bankr. W.D. Mich. 1993) ..................................................... 16

*Dean Witter Reynolds, Inc. (In re MacQuown),*
    717 F.2d 859 (3d Cir. 1983) ..................................................................... 10

*Devon Mobile Commc'ns Liquidating Trust v. Adelphia Commc'ns Corp.*
*(In re Adelphia Commc'ns Corp.),*
    No. 02–41729 (CGM), 2006 WL 687153, at *11 (Bankr. S.D.N.Y. Mar. 6, 2006) ................. 14

*Greenspan v. Orrick, Herrington & Sutcliffe LLP (In re Brobeck, Phleger, & Harrison LLP),*
    408 B.R. 318, 342 (Bankr. N.D. Cal. 2009) ....................................................... 14

*Hassett v. Far W. Fed. Sav. And Loan Ass'n (In re O.P.M. Leasing Servs., Inc.),*
    40 B.R. 380, 396 (Bankr. S.D.N.Y. 1984), *aff'd,* 44 B.R. 1023 (S.D.N.Y. 1984) ................. 17

*HBE Leasing Corp. v. Frank,*
    48 F.3d 623, 635 (2d Cir. 1995) ................................................................. 12

*Heublein, Inc. v. United States,*
    996 F.2d 1455, 1461 (2d Cir.1993) ................................................................ 7

*Holber v. M&T Bank (In re Scheffler),*
    471 B.R. 464 (Bankr. E.D Pa. 2012) ............................................................. 10

*In re Ozark Restaurant Equip. Co., Inc.,*
    850 F.2d 342, 344–345 (8th Cir. 1988) .......................................................... 15

*In re R.M.L., Inc.*,
　92 F.3d 139 (3d Cir. 1996) ........................................................................... 14, 15

*Ingalls v. Erlewine (In re Erlewine)*,
　349 F.3d 205, 209 (5th Cir. 2003) ...................................................................... 13

*Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*,
　262 B.R. 406, 466-67 (S.D.N.Y. 2001) ............................................................... 14

*Kendall v. Sorani (In re Richmond Produce)*,
　151 B.R. 1012, 1018 (Bankr. N.D. Cal 1993) ..................................................... 17

*Kornfeld v. C.I.R.*,
　137 F.3d 1231, 1235 (10th Cir. 1998) ................................................................. 11

*Leonard v. Mylex Corp. (In re Northgate Computer Sys., Inc.)*,
　240 B.R. 328, 365 (Bankr. D. Minn. 1999) ........................................................ 15

*Levey v. Abbott (In re Limonciello)*,
　No. 05 B 39333, 2009 WL 1408077, at *8 (Bankr. N.D. Ill. May 19, 2009) .......... 15

*Lingham Rawlings, LLC v. Gaudiano (In re Lingham Rawlings, LLC)*,
　No. 10-32769, 2013 WL 1352320, at *27 (Bankr. E.D. Tenn. Apr. 3, 2013) ......... 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
　475 U.S. 574, 587–88 (1986) ............................................................................. 7

*McCarthy v. Dun & Bradstreet Corp.*,
　482 F.3d 184, 202 (2d Cir. 2007) ....................................................................... 6

*Meeks v. Perroni (In re Armstrong)*,
　234 B.R. 899, 905-06 (Bankr. E.D. Ark. 1999) ................................................... 16

*Mellon Bank, N.A. v. Metro Commc'ns., Inc.*,
　945 F.2d 635, 646 (3d Cir. 1991) ....................................................................... 14

*Official Comm. of Unsecured Creditors v. Lozinski (In re High Strength Steel, Inc.)*,
　269 B.R. 560, 567 (Bank. D. Del. 2001) ........................................................ 8, 9-10

*Peltz v. Hatten*,
　279 B.R. 710, 736 (D. Del. 2002) .................................................................. 14, 15

*Pereira v. Wells Fargo Bank, NA (In re Gonzalez)*,
　342 B.R. 165, 173 (Bankr. S.D.N.Y. 2006) ........................................................ 15

*Pereira v. WWRD US LLC (In re Waterford Wedgwood USA, Inc.)*,
500 B.R. 371, 378 (Bankr. S.D.N.Y. 2013) ........................................ 7, 11, 13, 14, 15

*Schaps v. Just Enough Corp. (In re Pinto Trucking Serv., Inc.)*,
93 B.R. 379, 387 (Bankr. E.D. Pa. 1988)................................................ 10

*Slone v. Dirks (In re Dirks)*,
407 B.R. 442 (B.A.P. 6th Cir. 2009) ..................................................... 13, 15

*Stanley v. U.S. Bank Nat'l Assoc. (In re TransTexas Gas Corp.)*,
597 F.3d 298 (5th Cir. 2010)............................................................ 16

*Steinberg v. Johnson (In re Edward M. Johnson & Associates, Inc.)*,
61 B.R. 801, 806-808 (Bankr. E.D. Tenn. 1986) .................................... 16

*Tese-Milner v. Edidin and Accocs. (In re Operations NY LLC.)*,
490 B.R. 84, 98 (Bankr. S.D.N.Y. 2013) ............................................... 8

*True v. United States*,
190 F.3d 1165, 1175 (10th Cir. 1999)................................................... 11

*TSIC, Inc. v. Thalheimer (In re TSIC, Inc.)*,
428 B.R. 103, 114 (Bankr. D. Del. 2010) ............................................ 16, 17

