**FREDERICK L. WHITMER, ESQ.**
c/o Kilpatrick Townsend & Stockton LLP
1114 Avenue of the Americas
New York, N.Y.  10036-7703
212.775.8773 (telephone)
212.775.8821 (facsimile)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

In re:

       THELEN LLP,

                Debtor.

----------------------------------------------------------x

Yann Geron, Chapter 7 Trustee of the Estate
of Thelen LLP,

                Plaintiff,

       -v-

GARY L. FONTANA, et al.,

                Defendants.

----------------------------------------------------------x

Chapter 7

Case No. 09-15631 (ALG)

Adv. Pro. No. 11-02648 (ALG)

**MEMORANDUM IN OPPOSITION TO THE TRUSTEE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT ON BEHALF OF THE
<u>WHITMER-FONTANA DEFENDANTS</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT ........................................1

STATEMENT OF FACTS ...........................................................................................................4

    The Debtor's Organizational History as a California
    Registered LLP and Defendants' Status as Partners.............................................................4

    Provisions for Both Periodic Distributions of Net Income
    and Periodic Draws as Advances Against Net Income.........................................................6

    No Prohibition of Draws or Other Advances in Excess of
    Net Income And No Requirement for the Repayment of
    Such Advances......................................................................................................................8

    The Debtor's Allocation of Income for 2008 and Netting of
    Excess Draws Against Capital Accounts.............................................................................9

    Thelen as a Business and A Financial Overview...............................................................12

ARGUMENT ............................................................................................................................16

    I.     THE DEBTOR DID NOT MAKE "TRANSFERS" TO THE
           DEFENDANTS IN ITS NETTING OF THEIR DRAWS AND
           ADVANCES AGAINST NET INCOME; EACH DRAW OR
           OTHER PAYMENT WAS ITSELF A TRANSFER OF
           PROPERTY OR VALUE AND, HENCE, A TRANSFER AT
           THE TIME MADE. ........................................................................................16

           A.     The Trustee's Description Of The Netting Process Is
                 Incomplete And Inaccurate. ..................................................................16

           B.     The Debtor's Netting Process Did Not Quantify Any
                 Indebtedness Owed By The Defendants. .................................................18

           C.     The Debtor's Netting Process Did Not Relinquish
                 Any Indebtedness Owed By The Defendants. ..........................................21

            D.     The Integrated Transaction Doctrine as Advanced by the
                 Trustee Has No Rational Application To the Debtor's
                 Compensation Process. ..........................................................................22

           E.     The Time Of The Transfers Is Determined By When They
                 Were Made—Not When Defendants' Draws and Personal
                 Charges First Began To Exceed Later-Determined Net
                 Income..................................................................................................24

II.    DETERMINATION OF REASONABLE EQUIVALENT VALUE
REQUIRES CONSIDERATION OF THE TOTALITY OF THE
FACTUAL CIRCUMSTANCES OF THE CHALLENGED
TRANSFERS AND IS NOT, AS THE TRUSTEE URGES,
DEFINED BY THE PARTNERSHIP AGREEMENT'S PROFIT
SHARING PROVISIONS ...................................................................................25

A.    To Establish that the Draws Constituted a "Fraudulent
Conveyance" the Trustee Must Prove that the Defendants
Were Paid More Than Their Services Were Worth in the
Market. ..................................................................................................26

B.    The Trustee Bears the Burden of Proof on All Elements of
His Claim ..............................................................................................28

C.    "Reasonably Equivalent Value" Is Established by the
Totality of the Circumstances, Not by Some Arbitrary
Formula ................................................................................................28

D.    The Best Measure of the "Value" of the Services the
Partners Performed During 2008 Is the Amounts that
Thelen Charged Clients for that Work....................................................30

E.    Case Law Understandably Rejects the Trustee's Theory in
This Connection ....................................................................................33

CONCLUSION...............................................................................................................35

# TABLE OF AUTHORITIES

**Cases**

*Angell v. Montague Farms (In re Tanglewood Farms Inc. of Elizabeth City)*, No. 10-06719-8-JRL, 2013 WL 1619390 (Bankr. E.D.N.C. Apr. 15, 2013) ........................... 21, 22

*Annod Corp. v Hamilton & Samuels,* 123 Cal.Rptr.2d 924, 100 Cal.App.4[th] 1286, (2003) ............................................................................................................................ 3, 33, 34

*Barnhill v. Johnson,* 503 U.S. 393 (1992) ........................................................................ 16, 23

*BFP v. Resolution Trust Corp.,* 511 U.S. 531 (1994) ............................................................. 29

*Braunstein v. Branch Group, Inc. (In re Massachusetts Gas & Elec. Light Supply Co., Inc.),* 200 B.R. 471 (Bankr. D. Mass. 1996) ................................................................ 24

*Claybrook v. Metro Auto Xpress LLC (In re American Remanufacturers, Inc.),* 2008 WL 2909871 (Bankr. D. Del. July 25, 2008) .................................................................... 24

*Crumpton v. Stephens (In re Northlake Foods, Inc.),* 715 F.3d 1251 (11th Cir. 2013) .................................................................................................................................... 29

*Fidelity Bond & Mort. Co. v. Brand,* 371 F.Supp.708 (E.D. Pa. 2007) ................................. 28

*HBE Leasing Corp. v. Frank,* 48 F.3d 623 (2d Cir. 1995) .................................................... 23

*Image Masters, Inc. v. Chase Home Finance,* 489 B.R. 375 (E.D. Pa. 2013) ...................... 29

*In re Armstrong,* 234 B.R. 899 (Bankr. E.D. Ark. 1999) ..................................................... 33

*In re Damas,* 504 B.R. 290 (Bankr. D. Mass. 2014) ............................................................ 24

*In Re Fairchild Aircraft Corp.,* 6 F.3d 1119 (5th Cir. 1993) ............................................... 29

*In re Gonzalez,* 342 B.R. 165 (S.D.N.Y. 2006) .................................................................... 29

*In re Holyoke Nursing Home Inc.*, 273 B.R. 305 (Bankr. D. Mass. 2002) ............................ 24

*In re R.M.L., Inc.,* 92 F.3d 139 (3rd Cir. 1996)................................................................... 29

*In re Rodriguez,* 895 F.2d 725 (11th Cir. 1990) ................................................................ 30

*McQueen, Rains & Tresch, LLP v. Citgo Petroleum Corp,* 195 P.3d 35 (Okla. 2008) ................................................................................................................................ 33

*Mellon Bank N.A. v. Metro Commc's. Inc.,* 945 F.2d 635 (3rd Cir. 1991) ...................... 28

*Mills v. Everest Reinsurance Co.,* 410 F. Supp. 2d 243 (S.D.N.Y. 2006) .......................... 24

*Official Comm. Of Unsecured Creditors v. Lozinski (In re High Strength Steel, Inc.)*, 269 B.R. 560 (Bankr. D. Del. 2001)..................................................................21, 22

*Orr v. Kinderhill Corp.*, 991 F.2d 31 (2d Cir. 1993).....................................................22

*Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206 (3d. Cir. 1990)..........................................................................................................................22

*Weaver v. Kellogg*, 216 B.R. 563 (S.D. Tex. 1997).......................................................29

**Statutes**

11 U.S.C. § 101(54) ......................................................................................................24

11 U.S.C. § 548............................................................................................................16

11 U.S.C. § 548(a)(1)(B) ..............................................................................................25

11 U.S.C. § 723(a) ........................................................................................................20

Cal. Corp. Code § 16103(a) ...........................................................................................6

Calif. Corp. Code § 16807, subd.(b)...........................................................................9, 19

California Uniform Partnership Act of 1994 (Cal. Corp. Code §§ 16100-16962) .................6, 18

**Legislative History**

140 Cong. Rec. 10752-01, Oct. 4, 1994.........................................................................20

**Other Authorities**

9 Witkin, Summary of California Law 10th (2005) Partnerships, § 49....................................9, 19

Collier on Bankruptcy ¶ 553.09[1][a]...........................................................................24

## PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT

The Whitmer-Fontana group of defendants[1] submit this memorandum to demonstrate that the Trustee's positions asking for this Court to grant summary judgment rest on several false premises, both factual and legal, requiring, at a minimum, that the Trustee's motion should be denied. The Trustee, after all, bears the burden of proving all the elements of his claims alleging fraudulent transfer; that much is clear. That correct statement of law poses the Trustee's fundamental problem: he cannot meet that standard on the facts. So, read for what its true purpose is, this motion is a studied effort to elide that burden by having this Court declare, as a matter of law, 1) that there were fraudulent transfers; 2) that the date of the fraudulent transfer supposedly occurred long *after* the semi-monthly draws were paid to the Defendants, 3) that Thelen was insolvent at the time of the alleged fraudulent transfer on a date long after Thelen ceased business, and that, 4) contrary to the "totality of circumstances" test generally applied by Bankruptcy Courts in such matters, the reasonable equivalent value of the services rendered by the Defendants equals precisely the aliquot share of profits to which the Trustee now says the Defendants "should" have been paid. Application of prevailing law on this record, as this Memorandum demonstrates, exposes the barrenness of the Trustee's position and requires denial of the Trustee's motion.