*United States v. Tabor Court Realty Corp.*,
803 F.2d 1288, 1302 (3d Cir. 1986).................................................... 12

*Universal Church v. Geltzer*,
463 F.3d 218 ............................................................................... 7

*Watts v. MTC Development, LLC (In re Palisades at W. Paces Imaging Ctr., LLC)*,
501 B.R. 896 (Bankr. N.D. Ga. 2013)................................................... 18

*Yoder v. T.E.L. Leasing (In re Suburban Motor Freight, Inc.)*,
124 B.R. 984, 998 (Bankr. S.D. Ohio 1990) .......................................... 12

**Statutes**

11 U.S.C. § 101(9) ........................................................................ 7
11 U.S.C. § 101(54) ...................................................................... 8
11 U.S.C. § 101(32) ...................................................................... 7
11 U.S.C. § 101(54) ...................................................................... 8
11 U.S.C. § 548............................................................................ 1, 7
11 U.S.C. § 550 ........................................................................... 1

iv

**Other Authorities**

*H.R. Rep. No. 95–595, at 314 (1977), reprinted in* 1978 U.S.C.C.A.N. 5963 ............................... 8

*S. Rep. No. 95–989, at 27 (1978), reprinted in* 1978 U.S.C.C.A.N. 5787.................................... 8

**Rules**

Bankruptcy Rule 7056 ...................................................................................................... 1

Fed. R. Civ. P. 56(a) ....................................................................................................... 6

Yann Geron, as chapter 7 trustee ("**Trustee**") of Thelen LLP ("**Thelen**" or "**Debtor**"), submits this memorandum of law in support of his motion ("**Motion**"), pursuant to sections 548 and 550 of title 11 of the United States Code ("**Bankruptcy Code**") and Federal Rule of Bankruptcy Procedure ("**Bankruptcy Rules**") 7056, making applicable Rule 56 of the Federal Rules of Civil Procedure, and in accordance with the Scheduling Order entered on January 28, 2014 ("**Scheduling Order**"), for partial summary judgment with respect to the fraudulent transfer claims in the above-captioned actions ("**Actions**") on the issues set forth in section 3(a) and (b) of the Scheduling Order, including, as a matter of law: (i) the point in time at which the overcompensation and loan advances were made, and (ii) whether the governing partnership agreements establish the reasonably equivalent value of a partner's services. In support of the Motion, the Trustee respectfully represents as follows:

## PRELIMINARY STATEMENT

The Trustee seeks to avoid certain transfers made by Thelen, a law firm, to its partners ("**Defendants**") as fraudulent transfers pursuant to section 548(a) of the Bankruptcy Code. The transfers consist of draw payments and loan advances made to the Defendants for less than reasonably equivalent value ("**REV**") at a time when Thelen was insolvent or otherwise financially distressed. While not all issues in this case can be summarily decided, two critical issues are ripe for partial summary judgment as there is no genuine dispute as to facts material to their determination.

The first question to be addressed is: as a matter of law, what is the time of the transfer(s) at issue? Only one of two answers can result. That date is either (i) at various points in time when Thelen made draw advances or loan advances to Defendants, or (ii) on the effective date at which Defendants' allocable share of net income was calculated under the Partnership

1

Agreements, and against which the advances were netted.  Defendants contend it was the former,

while the Trustee contends it was the latter.

Neither party can dispute that the draw and loan advances were made periodically

throughout 2008 and that a final year-end calculation was required under the Partnership

Agreement.  Because the payments to Defendants were temporary advances which had to be

netted against Defendants' true entitlement to compensation, the final calculation-- when the

reconciliation was complete and the transaction was concluded-- is the unequivocal answer.  The

transfers thus occurred at year end when the advances were netted against the Defendants'

allocable share of net income.

The second question is:  as a matter of law, do the partnership agreements determine the

REV for the Defendants' services, and is that value the final allocable share of net income for

each Defendant? There is no dispute that the partnership agreements were entered into on an

arms-length basis and in good faith or that the partnership agreements defined the Defendants'

entitlement to compensation.  Thus, the only remaining issue is whether the partnership

agreements should be used to calculate REV.  The bargained for exchange set forth in the

partnership agreements constitutes the market value of Defendants' services, and those

agreements define the partner's allocable share of net income as the amount of such

compensation.  Thus, this Court should find that the partnership agreements determined the REV

of Defendants' services, and that, as a matter of law, that value is equal to Defendants' final

allocable share of net income.

## FACTUAL BACKGROUND

Thelen LLP was a California limited liability partnership that operated as a law firm.  It was formerly known as Thelen Reid Brown Raysman & Steiner LLP during times relevant to the Actions.  (Affidavit of Karl Knechtel in Support of Trustee's Motion for Summary Judgment ("**Knechtel Aff.**") at ¶¶ 1, 2; Exs. A, B, E).