---

[1] The Whitmer-Fontana Group currently consists of Frederick L. Whitmer, Gary F. Fontana, Eli R. Mattioli, Greg Faulkner, Brian Donnell, Robert Nelson, Bruce Meyerson, Dean Morehous, Dennis Cavanaugh. This memorandum refers to the Group, collectively, as "Defendants." Edmund Cooke no longer participates with this group as he has separately filed for personal bankruptcy, thereby staying any action against him, including the adversary proceeding in connection with the Thelen bankruptcy. As to Greg Faulkner and Bruce Meyerson, the Court should note that both Messrs. Faulkner and Meyerson became full equity partners in April 2008, having had only guaranteed payments up until that time, which should not be subject to the Trustee's arguments respecting fraudulent transfers, irrespective of the Court's decision here. There are other individual issues relating to the circumstances of their having agreed to become equity partners at that time, which they reserve for assertion, if as and when those issues are directly implicated in this litigation.

1

First, the Trustee either misreads or misinterprets the provisions of the relevant Thelen Partnership Agreements to support his motion.  An informed reading of both the relevant partnership agreements, contrary to the Trustee's positions, conclusively demonstrates that the Trustee's position lacks merit.  For example, the Defendants here are *not* "Former Partners" as that term is defined in those agreements.  Recognizing and enforcing this distinction, as must be done to enforce the Partnership Agreement as written and as intended, undermines the Trustee's position.  The characterization, "Former Partner" is not a mere technicality; the definition and characterization of continuing partners, as the Defendants here, to obtain benefits as so-called Dissolution Partners, was a significant element of the Fourth Amended Partnership Agreement to benefit the Thelen enterprise.  Thelen management touted the distinction as part and parcel of the overall incentives offered the partnership to encourage as many of the then-remaining Partners to soldier on in the Thelen enterprise to the very end.  The Defendants did, and having taken on the burden of remaining at Thelen, uncompensated to the end of their tenure at Thelen, are entitled to the benefits of having done so, one of which was *not* being characterized as "Former Partners."

The Trustee's reliance on Partnership Agreement provisions that relate to "Former Partners" is accordingly misplaced and distorts both the meaning of the words used in the Partnership Agreement and seeks to penalize Defendants for having remained at Thelen to the end.

Second, the Trustee advances a theory to support his claim to recover alleged "fraudulent conveyances" that posits that the monthly draws paid to the Defendants were not transfers *at the time that the draws were paid*, but rather were collapsed into a year-end accounting that determined each partner's allocable share of profits through what the Trustee calls a "netting."  That year-end division and allocation of net profits, says the Trustee, is the "transfer" deemed

2

fraudulent and occurs at *that* time. Putting aside the fact that this remarkable and unprecedented fraudulent transfer theory is wholly without credible, analogous judicial authority, it is also directly contrary to the language of both the Bankruptcy Code and the relevant partnership agreements and is wholly inconsistent with the usual operation of the Thelen firm, or indeed law firm partnerships generally. Whatever the motivation for advancing this theory, the plain fact is that the theory is baseless both in law and fact, and is utterly divorced from practical reality.

The unreality of the Trustee's theories does not end there. Through another argument motivated by litigation strategy rather than either law or fact, the Trustee endeavors to deprive the Defendants of the Bankruptcy Code's exemption from a characterization of "fraudulent" for transfers made by insolvent entities, if such transfers were made in exchange for the receipt of something of "reasonably equivalent value." That argument urges that this Court adopt, as a matter of law on this summary judgment motion, that the value of a partner's services, given to clients of their law firm in exchange for the semi-monthly draws, equates precisely to what that partner's allocable share of profits would be for any given year. From that fallacious and facile assumption, the Trustee concludes that each of the Defendants should return a substantial sum to the Debtor.

Understandably, the Trustee has no authority, direct or remotely analogous, to support that position. Reality and judicial authority, to the contrary, make clear that a proper determination of "reasonably equivalent value" requires a fact-intensive inquiry that is *not* subject to mathematical formulas or precise definition. Indeed, though the Debtor has purported to support this overreaching theory with an extensive list of cases, none addresses the law firm draw context; and significantly missing from the Trustee's exhausting catalog of cases is the one case that does address that context: *Annod Corp. v Hamilton & Samuels,* 123 Cal.Rptr.2d 924,

100 Cal.App.4[th] 1286, (2003), which undermines the Trustee's proposed reasonable equivalent value theory of the Trustee. Defendants' within argument, explaining that case, *infra,* at 33-35, further elaborates the utter baselessness of this aspect of the Trustee's position.

The sum and substance of the Trustee's motion then, which at least has had the benefit of having forced the Trustee to attempt to support the claims that he has made for several years, as this Memorandum demonstrates, is that the theories that the Trustee advances to justify imposition of liability on the Defendants are simply not supported by either the facts or prevailing law. The Trustee's arguments and supporting documents, urging summary judgment on these issues has in fact exposed the Trustee's claims against these Defendants for what they are: claims for relief in search of a new theory of factual and legal support, for prevailing law simply does not support the claims. The Trustee's search is meritless; and his motion should be denied in all respects.

## **STATEMENT OF FACTS**[2]

The Debtor's Organizational History as a California
Registered LLP and Defendants' Status as Partners

The Debtor was created through the 1998 merger of two law firms, Thelen Marrin Johnson & Bridges LLP and Reid & Priest LLP. From June 1998 until December 2006, the Debtor operated as a national law firm known as Thelen Reid & Priest LLP.

Effective December 1, 2006, members of Brown Raysman Millstein Felder & Steiner LLP became members of the Debtor, and the Debtor changed its name to Thelen Reid Brown Raysman & Steiner LLP. From that date until October 28, 2008, the Debtor's affairs were

---

[2] The facts set forth here are supported either by the Declarations of Eli R. Mattioli and Gary L. Fontana, filed simultaneously herewith, or are otherwise not subject to dispute.

governed by the Third Amended and Restated Partnership Agreement of Thelen Reid Brown Raysman & Steiner LLP (the "Third Partnership Agreement"). Tr. Exh. A.

In or about August 2008, the withdrawal of several of Debtor's Partners triggered a non-monetary breach of a so-called "partner head-count" covenant contained the Debtor's loan agreement with Citibank N.A. In September 2008, because the remaining Partners considered a continuation of the Debtor's operations to be feasible, its name was changed to Thelen LLP. By late October 2008, however, and in light of the world-wide economic crisis, prospects for continuation dimmed to the point that the Partners voted in favor of the Debtor's dissolution.

The Debtor's members concurrently entered into the Fourth Amended and Restated Partnership Agreement of Thelen LLP (the "Fourth Partnership Agreement"), Tr. Exh. E, which governed the Debtor's affairs from October 28, 2008 through its dissolution in November 2008 and its filing of a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code in September 2009.[3] Each of the Defendants either was a Partner in the Debtor as of December 1, 2006 or became such a Partner thereafter and prior to October 28, 2008. Under Section 1.9.11, "Partner" means "as of any date, each individual who on such date is a Partner with the right to share in the Net Income of the Partnership pursuant to Section 2.1." Tr. Exh. E, § 1.9.11. Under Section 2.1, "[t]he Partners in the Partnership shall be those individuals who have been admitted as Partners to the Partnership pursuant to the terms of this Agreement and who have not ceased to be Partners pursuant to Article 6." *Id.,* § 2.1.

None of the of the Defendants ever withdrew or otherwise ceased to be a Partner pursuant to Article 6 of the Partnership Agreement. Therefore, all of the Defendants remained as Partners

---

[3] Unless otherwise indicated, terms used in this memorandum are as defined in the Third Partnership Agreement and the Fourth Partnership Agreement (each a "Partnership Agreement" ), and all references in text are to the Fourth Partnership Agreement.

5

through the date of the Debtor's dissolution. Defendants and other such continuing Partners

became known as "Dissolution Partners."