 From December 1, 2006, through October 27, 2008, the Debtor's affairs were governed by The Third Amended and Restated Limited Liability Partnership Agreement of Thelen Reid Brown Raysman & Steiner LLP (the "**Third Partnership Agreement**"). (Knechtel Aff. at ¶¶ 5, 6; Exs. A, E).  From October 28, 2008, through the date of its dissolution, the Debtor's affairs were governed by The Fourth Amended and Restated Limited Liability Partnership Agreement of Thelen LLP (the "**Fourth Partnership Agreement**, and together with the Third Partnership Agreement "**Partnership Agreements**").[1] (Knechtel Aff. at ¶ 6; Exs. C, D, E).  The Defendants signed one or more of the Partnership Agreements or through their conduct manifested an intention and agreement to be bound by one or more of the Partnership Agreements.[2]  (Knechtel Aff. at ¶ 7; Exs. A, C, D, E).

The Debtor operated under a three tier partnership:  (i) equity partners without guaranteed compensation ("**Equity Partners**"), (ii) equity partners with guaranteed compensation, and (iii) income partners (strictly salaried).  (Knechtel Aff. at ¶ 8; Exs. A, E).  All of the Defendants are Equity Partners.  (Knechtel Aff. at ¶ 8; Exs. A, E).  Each Equity Partner's proportionate

---

[1] It should be noted that one exception is that the Trustee contends that section 4.1.2.1 does not render null and void sections 2.2 and 2.3 ("**Exclusivity Waiver Provision**"), because the Exclusivity Waiver Provision is a fraudulent transfer. *See* Amended Complaints in these adversary proceedings. In related proceedings, the Trustee has also contended that the *Jewel v. Boxer* provision is not enforceable.

[2] Section 8.3 of the Partnership Agreements provides for the application of the laws of the State of California (other than its conflicts of laws principles) to the construction, interpretation and effect of the agreements.

3

entitlement to a net distribution was determined by a point system referred to as a Sharing Ratio. (Knechtel Aff. at ¶ 9; Exs. A, E, F, G).  The "Sharing Ratio" of each Partner was set forth on Schedule 1 of the Partnership Agreements, which Schedule reflected the amount of points each Partner was assigned at the time they entered into the Partnership Agreements.  (Knechtel Aff. at ¶ 10; Exs. A, E).  In turn, the net income to which each Equity Partner was entitled was his or her allocable share of net income, calculated through the point system as of the end of the calendar year. (Knechtel Aff. at ¶¶ 10, 11; Exs. A, E, G).

The Partnership Agreements also provided that "[e]ach Partner shall be entitled to receive a draw as an advance against such Partner's share of Net Income of the Partnership on a periodic basis under a policy determined from time to time by the Office of the Chair."  (Knechtel Aff. Exs. A, E).  In 2008, Equity Partners received semi-monthly draws (plus two special draws) which were to be applied against each Equity Partner's allocable share of net income for that year.[3]  (Knechtel Aff. at ¶¶ 12, 13; Exs. A, E, G, I, J, K). These draw payments ("**Draw Advances**") were made in the middle of, and at the end of each month; and the two special additional payments were made at the end of March and June of 2008. (Knechtel Aff. at ¶ 13; Exs. G, J, K).

Throughout 2008, the Debtor also occasionally made loans and gave advances to the Defendants for a variety of reasons, including, among other things, payment of health insurance and other personal expenses.  In addition, the Debtor made quarterly estimated state, federal and foreign tax payments on behalf of certain of its partners (collectively "**Loan Advances**").

---

[3] The draw was $1,000 per equity point per month, with a minimum draw of $21,000 per month for Equity Partners (16 points or higher).

4

(Knechtel Aff. at ¶ 16; Exs. O, P).  The Partners understood that they were required to repay

these amounts to Thelen.

On October 28, 2008, Thelen's partners voted to dissolve the Partnership, and they

entered into a Dissolution Agreement which contemplated that the firm would effectuate the

dissolution on a date between November 26, 2008 and December 15, 2008.  (Knechtel Aff. at ¶

3; Ex. C).  Thelen effectuated its dissolution on November 30, 2008.  (Knechtel Aff. at ¶¶ 4; Ex.

D).  On September 18, 2009, the Debtor filed a voluntary petition for relief under Chapter 7 of

the Bankruptcy Code and the Trustee was appointed in this case.

As set forth above, the Draw Advances and the Loan Advances were received by

Defendants at various points in time during 2008.[4]  Because the Draw Advances and Loan

Advances were intended to be advances that were netted against the net income of Thelen,

Defendants were ultimately only entitled to their allocable share of net income ("**Final ASNI**").[5]

If their Draw Advances exceeded this amount, that excess was due to Thelen.  The Defendants

were also required to pay Loan Advances either by direct payment or deduction from the

partner's allocable share of net income.  Under the Partnership Agreements, the Final ASNI for

each Defendant during the applicable period was determined as of December 31, 2008 (the

"**Netting Date**", and the process by which the netting occurred, the "**Netting Process**").

After an analysis of the transfers at issue, including the Draw Advances and the Loan

Advances, the Trustee concluded that excess Draw Advances were due to the Firm by the

Defendants.  The Trustee therefore was compelled to commence claims against the Defendants.

---

[4] As to the latter, these times differ for every Defendant.

[5] Aside from Mr. Cooke, Defendants were also entitled to contingency income, which is less than $1,000 for each of
them.

In these cases, the Draw Advances exceeded the Final ASNI for each Defendant, and the Trustee seeks to recover these excess payments (the "**Damage Amount**").[6]  In addition, if Loan Advances remained due, those obligations were also payable as of the Netting Date and these amounts were added to the Damage Amount.[7]

The facts above are not in dispute and are set forth in the Trustee's Statement of Undisputed Material Facts Pursuant to S.D.N.Y. Local Bankruptcy Rule 7056-1 filed herewith.