The Partnership Agreement provides that California law governs its construction,

interpretation and effect, and that the Partners elected to be governed by the California Uniform

Partnership Act of 1994 (Cal. Corp. Code §§ 16100-16962) ("CUPA"), as it applies to registered

limited liability partnerships. Tr. Exh. E, §§ 1.9.8, 8.3. The general rule under CUPA is that

relations among partners and between partners and their partnership are governed by their

partnership agreement. Cal. Corp. Code § 16103(a). To the extent that the partners fail to agree

upon a contrary rule, CUPA provides the default rule. *Id.* CUPA § 16306(c) provides that

partners in a registered limited liability partnership are shielded from liability for partnership

obligations, "whether arising in tort, contract, or otherwise." *Id.*, § 16306(c). That statute,

quoted *infra at 9,* preserves this liability shield after dissolution by excluding registered limited

liability partnerships such as the Debtor from the requirement in CUPA § 16807(b) that a partner

contribute to a partnership in liquidation an equal to the excess of the charges over credits in the

partner's capital account. *Id.*, § 16807(b).

Provisions for Both Periodic Distributions of Net Income
and Periodic Draws as Advances Against Net Income

The Partnership Agreement provides in Article 4 for the allocation of Net Income to

Partners and the Debtor's payment to Partners of periodic distributions of Net Income as well as

periodic draws as advances against Net Income.

Section 4.1.1.1 of the Partnership Agreement provides for the allocation of Net Income to

the Partners in proportion to their respective Sharing Ratios, subject to important limitations and

regulatory allocations which are provided in Sections 4.1.1.2-4.1.1.4. Though ignored by the

Trustee, those provisions (i) prohibit the allocation of negative Net Income that would create or

increase a deficit in a Partner's Capital Account and (ii) require the allocation of additional

positive Net Income as necessary to restore a Partner's negative capital balance to zero.  Such

additional allocations are required by federal Treasury regulations cited in the Partnership

Agreement and result in more negative income, and less positive income, being allocated to

Partners with positive capital.  Tr. Exh. E, §§ 4.1.1.1-4.1.1.4.

Section 4.2.1 of the Partnership Agreement provides for the payment of periodic draws to

Partners as advances against Net Income, and Section 4.2.2 provides for the distribution of Net

Income to Partners, subject to reduction by the amount of prior draws and other advances paid to

them or for their benefit.  Tr. Exh. E, §§ 4.2.1, 4.2.2.  Although the Trustee suggests to the

contrary, the Partnership Agreement does not contain terms permitting or requiring the Debtor to

allocate and distribute Net Income only at year-end.  To the contrary, Section 4.2.2 of the

Partnership Agreement describes the process as occurring "from time to time," stating as

follows:

> *The Partnership shall distribute to the Partners from time to time, in proportion to their Sharing Ratios, all or a portion of Net Income of the Partnership, reduced by prior draws or other advances against Net Income paid to such Partners pursuant to Section 4.2.1,* under a policy determined from time to time by the Office of the Chair. Such policy shall take into account, among other matters, the Capital Policy of the Partnership. All Partnership disbursements which are not deductible in computing Net Income, or which are made for the direct benefit of a Partner, shall be treated as distributions to the benefited Partners in accordance with a policy determined from time to time by the Office of the Chair.

Tr. Exh. E, § 4.2.2 (emphasis added).

The debtor for many years allocated and distributed Net Income to Partners not only as of

year-end, but on a periodic basis throughout the year.  As is typical of most law firms, the

Debtor's profits early in any given year were usually insufficient to permit distributions of Net

Income.  Usually by July or August of each year, if not sooner, profits rose to a point where Net

Income could be and was distributed to most Partners, their shares of Net Income being greater than the amounts of their prior periodic draws. Section 4.2.2 expressly authorized this practice.

No Prohibition of Draws or Other Advances in Excess of Net Income
And No Requirement for the Repayment of Such Advances

The Trustee is similarly inaccurate in suggesting that the Partnership Agreement contains terms prohibiting payment of periodic draws or other advances in excess of allocable Net Income. The Partnership Agreement contains no such terms. It would not be unusual for a law firm to pay such excess draws, particularly in earlier months of any given year when law firm collections tend to be lower than in later months.

The Trustee is also inaccurate in suggesting that the Partnership Agreement contains terms requiring the Partners to repay such excess draw and other advances. To the contrary, the Partnership Agreement entitles the Debtor to recover the amount of such draws and other advances only though (i) a reduction of a Partner's income distributions under Section 4.2.2 (as stated above), (ii) an offset against a Partner's Capital Account as provided in Section 3.2,[4] or (iii) an offset against a Former Partner's share pre-cessation Net Income and the value of his partnership interest, including his capital balance, as provided in Section 6.6.3.[5] Tr. Exh. E, §§ 4.2.2, 3.2, and 6.6.3.

And while the Trustee contends otherwise, the Partnership Agreement does not contain terms enlarging the Debtor's rights or the Partners' obligations with respect to such excess draws

---

[4] Under Section 3.2 of the Partnership Agreement, the Debtor maintained a Capital Account for each Partner with a balance as of December 31, 2005 as set forth in Schedule 4, to be increased by the Partner's contributions to the partnership and share of positive Net Income and other items of gain, and to be decreased by the Partner's share of losses and cash distributions paid to the Partner or for his personal benefit, including draws made pursuant to Section 4.2.1 and personal disbursements or what the Trustee defines as "Loan Advances." Tr. Exh. E, § 3.2.

[5] A Former Partner is "an individual who, having been a Partner, has ceased to be a Partner for such any reason ...." Tr. Exh. E, § 1.9.4. As stated *supra*, Defendants did not cease being Partners. Accordingly, Section 6.6.3 did not apply to them.

and advances in the event of dissolution.  Under Article 7, which governs dissolution and

termination, a Partner with a negative capital balance resulting from such draws and advances

would merely be precluded from sharing in the distribution of partnership assets remaining after

the payment of creditors pursuant to Section 7.4.5.1, because Section 7.4.5.2 permits only

Partners with positive capital to share in such a distribution.  Tr. Exh. E, § 7.4.5.2.

Article 7, however, does not provide for Partners to repay excess draws or other advances

so as to eliminate a negative capital balance.  To the contrary, Section 7.4.5.2 provides:  "If any

Partner's Capital Account has a deficit balance (after giving effect to all contributions,

distributions and allocations for taxable years, including the taxable year during which the

liquidation occurs), such Partner share not be obligated to contribute to the capital of the

Partnership the amount necessary to restore such deficit balance to zero."  Tr. Exh. E, § 7.4.5.2.

Consistent with the liability shield afforded to members of registered LLPs such as the Debtor,

CUPA § 16807(b) similarly excludes them from having to eliminate capital deficiencies upon

liquidation and winding up.[6]

The Debtor's Allocation of Income for 2008 and
Netting of Excess Draws Against Capital Accounts

Until late October 2008, the Debtor operated under day-to-the day management of its

Office of the Chair, consisting of its two Co-Chairmen and the Managing Partner of Operations.

---

[6] Section 16807(b) provides as follows: "Each partner is entitled to a settlement of all partnership accounts upon winding up the partnership business. In settling accounts among the partners, the profits and losses that result from the liquidation of the partnership assets shall be credited and charged to the partners' accounts. The partnership shall make a distribution to a partner in an amount equal to any excess of the credits over the charges in the partner's account. *Except for registered limited liability partnerships and foreign limited liability partnerships*, a partner shall contribute to the partnership an amount equal to any excess of the charges over the credits in the partner's account." Calif. Corp. Code § 16807, subd.(b) (emphasis added).  See also 9 Witkin, Summary of California Law 10th (2005) Partnerships, § 49, p. 624: "If there is an excess of charges [over credits] in a partner's account, the affected partner must contribute that amount to the partnership. *Registered and foreign limited liability partnerships are excepted from this obligation.*"  (Emphasis added.)

In late October 2008, the Debtor's Partnership Council adopted a resolution for appointment of a committee of Partners known as the Administrative Committee. The Administrative Committees replaced the Office of the Chair as of October 28, 2008 and thereafter supervised the Debtor's dissolution and post-dissolution activities, including the its allocation of partnership income for 2008, and the netting of excess draws against Capital Accounts.

Defendants' Exhibit A is a letter dated April 2, 2009, sent by PricewaterhouseCoopers LLP ("PWC") to the Partners of the Debtor (the "PWC Letter"). PWC was at that time the Debtor's outside accounting and auditing firm. The PWC Letter confirms the following facts with respect to the Debtor's allocation of partnership income for 2008, its netting of excess draws against Capital Accounts and related matters.

- Any Partner whose effective withdrawal from the Debtor was prior to October 28, 2008 was treated as a Former Partner under the Third Partnership Agreement, and the point value of each Former Partner's interest was calculated through the date of his or her departure not year-end 2008—under the closing of the books method. Examples of such calculations are in the Trustee's Exhibit L.