## ARGUMENT

The Trustee asserts that the Damage Amount is due to the estate, and he seeks partial summary judgment on certain fraudulent transfer issues relating to these claims, including a finding that, pursuant to section 548 of the Bankruptcy Code: (i) the Netting Process effectuated a "transfer" on the Netting Date, and (ii) the REV for Defendants' services to the Debtor is set forth in the in the Partnership Agreements as the Final ASNI.  As a result, any amount received in Draw Advances in excess of the Final ASNI or as Loan Advances that were not re-paid or netted at a time when the Debtor was financially distressed[8] are fraudulent transfers.

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under governing law." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007).  If "after drawing

---

[6] The Trustee has also sued to recover capital contribution obligations but those claims are not part of this motion for summary judgment.

[7] If the Final ASNI was in excess of Draw Advances (as opposed to the reverse situation for 2008), the Loan Advances would have been paid from such amounts reducing the amount payable to the Defendants.

[8] Financial distress of Thelen is not determined or addressed in this Motion.

all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor

of that party," the court should grant summary judgment. *Heublein, Inc. v. United States*, 996

F.2d 1455, 1461 (2d Cir.1993) (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 587–88 (1986)). "Mere conclusory allegations or unsupported speculations will not

defeat a motion for summary judgment." *Pereira v. WWRD US LLC (In re Waterford*

*Wedgwood USA, Inc.)*, 500 B.R. 371, 378 (Bankr. S.D.N.Y. 2013) (*citing Matsushita*, 475 U.S.

at 586–87).

**I.    The Draw Payments and the Loan Advances Were Made on December 31, 2008
When The Netting Process Was Complete.**

As a matter of law, the time of the transfer was the Netting Date.  Pursuant to section

548(a)(1)(B) of the Bankruptcy Code, the trustee may avoid any transfer of an interest of the

debtor in property or any obligation incurred by the debtor that was made or incurred on or

within two years of the filing of the petition, if the transfer was for less than reasonably

equivalent value in exchange for the transfer at a time when the debtor was in financial distress

or so as to put the debtor in financial distress.[9]  In accordance with section 548(a)(1)(B), the time

of the transfer is of critical importance in establishing a fraudulent transfer claim because the

court assesses the financial distress of the debtor on or about that time.  *See* 11 U.S.C. §

548(a)(1)(B)(ii); *Universal Church v. Geltzer*, 463 F.3d 218, 226 (2d Cir. 2006) ("insolvency is

---

[9] This financial distress is defined under the Bankruptcy Code as one of three conditions: (I) the debtor was insolvent when the transfer was made or obligation incurred or was rendered insolvent as a result of the transfer or obligation, (II) the debtor was engaged, or was about to engage in a business or transaction for which any property remaining with the debtor was an unreasonably small capital, or (III) the debtor intended to incur or believed that it would incur debts that would be beyond its ability to pay as they matured.[9]  11 U.S.C. § 548(a)(1)(B)(i) - (iii). Section 101(32)(A) of the Bankruptcy Code provides in relevant part that the term "insolvency" means- "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation."  11 U.S.C. § 101(32)(A) and (B); § 101(9)(A)(ii).

determined by…whether the debtor's assets were exceeded by her liabilities at the time of the transfer"); *Tese-Milner v. Edidin and Accocs. (In re Operations NY LLC.)*, 490 B.R. 84, 98 (Bankr. S.D.N.Y. 2013) ("Under…Bankruptcy Code § 548(a)(1)(B)(ii)(II), the plaintiff must plead facts supporting the allegation that at the time of the transfers, the Debtor was engaged in or about to engage in a business or a transaction that would leave it with unreasonably small capital.").  The Trustee seeks a finding that the transfer at issue occurred on the Netting Date so that he may establish the financial distress of Thelen on or about December 31, 2008.

A.  The Transfer Occurred on the Netting Date

Pursuant to section 101(54)(D) of the Bankruptcy Code, "transfer" means: "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of, or parting with: (i) property; or (ii) an interest in property.*"* 11 U.S.C. § 101(54)(D).  The legislative history surrounding the definition of "transfer" suggests that Congress intended it to be expansive, and to include "any ... transfer of possession, custody or control even if there is no transfer of title...." *S. Rep. No. 95–989, at 27 (1978)*, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5813; *H.R. Rep. No. 95–595, at 314 (1977)*, *reprinted in* 1978 U.S.C.C.A .N. 5963; and courts have routinely held that the language of the statute is very broad.  *See Ames Dep't Stores, Inc. v. Wertheim Schroder & Co., Inc. (In re Ames Dep't Stores, Inc.)*, 161 B.R. 87, 90 (Bankr. S.D.N.Y. 1993) ("The legislative history of Section 101(58)[54] of the Bankruptcy Code makes it clear that the definition of the term "transfer" was intended to be as "broad as possible.");  *Official Comm. of Unsecured Creditors v. Lozinski (In re High Strength Steel, Inc.)*, 269 B.R. 560, 567 (Bank. D. Del. 2001) ("Courts have concluded that the language of [§ 101(54)] is very broad").