- The Debtor treated each Partner who had not withdrawn prior to October 28, 2008 as being a Dissolution Partner as of December 31, 2008, with the same profit ratio as such Partner had on October 28, 2008. This included all of the Defendants.

- The Debtor's Administrative Committee decided to continue the Debtor's prior practice of netting draws in excess of allocable Net Income against Capital Accounts for both Dissolution Partners and Former Partners.

- The Debtor's Administrative Committee determined that it would not permit the offset of unpaid personal charges against a Partner's Capital Account,

10

notwithstanding that the Partnership Agreement provides for such setoff in Section 3.2 governing Capital Accounts.

- If the excess of a Partner's draws over allocable Net Income resulted in a Partner having a negative capital balance, then additional Net Income was allocated to such Partner to restore his or her capital balance to zero. This resulted in less Net Income being allocated to the other Partners, *i.e.*, those Partners with positive capital balances. This treatment was required by the Internal Revenue Code, incorporated into the Fourth Partnership Agreement to apply equally to both Dissolution Partners (such as Defendants) and 2008 Former Partners.

As confirmed by PWC, the netting process described above did not result in the Debtor's determination of any indebtedness owed by any Defendant by reason of his prior receipt of any draws exceeding allocable Net Income or the Debtor's payment of disbursements for his personal benefit. Such netting process similarly did not result in the Debtor's demanding, requesting or otherwise seeking repayment of any such indebtedness or relinquishing or releasing such indebtedness. Although the Administrative Committee requested Partners' reimbursement of advances for personal disbursements (defined by the trustee as "Loan Advances"), this was not a result of the Debtor's netting process, as described above or as alleged by the trustee. To the contrary, although Section 3.2 of the Partnership Agreement provides for the netting of advances for personal disbursements against Capital Accounts, the Administrative Committee did not carry out netting adjustments with respect to such items.

To put issues raised by the Trustee's motion in perspective, it should be noted that the Debtor's Office of the Chair, from early 2008 until shortly before the events which triggered the Debtor's non-monetary breach of its loan agreement with Citibank N.A., informed the Partners

11

that the Debtor was operating profitably.  For example, Defendants' Exhibit B is an email dated

June 13, 2008, from the Debtor's Office of the Chair to all Partners, stating, among other things,

as follows:

> "May [2008] was our third straight month of performance that
> exceeded plan for net income.  Results for May were driven by
> strong collections.  Year to date, we are over $6M ahead of plan,
> with solid favorable variances in both revenue and expense."

It was in the context of receiving from the Debtor's senior management such favorable

reports on its operations that the Debtor's Partners, including the defendants, continued to

perform valuable services as partners in the Debtor in exchange for the periodic draw payments

and other advances that the Trustee has challenged in this action.

Thelen as a Business and A Financial Overview

During the entire period that is relevant to the issues before this court, Thelen employed

both internal and external financial and accounting personnel.  The internal accounting staff was

headed by the firm's Chief Financial Officer, Ted Tinson.  Mr. Tinson had a staff of people who

were responsible for recording income and expense and for maintaining the  sophisticated

financial software that the firm used.  The accounting staff prepared numerous financial reports

for firm managers on a daily, weekly and monthly basis.  Some of these reports were made

available to partners in the firm.

Thelen was accordingly operated as a business.  Thelen operated at a profit in for many,

many years.  The primary source of revenue for the firm was the time that partners, associates

and legal assistants spent providing legal services to clients of the firm.  In general, those clients

were billed for such services on the basis of standard hourly rates that were established in

advance.  The hourly rates charged by Thelen varied from lawyer to lawyer based primarily on

the skill and experience of the attorney and the complexity of the legal specialty involved.

12

Compensation paid to partners in the firm was based on a "point system" which was determined by a vote of the partnership in advance of every year. Partner compensation at Thelen depended on various factors, but billing rates and the skill and experience of the partners played only a minimal role. Based on Mr. Fontana's analysis of Thelen's compensation system over many years, there was very little, if any, statistical correlation between the billing rates that clients were charged for an attorney's time and his annual compensation. The compensation paid to a partner had no bearing on the hourly billing rates that the firm charged clients for the lawyer's services.

Thelen operated on a calendar year basis. In his argument, the Trustee describes what he refers to as a "netting" process that supposedly took place at year end in order to determine how firm income should be allocated. The Trustee's description of the process is both inaccurate and incomplete. As with every business enterprise, "net income" for a law firm can be calculated on a daily, weekly or monthly basis. In general, net income is simply the difference between income (revenue) and expense. Thelen did not need to wait until year end to determine whether it had net income. It could, and did, do so any time the information was needed or required. At Thelen, this was done every month of the year.

Nor was it necessary to wait until year end to determine how much, if any, net income was available for distribution to the partners. Because the partnership sharing ratios were determined in advance (i.e., at the beginning of the year) any partner's share of the firms net income could be, and was, determinable at any time.

On a monthly basis, in 2008 and for many years prior, the accounting staff calculated net income in order to determine if there was sufficient profit to allow a distribution to be made to some or all of the partners. On a monthly basis, net income was determined and allocated to

13

individual partners in proportion to their sharing ratios.  The firm generally withheld a portion of net income to cover bonuses and unanticipated expenses that might occur later in the year.  If there was money left over, on a monthly basis the firm would compare each partner's share of net income with the amounts that he or she had been paid to that point in draws.  If that partner's share of distributable net income was greater than the draws he had received, money would be available for distribution to the partner either in cash or to offset any balance in his personal account.

Because the draws paid to partners did not exactly match the sharing ratios, it was often the case that highly compensated partners would reach the point where their share of firm net income exceeded their draws earlier in the year than was the case for less highly compensated partners (i.e., ones with lesser sharing ratios).  Regardless, the process of calculating net income, allocating it to partners and comparing that figure with the draws each partner had received occurred each and every month of the year.

In almost every year of Thelen's operation over at least the last 20 years, the pattern and timing the distributions of firm net income was similar.  In the early months of every year, the firm may have earned profits, but the profits were insufficient to allow distributions to be made. By July or August of most years, net income normally rose to the point where most partners were entitled to receive a distribution because their share of net income was greater than the amounts that they had received in draws at that point in time.

The nine members of the Whitmer-Fontana group graduated from law school between 1971 and 1991.  On average, the members of the group had been practicing law for 29 years in 2008.  The average compensation for the members of the group for practicing law during 2007-2009 was as follows:

14

    a.  2007   $446,480

    b.  2008   $262,528 (draws received)

    c.  2009   $548,417

The Trustee has sought to reduce the compensation paid to the members of the group for

2008 by a total of $1,144,828.  If his theories were accepted, the average compensation for the

members of the group for 2008 would be reduced to: $135,325.

The hourly rates that Thelen charged clients for the services performed by the members

of the Whitmer-Fontana group in 2008 ranged from $375 to $675.  Their billing rates at Thelen

for 2007 were the same.  In 2009, their billing rates ranged from $385 to $750 per hour.  On

average the hourly billing rates for the members of the group were as follows:

    d.  2007   $548

    e.  2008   $548

    f.  2009   $574

One of the reports prepared and distributed by Thelen on a regular basis was a "Cash

Collected by Attorney" report.  The report consisted of fewer than 10 pages.  Though Defendants

have requested a requested a copy of that report for 2008 from the Trustee's counsel, the Trustee

has yet to provide it.  For the year 2007 that report shows that Thelen collected $4,826,424.49 as

a direct result of time worked by the members of the Whitmer-Fontana group.  In addition, in the

same year the firm collected an additional $11,024,193.38 in legal fees on matters that the

members of the Whitmer-Fontana group supervised.  It is likely that the figures for 2008 would

be comparable.

During 2008, the members of the Whitmer-Fontana group they worked a total of 8,948

billable hours and billed clients a total of $6.8 million in legal fees.

## ARGUMENT

### I.    THE DEBTOR DID NOT MAKE "TRANSFERS" TO THE DEFENDANTS IN ITS NETTING OF THEIR DRAWS AND ADVANCES AGAINST NET INCOME; EACH DRAW OR OTHER PAYMENT WAS ITSELF A TRANSFER OF PROPERTY OR VALUE AND, HENCE, A TRANSFER AT THE TIME MADE.