8

Defendants' retention of amounts to which they were not entitled constituted a transfer. Indeed courts have held that "[w]ithholding a portion of funds owed to a debtor is an indirect and involuntary disposition of its property." *Angell v. Montague Farms (In re Tanglewood Farms, Inc. of Elizabeth City)*, No. 10-06719-8-JRL, 2013 WL 1619390, at *4 (Bankr. E.D.N.C. Apr. 15, 2013). In *Tanglewood Farms*, the defendant, a soybean grower, conducted business with the debtor and principals of the debtor. After purchasing soybean from the debtor, the defendant made a payment to the debtor for soybean seed; however, rather than paying the full amount owed, the defendant offset amounts owed by the principal of the debtor to the defendant. The court found that the offset of amounts due by the principal was a "transfer" for the fraudulent transfer purposes. The court explained: "[a] 'transfer' occurs, for purposes of § 101(54)(D) and § 548, when funds owed to the debtor or a portion thereof are involuntarily retained by a third-party." *Id.*

In *High Strength*, 269 B.R. 560, the debtor loaned money to the debtor's majority shareholder. The trustee alleged that the shareholder's CEO had "cooked the books" of the debtor pre-petition by retroactively increasing rents owed by the debtor to the majority shareholder, thereby eliminating a portion of the insider's debt to the debtor, and further engaged in an improper post-petition reconciliation of debtor's books to attribute certain losses to the debtor, rather than the insider. *Id.* at 566. The shareholder and other insider defendants moved to dismiss the allegations in the complaint that these reconciliations were fraudulent transfers, claiming that no "transfer" had occurred. *Id.* at 567. Specifically, the defendants argued that the "alleged transfers were nothing more than reconciliations of accounting statements…to reflect accurately the Debtor's finances," and that "the reconciliations merely reflected the true state of affairs between the Debtor and the Defendants." *Id.* The Delaware Bankruptcy Court rejected

9

this argument, finding that a reconciliation of the debtor's books and records that wiped out a

debt owed to the debtor from the defendant was a "transfer" within the meaning of section

101(54)(D) of the Bankruptcy Code.  The court explained:

> Defining "transfer" broadly, we conclude that a reconciliation may
> constitute a transfer of a debtor's interest in property.  A
> reconciliation is defined as "an adjustment of accounts so that they
> agree, particularly where there are outstanding items." Black's
> Law Dictionary 1278 (1999).  Adjusting the accounts could
> directly or indirectly dispose of a property interest particularly
> where the adjustment effects a setoff or recoupment.

*Id*. at 568.

Here too, the Netting Process effectuated a transfer of Thelen's property; Thelen could

not demand a return of funds distributed as Draw Advances and Loan Advances until the Netting

Process had been completed.[10]  The Netting Process occurred as of December 31, 2008—the

Netting Date, and thereafter, Defendants retained payments that should have been turned over to

the Debtor.  As a result, the Netting Process, which quantified the amount of the debt owed by

the Defendant to Thelen, constituted the transfer at issue, and this transfer took place on the

Netting Date.  Prior to the Netting Date, it was impossible to determine whether or in what

amount the Defendant had been overpaid or underpaid through the Draw and Loan Advances.

Any conclusion to the contrary--that each Draw or Loan Advance was a transfer—is not

---

[10] *See also Dean Witter Reynolds, Inc. (In re MacQuown)*, 717 F.2d 859 (3d Cir. 1983) (in section 548(d) context, court found record date when the transaction was completed, as opposed to date that the deed was executed, was the date of transfer of real property for fraudulent transfer purpose); *Holber v. M&T Bank (In re Scheffler)*, 471 B.R. 464 (Bankr. E.D Pa. 2012) (court found transfer date was "April 25, 2007, when all attributes of ownership of the Home—legal, equitable, and possessory—were unified and the family trust finally conveyed title to him"); *Schaps v. Just Enough Corp. (In re Pinto Trucking Serv., Inc.)*, 93 B.R. 379, 387 (Bankr. E.D. Pa. 1988) (where transaction involved transfer of releases as well as real property in the settlement of a lawsuit, court states that "it seems logical to conclude that the entire transfer was not "made" until all aspects of it could be perfected." )

supported by the law or facts.  This Court should thus find that, as a matter of law, the transfer in

question occurred on the Netting Date.

> B.  Even if the Draw Payments, the Loan Advances
> and the Netting Process are Distinct Steps,
> They Are Part of One Integrated Transaction

Even assuming *arguendo* that this Court deems the Draw Advances and Loan Advances

to be formally distinct transfers, these transfers should be deemed various steps in one

interrelated transaction that culminated in the Netting Process.

The principle of considering the overall transaction, often referred to as the "integrated

transaction doctrine" or the "step transaction doctrine," has been used in the fraudulent transfer

context for a variety of purposes, such as in deciding whether REV has been paid and to

determine the parties who in fact paid or received the value.  As explained in *Big V*

*Supermarkets, Inc. v. Wakefern Food Corp. (In re Big V Holding Corp.)*, 267 B.R. 71, 92–93

(Bankr. D. Del. 2001),

> The step transaction doctrine is a judicially-created doctrine that
> has traditionally been applied in the tax context.  Nevertheless,
> courts often apply the step transaction concept in other fields as
> well, including disputes involving issues of ... fraudulent
> conveyances.  "Under this doctrine, interrelated yet formally
> distinct steps in an integrated transaction may not be considered
> independently of the overall transaction."  Therefore, by "linking
> together all interdependent steps with legal or business
> significance, rather than taking them in isolation," the result may
> be based 'on a realistic view of the entire transaction.'