The Bankruptcy Code is explicit that for purposes of 11 U.S.C. § 548, a transfer occurs the moment a debtor parts with funds or an interest property. *See Barnhill v. Johnson*, 503 U.S. 393, 397 (1992). The transfers that the Trustee here argues should be considered fraudulent are the Debtor's payments of draws and advances, all of which were made and completed in the period between January and October 2008. Despite the fact that the draws were paid semi-monthly in the January-October period, the Trustee nonetheless contends that the Debtor made transfers on December 31, 2008, because it was as of that date that Thelen determined the excess of each partner's prior draws and personal charges over his final allocable share of Net Income effective as at that date, if any. This "netting" process, the Trustee asserts, constitutes the Defendant's alleged indebtedness to the Debtor under Sections 6.6.3 and 7.4.5 of the Partnership Agreements. Defendants elaborate herein the legal and factual bankruptcy of the Trustee's position.

### A.    The Trustee's Description Of The Netting Process Is Incomplete And Inaccurate.

The Trustee's description of the distribution process prescribed by the Partnership Agreements and applied by the Debtor is both incomplete and inaccurate as the accompanying Declarations make plain.[7] The Trustee, for example, ignores that the process prescribed by the Partnership Agreements involved *both* credits *and* offsetting charges to each Partner's Capital Account as provided in Section 3.2, and that the Debtor applied excess draws against the Capital

---

[7] Defendants' declarations come from persons with extensive, personal knowledge of the operations of Thelen while it was a going concern. This is stark contrast to the declaration purporting to support the Trustee's motion.

Accounts of *both* Dissolution Partners, such as Defendants, *and* 2008 Former Partners. The PWC Letter confirms this fact. Defts. Exh. A. As a result, any excess of a Partner's draws over allocable Net Income for 2008 was either eliminated or reduced by the Partner's positive capital balance.

The Trustee similarly ignores the fact that if *any* excess of a Partner's draws over allocable Net Income resulted in the Partner having a negative capital balance, the Partnership Agreements provided that *additional* Net Income was to be allocated to that partner precisely in order to restore his capital balance to zero. As a result of that allocation, commensurately less Net Income was allocated to other Partners who had positive capital balances. As the PWC Letter confirms, that was the mechanism that Thelen unquestionably and uniformly utilized and it applied this practice equally to both Dissolution Partners, including the defendants, and 2008 Former Partners. *Id.*

The Trustee's contention that the year-end netting process somehow constituted a transfer of the amount by which each Defendant's prior draws and other advances exceeded his final share allocable Net Income for 2008, either ignores or misunderstands that the same "netting" process itself precluded such transfer by offset of the excess draws against a Partner's capital balance. That conclusion is further starkly demonstrated by the Partnership Agreements' direction to allocate additional income to partners whose capital accounts would otherwise become negative, even at the expense of other Partners' current income.[8]

---

[8] The Trustee's argument also seems to assume that this "netting" was done but once a year, at year's end. The Partnership Agreements, on the contrary, speak in terms of this occurring "from time to time" and it did, as the Fontana Declaration attests.

A proper reading and application of the relevant Partnership Agreement provisions demonstrate that there was no excess, and therefore no year-end "transfer," as alleged by the trustee. Those correct conclusions necessarily require denial of the Trustee's motion.

**B.** **The Debtor's Netting Process Did Not Quantify Any Indebtedness Owed By The Defendants.**

The Trustee's suggestion that the Debtor determined the defendants' excess draws to be "indebtedness" under Sections 6.6.3 and 7.4.5 of the Partnership Agreements equally misunderstands and misconstrues the Partnership Agreements. *First*, the Trustee continues to ignore the fact that Section 6.6.3 applies only to a "Former Partner," as that term is defined in the Partnership Agreements, meaning "an individual who has ceased to be a Partner ...." Exh. B, § 1.9.4. The Defendants here are not "Former Partners" as that term is defined for purposes of Section 6.6.3. Indeed, Thelen uniformly treated Partners who, like the Defendants here, had *not* withdrawn prior to October 28, 2008 as being Partners—not *Former* Partners—as of December 31, 2008. The PWC Letter confirms this fact. Defendants had not withdrawn from Thelen prior to that date; indeed, Defendants have *never* withdrawn. In consequence of the fact that Defendants had not withdrawn, Thelen *did* not—and this Court *should* not—apply Section 6.6.3 to any of them.

*Second*, the Debtor did not—and, again, could not—determine that the defendants' supposed "excess" draws were "indebtedness" under Section 7.4.5 of the Partnership Agreements. The reason is straightforward: Section 7.4.5 provides for application of the Debtor's assets upon liquidation and winding up in accordance with CUPA § 16807, *i.e.*, first to the payment of creditors and then to Partners with positive capital balances. Section 7.4.5 neither states or implies—and certainly does not require—that a Partner left with a negative capital balance resulting from "excess" draws must repay such distributions. Likewise, CUPA §

18

16807(b), consistent with the liability shield afforded to members of registered limited liability partnerships, expressly excludes limited liability partnerships from the requirement partners eliminate capital deficiencies upon liquidation and winding up. A plain reading of the statute confirms this:

> Each partner is entitled to a settlement of all partnership accounts upon winding up the partnership business. In settling accounts among the partners, the profits and losses that result from the liquidation of the partnership assets shall be credited and charged to the partners' accounts. The partnership shall make a distribution to a partner in an amount equal to any excess of the credits over the charges in the partner's account. *Except for registered limited liability partnerships and foreign limited liability partnerships,* a partner shall contribute to the partnership an amount equal to any excess of the charges over the credits in the partner's account.

Calif. Corp. Code § 16807, subd.(b) (emphasis added). *See also* 9 Witkin, Summary of California Law 10th (2005) Partnerhips, § 49, p. 624: "If there is an excess of charges [over credits] in a partner's account, the affected partner must contribute that amount to the partnership. *Registered and foreign limited liability partnerships are excepted from this obligation.*" (Emphasis added.)

Manifestly, under CUPA, the Thelen Partners could lawfully adopt a provision similar to the limited liability partnership exception set forth in CUPA § 16807(b). Thus, Section 7.4.5.2 of the Fourth Partnership Agreement—the second part of the provision cited by the Trustee— states:

> If any Partner's Capital Account has a deficit balance (after giving effect to all contributions, distributions and allocations for taxable years, including the taxable year during which such liquidation occurs), such Partner shall *not* be obligated to contribute to the capital of the Partnership the amount necessary to restore such deficit balance to zero.

Exh. B, § 7.4.5.2 (emphasis supplied). Under this provision, in harmony with CUPA § 16807(b),

the Debtor was expressly precluded by contract from treating any excess draws as indebtedness owed to the Debtor. Enforcing the Trustee's position, in the teeth of this Partnership Agreement provision, would effectively rewrite and repeal the protections of this provision, contrary to well-settled principles of contractual and statutory interpretation and enforcement.

These conclusions are also consistent with the limits of the obligations of registered limited liability partnership members under the Bankruptcy Code. Indeed, the Bankruptcy Code was amended in 1994 to provide explicitly for limited liability partnerships. As a result, the Bankruptcy Code now provides that partners, such as the Defendants here, are liable for deficiencies only "to the extent that under applicable non-bankruptcy law such general partner is personally liable for such deficiency." 11 U.S.C. § 723(a). The legislative comment to this section elaborates the reach of this protection by explaining that "a partner of a registered limited liability partnership would only be liable in bankruptcy to the extent a partner would be personally liable for a deficiency according to the registered limited liability statute under which the partnership was formed." *See* 140 Cong. Rec. 10752-01, 10768, Oct. 4, 1994. Thus, by combining and enforcing these provisions as they are intended to operate, no Defendant is personally liable, under California law, under the Partnership Agreements, or anything else for any supposed "excess payment."

*Third*, while Section 3.2 of the Partnership Agreements provides for the netting of personal charges against Capital Accounts, the Debtor failed to do so. The PWC Letter confirms this fact. Defts. Exh. A ("The Administrative Committee has determined that it will not permit offset of unpaid personal charges against a partner's capital account."). Thus, contrary to the Trustee's characterization, Thelen did not quantify indebtedness and make a transfer with respect

20

to the defendants' personal charges as of the alleged December 31, 2008 netting date, and it would be contrary to the Partnership Agreements and California law to do so now.