Likewise, in *Waterford Wedgwood USA*, the court employed a similar test called the "end

result" test, in which the step transaction doctrine is applied to combine separate events that in

fact are component parts of an individual transaction.  500 B.R. at 379–80; s*ee also True v.*

*United States*, 190 F.3d 1165, 1175 (10th Cir. 1999); *Kornfeld v. C.I.R.*, 137 F.3d 1231, 1235

(10th Cir. 1998) (tax cases employ the "end result" test which "combines into a single

transaction separate events which appear to be component parts of something undertaken to reach a particular result").[11]  In these cases, the court focused on the end result of a transaction in analyzing its impact on the estate.

In the cases here, it is clear that the Draw Advances, the Loan Advances and the Netting Process were all part of one overall transaction governed by the Partnership Agreements.  When the Defendants entered into the Partnership Agreements, they agreed to receive the Final ASNI as compensation for their services to Thelen, and the Final ASNI was the amount to which the Defendants were entitled.  The Defendants were aware of the fact that retention of the Draw and Loan Advances was temporary and that the Defendants' ultimate entitlement to those amounts was dependent on the Netting Process.  As a result, Defendants cannot now argue that each Draw or Loan Advance is a separate transfer for fraudulent transfer purposes.  The application of the step transaction or end result test is particularly appropriate here because the Trustee does not seek to claw back the entirety of the funds received by Defendants; the Trustee only seeks those amounts that exceeded the amounts to which they were entitled based on the Netting Process, and as calculated on the Netting Date.  Thus, the various transfer, offsets and reconciliations must be deemed to be one integrated transaction.

---

[11] *See also HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995) ("it is well established that multilateral transactions may under appropriate circumstances be 'collapsed' and treated as phases of a single transaction for analysis under the UFCA"); *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302 (3d Cir. 1986) (where "two exchanges were part of one integrated transaction," court properly collapsed them for purposes of analyzing whether fraudulent transfer occurred under Pennsylvania UFCA); *Yoder v. T.E.L. Leasing (In re Suburban Motor Freight, Inc.)*, 124 B.R. 984, 998 (Bankr. S.D. Ohio 1990) ("Courts have looked beyond the artifice created by the parties to the essence of the transaction.  By 'integrating' the separate components of the larger transaction—or what is often referred to as 'collapsing' the transaction—courts are able to assess the net effect of the series of transactions under review").

12

C.  Even if the Court Finds that the Draw and Loan Advances
Were Transfers under Section 548 of the Bankruptcy Code,
the Dates of the Transfers at Issue Are in the Later Part of 2008

Assuming *arguendo* that this Court finds that the Draw and Loan Advances are separate "transfers" made throughout 2008, this Court should find that the first transfer occurred when the Draw and Loan Advances began to exceed the Final ASNI; in other words, those payments made in the later part of 2008.  For example, if the first payment received by Defendant that exceeded that partner's Final ASNI was made in August of 2008, that would be the date of the fraudulent transfer.  While this muddies the otherwise clear and sensible analysis set forth above, it is the only conclusion that can be drawn if the Netting Date is not found to be the proper date of the transfer.

**II.  To the Extent the Defendants Retained Amounts in Excess of What Was Due to Them Pursuant to the Partnership Agreements, They Received More Than REV**

As a matter of law, the Partnership Agreements set forth the method of calculating the REV of Defendants' services.  Consequently, the REV of Defendants' services equates to the Final ASNI, as provided for in the Partnership Agreements.

Although in some circumstances, REV is a matter of fact, "[c]ertain transactions … can give the debtor reasonably equivalent value as a matter of law."  *Ingalls v. Erlewine (In re Erlewine)*, 349 F.3d 205, 209 (5th Cir. 2003).  For example, summary judgment may be granted on REV based on the arms-length nature of the negotiations.  *See, e.g., Waterford Wedgwood USA*, 500 B.R. at 382-83 (where sale price was determined as a result of an arm's length bidding process, summary judgment appropriate on issue of REV).  Further, in evaluating REV, "[t]he methodology used in assessing value is an issue of law."  *Slone v. Dirks (In re Dirks)*, 407 B.R. 442 (B.A.P. 6th Cir. 2009).

13

The question of whether REV was received by the Debtor requires a "two-fold inquiry: whether the debtor received any value at all in exchange for the transfer; *i.e.*, any realizable commercial value as a result of the transaction, and whether that value was in fact reasonably equivalent to the cash transferred by the debtor." *Devon Mobile Commc'ns Liquidating Trust v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.*), No. 02–41729 (CGM), 2006 WL 687153, at *11 (Bankr. S.D.N.Y. Mar. 6, 2006) (*citing In re R.M.L., Inc.*, 92 F.3d 139 (3d Cir. 1996)).  Courts also recognize that "the requirement that the debtor must have 'received' the value in question expresses a temporal condition demanding an element of contemporaneity in the determination of whether something close to the reasonable equivalence has been exchanged." *Greenspan v. Orrick, Herrington & Sutcliffe LLP (In re Brobeck*, *Phleger, & Harrison LLP),* 408 B.R. 318, 342 (Bankr. N.D. Cal. 2009) (*citing Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.*), 262 B.R. 406, 466-67 (S.D.N.Y. 2001)).  "Because fraudulent conveyance laws are intended to protect a debtor's creditors, the analysis of reasonable value must be determined from the creditors' standpoint."[12]   *Waterford Wedgwood USA*, 500 B.R. at 381 (*citing Peltz v. Hatten*, 279 B.R. 710, 736 (D. Del. 2002), *in turn quoting Mellon Bank, N.A. v. Metro Commc'ns., Inc.*, 945 F.2d 635, 646 (3d Cir. 1991)).