**C.    The Debtor's Netting Process Did Not Relinquish
Any Indebtedness Owed By The Defendants.**

The Trustee's version of the facts similarly fails to demonstrate any basis to find that the year end's netting process resulted in the Debtor's relinquishment of indebtedness owed by the Defendants—or indeed anyone else.  The Trustee's contrary contention relies on both *Official Comm. Of Unsecured Creditors v. Lozinski (In re High Strength Steel, Inc.)*, 269 B.R. 560 (Bankr. D. Del. 2001), and *Angell v. Montague Farms (In re Tanglewood Farms Inc. of Elizabeth City)*, No. 10-06719-8-JRL, 2013 WL 1619390 (Bankr. E.D.N.C. Apr. 15, 2013) as putative support for this anomalous procedure.  Those authorities, however, for whatever they mean, do *not* have either decisional, much less determinative significance respecting this issue. It is clear from an informed reading that those decisions involved transactions and events that are not analogous to the facts here.  In *High Strength*, for example, the debtor's insider-CEO had "cooked the books" by retroactively increasing the debtor's rent obligations to an affiliate, thereby effectively eliminating over $1.8 million of indebtedness which the affiliate owed to debtor.  *269* B.R. at 568.  In *Tanglewood Farms*, moreover, the debtor's principal improperly caused the debtor to forego full payment of amounts owed by the defendant in order to effectuate a cancellation of indebtedness which the principal and an affiliate owed to the defendant.  2013 W.L. 1619390 at *4.  Even to suggest that the circumstances there have any relevance here impugns both the Debtor and the Defendants; what it does not do is support the conclusion that the Trustee urges here.[9]

---

[9] The Trustee has already conceded that the Defendants neither acted in bad faith or in less than arms' length respecting Thelen in connection with the challenged draws.

It surely goes without saying that neither the Debtor nor the Defendants (not one of whom had executive authority in the Firm) engaged in any such transactions. The Debtor's determination and implementation of allocations of partnership income for 2008, including such regulatory allocations as were required by federal Treasury regulations with respect to Partners having negative capital balances as a result of excess draws, were commonplace, entirely legal and appropriate activities.

Those activities were carried out by the Debtor's Administrative Committee with the guidance of outside counsel and accountants, and with no involvement whatever by any Defendant. Even more fundamentally, the Debtor did not determine that any amounts were owed by the defendants as a result of its year end processes. The only amounts it claimed due from the Defendants are the personal charges, as to which the Debtor did not make netting adjustments and did not relinquish a right to payment. Quite clearly, the trustee's reliance on *High Strength* and *Tanglewood* is misplaced and should not guide this Court's decision on the present motion.

**D.    The Integrated Transaction Doctrine as Advanced by the Trustee Has No Rational Application To the Debtor's Compensation Process.**

The Trustee's attempt to invoke the integrated transaction doctrine to fix the time of the alleged fraudulent transfer is also without merit: the doctrine simply has no application in the context in which the Trustee urges its employment. Of course a court may "collapse" several different, but related transactions or transfers, into one transaction to determine whether a transaction is fraudulent. *Orr v. Kinderhill Corp.*, 991 F.2d 31 (2d Cir. 1993); *Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206 (3d. Cir. 1990). But the application of this doctrine is limited to evaluating the substance of serial transactions whose ultimate purpose is, by intention, to frustrate potential or actual creditors.

22

This integrated transaction has accordingly been applied most frequently with respect to lenders who have financed leveraged buyouts of companies that subsequently become insolvent. *See, e.g., HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995). The paradigmatic scheme is similar to that alleged in *HBE*: one transferee gives fair value to the debtor in exchange for the debtor's property; the debtor then gratuitously transfers the proceeds of the first exchange to a second transferee. The first transferee thereby receives the debtor's property, and the second transferee receives the consideration, while the debtor retains nothing. *Id.*.

The integrated transaction doctrine simply has no practical or rational application to the common, long-standing practice of paying monthly draws to partners. The Partners' periodic draws here were paid on a semi-monthly basis, each payment being made as compensation for each Partner's performance of professional services in each pay period. The Debtor thus received value, *i.e.*, the professional services for which it billed the Firm's clients, in exchange for each draw payment. The draw payments were obviously not part of a larger plan, scheme or subterfuge to divert value from the Debtor to the detriment of creditors by means of its year-end netting process. Most importantly, any Partner could cease providing services and withdraw from the Debtor at any time during the year. As established by the PWC Letter and the Trustee's own exhibits—*see* Tr. Exh. L—the Debtor calculated the income allocable to such a Former Partner and his point value through the date of departure under the Closing of the Books Method—without awaiting the year-end netting process.

What the Trustee urges here is application of the integrated transaction doctrine in order to reset the time of a series separate payments over several months, each which constituted a separate transfer when made, to the time, months later when net income was allocated. *Cf. Barnhill v. Johnson, supra*. The Trustee's argument is predicated on nothing more than a series

23

of year-end accounting adjustments, each essentially consisting of such setoffs as Congress intentionally excluded from the definition of "transfer" set forth in 11 U.S.C. § 101(54).[10] Research discloses no decision in which the integrated transaction doctrine has been so applied, and an application of the doctrine is clearly not warranted here. *Cf., Mills v. Everest Reinsurance Co.,* 410 F. Supp. 2d 243, 255 (S.D.N.Y. 2006) ("a new claim for fraudulent conveyance accrues at the time of each conveyance, it would be illogical and contrary to the spirit of the law to treat a series of transfers as one transaction for the purpose of determining when the statute of limitation was triggered").

**E.    The Time Of The Transfers Is Determined By When They Were Made—Not When Defendants' Draws and Personal Charges First Began To Exceed Later-Determined Net Income.**

As an alternative method of determining the asserted date of the alleged fraudulent transfers, the Trustee contends "that the first transfer occurred when the Draws and Loan Advances began to exceed the Final ASNI" (Tr. Mem. at 13), *i.e.*, each defendant's later-determined and final share of allocable Net Income.  Applying the Trustee's other theories respecting his claims here, this amount equals the same amount that the trustee alleges to be reasonable equivalent value for each defendant's services.  (Tr. Mem. at 13-19).  Thus, the

---

[10] The definition—though broad in scope—does not expressly include setoff, and the legislative history establishes that that Congress specifically considered and intentionally elected to exclude setoff from the definition as finally enacted.  See In re Damas, 504 B.R. 290, 296 (Bankr. D. Mass. 2014) ("Congress considered the question and expressly elected to exclude setoff form the meaning of transfer"); Braunstein v. Branch Group, Inc. (In re Massachusetts Gas & Elec. Light Supply Co., Inc.), 200 B.R. 471, 473 (Bankr. D. Mass. 1996) ("the legislative intent was to exclude setoff from the definition of transfer"); In re Holyoke Nursing Home Inc., 273 B.R. 305, 309 (Bankr. D. Mass. 2002) ("Congress intended to exclude setoff from the 'transfer' definition in order to assure that setoff would be treated exclusively under the [setoff] provision of § 553").  *See Claybrook v. Metro Auto Xpress LLC (In re American Remanufacturers, Inc.),* 2008 WL 2909871 (Bankr. D. Del. July 25, 2008) ("valid setoffs are not avoidable as preferential or fraudulent transfers for the simple reason that setoffs are not transfers of property of the estate"); *see also* Collier on Bankruptcy ¶ 553.09[1][a] ("setoff is not avoidable as a preference or a fraudulent transfer").

trustee contends under 11 U.S.C. § 548(a)(1)(B), that the first fraudulent transfer in a series of

payments occurs when the sum of prior payments exceed reasonable equivalent value.

This argument of the Trustee should also be rejected because it contradicts the statute's

plain terms. The statute makes clear that the time of a transfer occurs when a debtor has parted

with an interest in property, *i.e.*, the actual time of payment. Whether the debtor has received

reasonable equivalent value *at the time of the transfer* is relevant to determining whether that

transfer was constructively fraudulent; the theory is not at all relevant to determining when the

transfer occurred. One needn't speculate here when the draws were paid, the checks honored,

the 'value' transferred to the Partners. Understandably, the trustee has cited no legal authority

supporting his "first transfer" argument, and our research has disclosed none. That too is

understandable: the argument is a makeweight of no weight whatever.

The Trustee's effort to short-circuit the considerable burden he bears in this connection

should be rejected and his motion denied.

## II.    DETERMINATION OF REASONABLE EQUIVALENT VALUE REQUIRES CONSIDERATION OF THE TOTALITY OF THE FACTUAL CIRCUMSTANCES OF THE CHALLENGED TRANSFERS AND IS NOT, AS THE TRUSTEE URGES, DEFINED BY THE PARTNERSHIP AGREEMENT'S PROFIT SHARING PROVISIONS[11]

The second part of the Trustee's motion for summary judgment argues that the amounts

the Defendants received from Thelen in draws during 2008 exceeded the "reasonable equivalent

value" of the services that the Defendants performed because, according to the Trustee, the

"reasonable equivalent value" of Defendants' individual services equals precisely what a year

end distribution calculation would yield. Put more simply, a partner could expend hundreds of

hours in the defense of a serious case, win it, have his firm be paid handsomely for it, but if his

---

[11] The facts here are based on the Fontana Declaration.

firm as whole wasn't profitable, the reasonable equivalent value of his services would be, under the Trustee's theory, worthless. The Trustee's analysis of this issue too is deeply flawed and reflects an effort to cobble a plausible liability theory, the reality of the transactions, and the law governing them aside.