> A.  The Partnership Agreements Were Entered Into in Good Faith
> and at Arms-Length So the Market Value of Defendants'
> <u>Services Was Established in Those Agreements</u>

A court determining whether REV was exchanged looks to "(i) the fair market value of the economic benefit received by the debtor; (ii) the arms-length nature of the transaction; and

---

[12] In this regard, the Trustee could have determined that the distribution made to the Partners were entirely recoverable because the Firm was insolvent at the time of the Transfer.  The Trustee chose not to seek to recover these larger amounts (a position that has been pursued in other law firm insolvency cases), because the Trustee recognized the value of the Partners' services in the form of the calculation of their ASNI.

(iii) the good faith of the transferee." *Pereira v. Wells Fargo Bank, NA (In re Gonzalez)*, 342

B.R. 165, 173 (Bankr. S.D.N.Y. 2006) (*citing In re R.M.L., Inc.*, 92 F.3d 139, 149 (3d

Cir.1996)).  An inquiry into whether REV was received "is fundamentally one of common sense,

measured against market reality." *Leonard v. Mylex Corp. (In re Northgate Computer Sys.,*

*Inc.)*, 240 B.R. 328, 365 (Bankr. D. Minn. 1999) (*citing In re Ozark Restaurant Equip. Co., Inc.*,

850 F.2d 342, 344–345 (8th Cir. 1988)).

     Where a transaction involves an arm's length agreement made in good faith between a

willing buyer and a willing seller, the value exchanged under the contract is the most precise

method of determining REV. *See Waterford Wedgwood USA*, 500 B.R. at 381 (*citing Peltz*, 279

B.R. at 737-38) (in determining REV, "[c]ourts give 'significant deference to marketplace

values' and to values reached in the context of 'an arm's length transaction between a willing

buyer and a willing seller'"); *Dirks*, 407 B.R. 442 (REV provided where "the value given by

Defendant was based on an arm's length negotiation, between parties who were represented by

"very able and well respected, competent legal counsel"); *Bayonne Med. Ctr. V. Boyonne/Omni*

*Dev., LLC (In re Bayonne Med. Ctr.)*, No. 07-15195 MS, 2011 WL 5900960, at *33 (Bankr.

D.N.J. Nov. 1, 2011) (in determining REV, "[t]he best evidence of market value is usually

reflected in the actuality of a bargained for contract price"); *Levey v. Abbott (In re Limonciello)*,

No. 05 B 39333, 2009 WL 1408077, at *8 (Bankr. N.D. Ill. May 19, 2009) (citing Black's Law

Dictionary and defining fair market value as "the price that a seller is willing to accept and a

buyer is willing to pay on the open market and in an arm's-length transaction; the point at which

supply and demand intersect").

     Thus, an exchange made pursuant to a properly negotiated employment contract

constitutes a fair market value transaction, *i.e.*, REV exchange, notwithstanding subsequent

developments that may, in hindsight, change the economics of the arrangement. *See, e.g., Meeks v. Perroni (In re Armstrong)*, 234 B.R. 899, 905-06 (Bankr. E.D. Ark. 1999) (holding that fees paid to debtor's attorney pursuant to retainer agreement entered into when attorney was hired constituted REV for services performed, notwithstanding that actual hours expended did not add up to the amount paid and that the attorney's work came to naught); *Boyd v. Sachs (In re Auto Specialties Mfg. Co.)*, 153 B.R. 457, 499 (Bankr. W.D. Mich. 1993), *opinion adopted*, 153 B.R. 503 (W.D. Mich. 1993) (summary judgment granted on issue of REV where Debtor's former president was paid compensation established pursuant to contract found to have been negotiated on reasonable terms).

### B. Payments Made by Thelen in Excess of the Final ASNI Were Not Made for REV

In contrast to payments made for services in accordance with a pre-petition written agreement, REV is not received by a debtor if (i) the debtor makes payments in excess of its payment obligations under a contract, and (ii) those payments are made in exchange for services encompassed in that agreement or, even if not contemplated by the agreement, for which separate consideration was not negotiated. Courts have thus routinely held that a transaction lacks REV to the extent of such excess payments. *See, e.g., Stanley v. U.S. Bank Nat'l Assoc. (In re TransTexas Gas Corp.)*, 597 F.3d 298 (5th Cir. 2010) (holding that the debtor received less than REV in exchange for a severance payment made to its former chief executive officer pursuant to a separation agreement because it was more than was due under the contract); *TSIC, Inc. v. Thalheimer (In re TSIC, Inc.)*, 428 B.R. 103, 114 (Bankr. D. Del. 2010) (salary negotiated in CEO's employment agreement was consideration for his services, and thus additional severance package later provided for those same services was not for REV); *Steinberg v. Johnson (In re Edward M. Johnson & Associates, Inc.)*, 61 B.R. 801, 806-808 (Bankr. E.D.