First, the Trustee's position ignores the well-understood economic reality of law firms and the business of law. The draws Thelen paid to the Defendants during 2008 produced *net* income of well more than $1 million for Thelen and its creditors as a result of the Thelen's having billed and collected fees for the services performed by the Defendants. The Trustee avers that he endeavors to measure the market value of the services that the Defendants performed, but his approach makes the wholly unsupported and unsupportable assumption that the value of legal services by any individual partner is determined by the profitability of the law firm *as a whole* rather than by, for example, the hourly rates that Thelen actually charged clients and for which clients actually paid.

The illogic of the Trustee's position is demonstrated in part by common sense, but also by the fact that the Trustee's position is flatly contrary to well-developed case law dealing with "reasonably equivalent value."

**A.    To Establish that the Draws Constituted a "Fraudulent Conveyance" the Trustee Must Prove that the Defendants Were Paid More Than Their Services Were Worth in the Market.**

The Defendants in this case at the time they were Partners in Thelen had substantial experience as partners in large firms. Each was an experienced lawyer. The youngest of them (Greg Faulkner) graduated from law school in 1991. On average, the Defendants had been practicing law for 29 years.

Thelen, as all law firms, produced revenue by billing clients for legal services that these and other lawyers and legal assistants performed. In almost all cases on which work was done,

26

clients were billed on the basis of "standard hourly rates.". The hourly billing rates Thelen

charged its clients for the legal services that the Defendants performed in 2008 ranged from $375

to $675 per hour.

In order to induce lawyers to come to work and provide those legal services, Thelen was

required to offer *something* in exchange just to get the lawyers to come to work. In the case of

associate attorneys and non-equity partners, the inducement was primarily an agreed annual

salary, plus the opportunity for a year-end bonus if certain criteria were met. The situation with

the Partners at Thelen was different, but only slightly so. Equity partners obviously have a stake

in the success (i.e., net profits) of a law firm. However, partners also perform legal services for

the firm's clients and supervise the work of associates and legal assistants employed by the law

firm. Thelen, in turn, produced revenue by billing clients for all of that legal work.

Equity partners at Thelen did not work on a fixed salary, but were compensated on the

basis of the value of the partnership's "points" each partner held. Nevertheless, the law firm still

had to provide a level of compensation to partners that would induce them to come to work, bill

time to clients and assist in collection of the bills rendered. The partner compensation structure

that Thelen used in 2008 had been in effect at the law firm for many years. It was based on the

principle that each partner would be paid (1) a draw equal to $1,000 per partnership point per

month (with a minimum draw level of $21,000 per month); (2) double draws to be paid in April,

June and September (when estimated state and federal income tax payments were due), and (3) a

share of the annual net profit of the law firm calculated at the end of each calendar year. Fontana

declaration ¶__

Without the legal services that these Partners performed for Thelen clients during 2008,

Thelen's economic situation and that of its creditors would necessarily have been far worse.

While we have been unable to obtain the equivalent data for 2008 from the Trustee, Thelen's
records for 2007 show that Thelen received more than $5.9 million in revenue from the work
performed by these nine Partners.  The same records also show that in 2007 those nine
individuals supervised work performed by associates and legal assistants that produced an
additional $11.0 million in revenue for the law firm.  *Id.*

In 2007, these Partners received a total of $4.0 million in compensation from Thelen.  In
2008 those same partners received less than $2.4 million in draws (a 41.2 % reduction in income)
and, yet, the Trustee claims that they were "overpaid" and should be required to disgorge nearly
half ($1.1 million or 48.5%) of what they were paid.  In making that argument, the Trustee
ignores the fact that during 2008 those same nine Partners, the Defendants here, worked 8,948
"billable" hours and billed clients $6.8 million in legal fees.  Had these nine Partners not come to
work and had they not performed the work that they did, Thelen and its creditors would have
been in far worse financial shape.

**B.      The Trustee Bears the Burden of Proof on All Elements of His Claim**

It bears repeating that Code section 548 imposes the burden of proof on the Trustee to
prove that the debtor (i.e., Thelen) did not receive "reasonably equivalent value" in exchange for
the draws that were paid to the Defendant partners during 2008.  The party challenging a transfer
as fraudulent, here, the Trustee, bears the burden of proof on all elements of a constructive fraud
claim brought under section 548.  *Mellon Bank N.A. v. Metro Communications Inc.,* 945 F.2d
635, 646 (3rd Cir. 1991); *Fidelity Bond & Mort. Co. v. Brand,* 371 F.Supp.708, 716 (E.D. Pa.
2007).

**C.      "Reasonably Equivalent Value" Is Established by the Totality of the Circumstances,
Not by Some Arbitrary Formula**

The term "reasonably equivalent value" is not defined in the Federal Bankruptcy Act. Nor do the Partnership Agreements purport to define those terms. What is clear is that it does not mean "fair market value", nor does not it require a dollar for dollar transaction. *Crumpton v. Stephens (In re Northlake Foods, Inc.),* 715 F.3d 1251, 1256 (11th Cir. 2013); *In Re Fairchild Aircraft Corp.,* 6 F.3d 1119, 1125-26 (5th Cir. 1993); *Weaver v. Kellogg,* 216 B.R. 563, 574 (S.D. Tex. 1997). *See also BFP v. Resolution Trust Corp.,* 511 U.S. 531, 542-45, (1994)

In order to measure "reasonably equivalent", this and other federal courts have frequently applied a "totality of the circumstances" test. *See, e.g., In re Gonzalez,* 342 B.R. 165, 173 (S.D.N.Y. 2006). That test considers (1) the good faith of the transferee, (2) the fair market value compared to the price paid; and (3) whether the transaction was at arm's-length. *Image Masters, Inc. v. Chase Home Finance,* 489 B.R. 375, 387 (E.D. Pa. 2013)*; In re R.M.L., Inc.,* 92 F.3d 139, 148-49 (3rd Cir. 1996). What Courts do not do is find "reasonable equivalent value" to be a matter of law, on the basis that the Trustee argues here.

There is no question that the Defendants were not knowing participants in a fraud against creditors. Indeed, the Trustee concedes that the Defendants acted in "good faith" and at "arm's length" when the Defendants accepted the draws in return for the legal services that they performed on behalf of the firm's client.[12] Those concessions mean that the sole basis for the Trustee's fraudulent conveyance claims originates from the Trustee's view that the Defendants were "overpaid" because their final share of Thelen's net profits for 2008 (which was not even calculated until April 2009) was *less* than the draws the partners received during 2008.

The Trustee regards as irrelevant the thousands of hours that the Defendants worked in 2008 trying to help keep Thelen afloat, and the millions of dollars that clients paid Thelen for the

---

[12] At page 14 of his brief, the Trustee concedes that the Thelen partnership agreements were negotiated in "good faith" and at "arm's length".

29

legal services the Defendants performed, to the issue of "reasonably equivalent value." The

Trustee thus discounts utterly the money that Thelen received from collecting on the bills that

were sent to clients to pay Thelen for the work that the Defendants performed to receive the

draws that the Trustee now asserts were fraudulent.

Once again, the Trustee's position on this motion is unsupported by any citation to

relevant case law or economic literature. This is hardly a surprise, for it the Trustee's position is

a striking overreach to characterize the draws as fraudulent and completely ignores the economic

benefits that Thelen and its creditors obtained as a result of the Defendant's work. The Trustee's

entire rationale—to describe it generously—of this position is contrary to common sense and the

underlying purpose of the fraudulent conveyance statutes. *See In re Rodriguez*, 895 F.2d 725,

727 (11th Cir. 1990) ("The purpose of voiding transfers unsupported by reasonably equivalent

value is to protect creditors against depletion of a bankrupt's estate. Therefore, this provision

does not authorize voiding a transfer which confers an economic benefit upon the debtor.")

### D.   The Best Measure of the "Value" of the Services the Partners Performed During 2008 Is the Amounts that Thelen Charged Clients for that Work

The obvious, rational measure to gauge the reasonable equivalent value of the services

performed by the nine Defendants for the draws they received is the amount that Thelen charged

clients, which clients willingly paid for receiving those legal services. Those amounts surely

reflect the "market value" of those services in every sense of the word. Those amounts were

determined at arm's length; were billed to Thelen's clients, and were paid by them in the normal

course of business. This would appear to be a more than reasonable basis upon which to gauge

the "reasonable equivalent value" of the services Thelen offered its clients through the work of

these lawyers.