16

Tenn. 1986) (forgiveness of loan and transfers of cash to debtor's president and sole shareholder were for less than REV to the extent they exceeded shareholder's entitlement to cash and bonus pursuant to his employment contract) (*rev'd in part* on ground that district court exceeded its appellate authority in reversing bankruptcy court's factual determination as to amount due under the contract, 845 F.2d 1395 (6th Cir. 1988)).  This applies regardless of whether the amount due under the contract is pre-determined, or whether it is calculated by formula.  *See, e.g., Lingham Rawlings, LLC v. Gaudiano (In re Lingham Rawlings, LLC*), No. 10-32769, 2013 WL 1352320, at *27 (Bankr. E.D. Tenn. Apr. 3, 2013) (debtor received less than REV to extent distributions to manager exceeded commissions to which manager was entitled pursuant to management agreement, calculated as 2% of shopping center's gross receipts, along with reimbursable expenses).

If extra payments are made in exchange for a party's performance of a pre-existing contractual duty, that party has provided no consideration, and thus no "value," altogether in exchange for the extra payments.  *See TSIC*, 428 B.R. at 114 (no consideration provided, and thus debtor did not receive value for bonus, where CEO had pre-existing duty to serve as CEO in consideration of his $850,000 base salary); *Kendall v. Sorani (In re Richmond Produce)*, 151 B.R. 1012, 1018 (Bankr. N.D. Cal 1993) (rejecting manager's argument that his "managerial skills to the Debtor" constituted value in return for a $1.5 million transfer, where he was paid $20,000 per month for those services); *Hassett v. Far W. Fed. Sav. And Loan Ass'n (In re O.P.M. Leasing Servs., Inc.)*, 40 B.R. 380, 396 (Bankr. S.D.N.Y. 1984), *aff'd,* 44 B.R. 1023 (S.D.N.Y. 1984) (debtor "received no new consideration or value by virtue of… an agreement under which OPM had a preexisting obligation to perform").

17

Even if a transferee has provided services to the debtor in excess of what was required under the contract, unless compensation for those extra services was negotiated and agreed-to by the parties, the contract terms define REV. For example, in *Watts v. MTC Development, LLC (In re Palisades at W. Paces Imaging Ctr., LLC)*, 501 B.R. 896 (Bankr. N.D. Ga. 2013), a creditor was paid amounts in excess of the terms of the contract and the trustee successfully recovered such excess. There, the debtor entered into a construction management services contract with Sunbelt, which was owned and controlled by two insiders of the debtor. *See id.* at 903-904. The contract between the debtor and Sunbelt provided that the debtor would pay a total of $175,000 to Sunbelt in exchange for Sunbelt's construction management services. *Id.* at 904. Although the contract contained a space for the parties to insert the cost of "extras," that space was left blank, and no evidence was provided that there was ever an agreement for Sunbelt to provide any extras. *Id.* The trustee sought to avoid the more than $1.5 million transferred to Sunbelt under §§ 548 and 544 of the Bankruptcy Code, through various provisions of the Georgia Uniform Fraudulent Transfer Act.[13] Despite Sunbelt's contention that the excess payments were justified because the project had lasted longer than expected and "extras" had been provided, the court concluded that Sunbelt had provided REV *only* to the extent of the contract price of $175,000.

The terms of the Partnership Agreements supplied the method for determining the REV of the Defendants' services, and these Agreements were the result of arm's length, good faith negotiations between Thelen and its partners, all of whom are sophisticated and experienced attorneys. The Partnership Agreements set forth the Final ASNI as the compensation to which

---

[13] The Court was applying the Georgia UFTA, instead of § 548 of the Bankruptcy Code because the two-year look-back period under § 548 had expired. However, as relevant here, the Georgia UFTA is substantially identical to § 548, providing for the avoidance of a transfer made for less than REV while the debtor was insolvent or became insolvent as a result of the transfer. *See id.* at 908.

the Defendants were entitled for their services.  Therefore, any benefits that accrued to the

Debtor as a result of the Defendants' activities represented services performed by Defendants in

fulfillment of the Defendants' pre-existing duties under the Partnership Agreements.  To the

extent Defendants argue that their services were especially valuable or comprehensive, such an

argument does not alter the REV they provided to Thelen because no contractual arrangement

was made for extra compensation on account of such alleged services.

Thelen received no value for the transfers sought to be recovered as they constitute

excess amounts received by the Defendant over and above the compensation set forth in the

Partnership Agreements.  This Court should thus find that the Final ASNI as set forth in the

Partnership Agreement is, as a matter of law, REV for Defendants services.

## CONCLUSION

For all the forgoing reasons, this Court should (i) find that, as a matter of law, pursuant to

section 548(a) of the Bankruptcy Code: (a) the transfers at issue were made on the Netting Date;

and (b) the Partnership Agreements set forth the REV for the Defendants' services, and that REV

is equal to the Final ASNI; and (ii) grant such other and further relief as is just and proper.

Dated: New York, New York
       March 13, 2014

By: /s/Angela J. Somers
    Angela J. Somers
    Jeffrey E. Gross
    Yonah Jaffe

**REID COLLINS & TSAI LLP**
One Penn Plaza, 49th Floor
New York, New York 10119
212.344.5200 (telephone)
212.344.5299 (facsimile)

19