To accept the Trustee's position, would be to endorse the view that the "value" of the legal services performed by a partner in a law firm does not depend on the amount that a third party willingly pays for those services or even what those services would otherwise command, but, rather, depends on the profitability of the law firm. The absurdity of the trustee's position can readily be seen by comparing the billing rates and partner compensation at any law firm and over any reasonable period of time. Billing rates are determined by market forces and the perceived skill and experience of an attorney. Clients pay less money per hour for certain kinds of legal work and more for other types.

In the real world, hourly billing rates for lawyers in large law firms do not depend on the profitability of the law firm, nor do they go up and down depending on how much money the attorney gets paid each year. Highly skilled lawyers who don't control large amounts of client business tend to have lower incomes yet higher billing rates than less skilled attorneys with very large "books". This was certainly true of the compensation system at Thelen.[13] The latter (lawyers who control large client accounts) frequently get a much larger percentage of firm profits, deriving a major portion of their annual compensation for the client accounts they manage. Said differently, at any given law firm there will be a wide variety of factors that go into partner compensation decisions, but business generation invariably ranks very high on that list.

Actual facts related to the Defendants makes the point. In 2007, the nine Defendants received an average of $446,480 per person in compensation from Thelen. In 2008 those same partners received an average of $262,528 in draws for the work at the firm. Indeed, if the

---

[13] As stated by Mr. Fontana, any review of billing rates and compensation paid by Thelen each year, will show that there was little, if any, correlation between those variables. Conversely, there was a very high correlation between compensation and "billing attorney" fees.

Trustee's legal theories were to be accepted, the average amount that nine Partners would be paid

for their work during 2008 would be reduced to $135,325.  The hourly billing rates that Thelen

charged for the work of these nine individuals was the same in 2008 as it had been in 2007 —

indeed, in some cases it was slightly higher.

Further, if the trustee's theory of reasonably equivalent value is accepted and applied, the

"value" of every hour of legal service performed by these Partners declined by 69.7% between

2007 and 2008 for no reason other than the fact that the law firm's profit (and thus their

compensation) declined precipitously (and understandably in an economically rational world)

during the year that Thelen went out of business. [14]

If each hour of work done by these individuals was "worth" nearly 70% less in 2008,

why did Thelen continue to bill clients the same hourly rates?  And why did clients continue to

pay the same and sometimes even higher hourly rates, if the "value" of the services was less than

half what it was the year before?  These rhetorical questions point up the absurdity of the

Trustee's effort to equate the firm's profitability to the "reasonable equivalent value" of the

services of the Defendants.

Another contextual piece of evidence to demonstrate the absurdity of the Trustee's

position is shown by statistics from 2009.  After Thelen went out of business in November 2009,

the Defendants went to work for other law firms doing much the same kind of legal work they

had been doing at Thelen.  Not surprisingly, they all earned considerably more money in 2009

than they did in 2008.  On average, the nine defendants were paid $548,417 for their work at

---

[14]  Thelen paid partner draws for only 10.5 months in 2008.  Had it stayed in business and paid draws at the same level for the entire year, each defendant would have received an additional $31,500.  That would have increased the amount of their 2008 to an average of about $294,000.  While working for an additional month and a half would have resulted in more revenue for Thelen, and probably somewhat greater profits, the Defendants' share of firm net income would have remained the same.  As a result, the trustee's approach would ascribe a similar reduction in the "value" of their time for 2008 as compared with 2007 or 2009.

other law firms during 2009.  Once again, accepting and applying the Trustee's position on "reasonably equivalent value" would mean that the value of the legal services these lawyers performed in 2009 (measured in terms of their compensation) was *four times greater* than what the Trustee argues that it was in 2008.

**E.    Case Law Understandably Rejects the Trustee's Theory in This Connection**

The Trustee has freighted his brief with forty cases purporting to support this position.  In fact, none do, for none relates to an analysis of how draws in a law firm should be valued.  What apparently the Trustee failed to locate was the one opinion that does deal directly with draws paid to lawyers on the eve of bankruptcy, *Annod Corp. v Hamilton & Samuels,* 123 Cal.Rptr.2d 92, 100 Cal.App.4th 1286 (2003) that undermines completely whatever reasoning underlies the Trustee's reasonable equivalent value theory.[15]

*Annod Corp. v Hamilton & Samuels, supra*, is a California Court of Appeals decision that is directly on point.  It involved the bankruptcy of a law firm in Southern California which had continued to pay draws to partners in the firm for seven months after it had ceased to pay rent.[16] The trustee in that case claimed that the continued payment of draws constituted "fraudulent conveyances" despite findings by the trial court that "if the draws were not paid, none of the former partners would have continued working and generating revenue for the struggling law practice;" the Court continued, "[the] partnership draws represent undermarket values for the services performed by the former partners" and "the draws [from August 1, 1995 forward] were

---

[15]    The Trustee's brief also ignores the numerous judicial opinions that have upheld lawyer retainer agreements against "fraudulent conveyance" claims even in the absence of evidence that the lawyer billed enough time to fully cover the amount that was paid.  *See, e.g., In re Armstrong*, 234 B.R. 899, 906 (Bankr. E.D. Ark. 1999) ("[R]easonably equivalent value includes more than the tangible hours actually expended."); *McQueen, Rains & Tresch, LLP v. Citgo Petroleum Corp*, 195 P.3d 35, 44 (Okla. 2008) (and cases cited in n. 24).

[16]    As in the case of Thelen, the partners in Hamilton & Samuels had no personal liability for firm's rent obligations.  *See* 123 Cal.Rptr.2d at 931.  The draws were continued during the period from August 1995 to February 1996.  Beginning in September 1995, the firm ceased to pay its rent.  *Id.*

a fraction of what the former partners generated in receivables for Hamilton & Samuels." 123

Cal.Rptr.2d at 930-31.

The court in *Hamilton & Samuels* was presented with exactly the same legal argument

that the trustee is attempting here. In rejecting that argument on largely the grounds that the

Defendants here urge this Court should reject the Trustee's arguments, the Court noted,

> Annod [the trustee] contends that under general partnership law, a
> partner is entitled to no compensation other than a share of the
> profits, in the absence of an agreement to the contrary. It explains
> that, unless an agreement otherwise provides, services are rendered
> in exchange for a share of the profits and a partner is entitled to no
> additional compensation with respect to the reasonable value of
> services rendered.

123 Cal.Rptr. at 934. The Court also pointed out that there was nothing in the Hamilton &

Samuels partnership agreement that prohibited the payment of draws to partners, nor any thing

that said that "partners were not entitled to compensation for the legal work they performed." *Id.*

at 934-35.

Much like the Trustee here, the trustee in *Hamilton & Samuels* also argued that draws

could not be paid at a time when the law firm was operating at a loss, because the partnership

agreement defined partner compensation in terms of shares of "net profit". The Court of Appeal

rejected that argument as well, explaining,

> Assuming there were indeed no net profits, ... the partnership
> agreement nonetheless did not support Annod's assertion. [The
> partnership agreement provided] a method of establishing in what
> proportions the partners, as between themselves, would share in
> the profits and losses of the firm. [The partnership agreement] did
> not, however, provide that no partner could receive a draw if there
> were no net profits at any given point in time or any bills remained
> unpaid. *Id.* at 935.[17]

---

[17] It is also relevant to point out that this case also held that the question of reasonable equivalent value was a
question of fact peculiarly unsuitable for adjudication as a matter of law on summary judgment.

The same is true of the Thelen Partnership Agreements.  They, like the Annod agreement, contain *no* provision that precludes partners from receiving draws if net profits fall below a certain level.  Nor does the Partnership Agreement require the partners are to be denied compensation when they come to work in difficult circumstances and perform legal services that generate significant net revenue for the firm and its clients.  Absent specific evidence of bad faith or fraudulent intent—conceded by the Trustee not to exist here—the net revenue generated by the partners' efforts is sufficient to demonstrate that the law firm received "reasonably equivalent value" for the draws that were paid.

Both logic and law thus refute the Trustee's facile and fallacious equation of the definition of reasonable equivalent value and the ultimate determination of a partner's aliquot share of net profits.

When all is said and done, we end this brief much as we began it: the Trustee's various positions are manufactured to facilitate a litigation strategy to extract payments from the Defendants; none of his positions on this motion are the product of the prudent and proper application of prevailing law to established facts.  The Trustee's motion should therefore in all respects be denied.

## **CONCLUSION**

For the foregoing reasons, and as supported by the Declarations of Eli R. Mattioli Frederick L. Whitmer and Gary L. Fontana, simultaneously filed herewith, the Trustee's motion for summary judgment should be denied in all respects

FREDERICK L. WHITMER
On behalf of the Whitmer-Fontana Defendants

_Frederick L. Whitmer_

35

New York, New York
April 11, 2014