UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| THELEN LLP, | : | Case No. 09-15631 (ALG) |
| Debtor. | : | |

---

| | | |
|---|---|---|
| Yann Geron, Chapter 7 Trustee of the Estate of Thelen LLP, | : | |
| Plaintiff, | : | |
| v. | : | Adv. Pro. No. 11-02648 (ALG) |
| GARY L. FONTANA, et al., | : | |
| Defendants. | : | |

---

**MEMORANDUM DECISION DENYING TRUSTEE'S MOTION TO COMPEL ARBITRATION, DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT, AND GRANTING SUMMARY JUDGMENT TO THE TRUSTEE ON HIS CONTRACT CLAIM**

APPEARANCES:

REID COLLINS TSAI LLP
*Counsel to Yann Geron, Chapter 7 Trustee*
One Penn Plaza, 49th Floor
New York, New York 10119

    By:    Angela J. Sommers, Esq.
                Jeffrey E. Gross, Esq.
                Anne M. Bahr, Esq.
                Yonah Jaffe, Esq.

Frederick L Whitmer, Esq.
*Pro se, and for others in Whitmer/Fontana group*
c/o Kilpatrick Townsend & Stockton LLP
1114 Avenue of the Americas
New York, New York 10036

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

On September 18, 2009, the law firm Thelen LLP ("Thelen") filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code, and Yann Geron (the "Trustee") was appointed the chapter 7 trustee. The bankruptcy filing occurred almost one year after the partners of Thelen, a registered limited liability partnership governed by California law, voted to dissolve the partnership. During the intervening year, the firm apparently collected the firm's receivables and monetized available assets and paid them over to its secured lender, Citibank, N.A. ("Citibank").

From December 1, 2006, through October 27, 2008, the firm's business was governed by The Third Amended and Restated Limited Liability Partnership Agreement of Thelen Reid Brown Raysman & Steiner LLP, the firm's previous name (the "Third Partnership Agreement"). In August, 2008, the withdrawal of several partners triggered a non-monetary breach of the firm's loan agreement with Citibank. Although the firm continued to operate for a few months, on October 28, 2008, the partners voted to dissolve the firm and to adopt a Fourth Amended and Restated Limited Liability Partnership Agreement (the "Fourth Partnership Agreement), which governed its affairs up to the dissolution. An October 28, 2008, dissolution agreement contemplated that the firm would effectuate its dissolution on a date between November 26, 2008 and December 15, 2008; the actual date of dissolution was November 30, 2008.

Each of the Defendants either was a Partner of Thelen as of December 1, 2006 or became a Partner thereafter and prior to October 28, 2008, and each signed one or more of the Partnership Agreements or through conduct manifested an intention and agreement to be bound thereby.[1] Thelen had three tiers of partners: (i) equity partners without guaranteed compensation ("Equity

---

[1] One of the Defendants filed for bankruptcy protection, thereby staying the action as against him.

2

Partners"), (ii) Equity Partners with guaranteed compensation, and (iii) income partners (those who received salaries). All of the defendants in the instant adversary proceeding are or were Equity Partners. The Partnership Agreements both provide in § 8.3 that the laws of the State of California (other than its conflict of laws principles) apply to the construction, interpretation and effect of the agreements.

*The Partnership Agreements*

The Partnership Agreements provide that "'Partner' means, as of any date, each individual who on such date is a Partner with the right to share in the Net Income of the Partnership pursuant to Section 2.1." (Third, § 1.10.11; Fourth § 1.9.11). Section 2.1 provided that

> The Partners in the Partnership shall be those individuals who have been admitted as Partners to the Partnership pursuant to the terms of this Agreement and who have not ceased to be Partners pursuant to Article 6. Each of the Partners who have the right to share in the Net Income of the Partnership (irrespective of whether such Partner's compensation is determined solely based upon the right to share in the Net Income of the Partnership) and who have an interest in the capital of the Partnership are parties to this Agreement. . . .

The Partnership Agreements then provided in Article 4 for the allocation of Net Income to Partners, with each partner entitled to receive an allocation of the partnership's "Net Income" for the calendar year (or relevant portion thereof) in proportion to certain sharing ratios. Section 4.1.1 of the Third Partnership Agreement and section 4.1.1.1 of the Fourth Partnership Agreement both provided that the "Net Income of the Partnership for each calendar year or relevant portion thereof . . . shall, after taking into account any allocations of income . . . and any deductions[,] . . . be allocated to the Partners in proportion to their Sharing Ratios." Each Partner entering into the Partnership Agreement was assigned a certain number of points that were used to calculate the Partner's "Sharing Ratio." Section 4.2 of both Partnership Agreements governed distributions;

3

section 4.2.1, relating specifically to periodic draws, provided that:

> Each Partner shall be entitled to receive *a draw as an advance* against such Partner's share of Net Income of the Partnership on a periodic basis under a policy determined from time to time by the Office of the Chair.   (emphasis added).[2]

Section 4.2.2 provided that:

> The Partnership shall distribute to the Partners from time to time, in proportion to their Sharing Ratios, all or a portion of the Net Income of the Partnership, reduced by prior draws or other advances against Net Income paid to such Partners pursuant to Section 4.2.1, under a policy determined from time to time by the Office of the Chair.

In brief, the Partnership Agreements thus provided that the Partners would share in the Net Income of the Partnership; that the Partners could receive periodic advances as draws against Net Income; and that an allocation of Net Income to a partner would be reduced by "prior draws or other advances."

On September 15, 2011, the Trustee commenced similar adversary proceedings against many of the Thelen partners (including the Defendants) seeking, among other things, damages for breach of contract, avoidance of fraudulent conveyances and turnover of property of the estate. The Trustee's claims against nine of the Former Partners were consolidated in the instant consolidated Amended Complaint, which as amended on January 22, 2014, alleged that the defendant partners had been overcompensated in the year 2008 under the terms of the Partnership Agreements.   Accordingly, among other things, the Trustee sought damages against each defendant for breach of contract to recover the overpayments, plus costs, interest and attorneys' fees.   In addition, the Trustee alleged that the overpayments were avoidable as fraudulent conveyances under 11 U.S.C. § 548(a)(1)(B) (constructive fraudulent conveyance).   In May 2014, the Court denied a partial summary judgment motion filed by the Trustee concerning two

---

[2] The policies adopted by the Office of the Chair, if any, have not been included in the record.

4

aspects of the fraudulent conveyance claims in dispute. *Geron v. Fontana (In re Thelen)*, Ch. 7 Case No. 09-15631 (ALG), Adv. No. 11-2648, 2014 WL 2178156 (Bankr. S.D.N.Y. May 23, 2014).

In the instant motion, each side contends that the terms of the Third and Fourth Partnership Agreements support their respective positions, with the Defendants arguing that they do not have to return any overadvances received, and the Trustee arguing that advances in excess of net income are a liability that the Defendants owe to the estate.

*Arbitration*

Before dealing with the substantive motions before the Court, the Trustee's belated attempt to send this dispute to arbitration must be considered.

The Thelen Partnership Agreements each had an arbitration clause providing that

> Any controversy or claim arising out of or relating to this Agreement, including any breach, amendment or modification hereof, shall be determined exclusively by arbitration conducted either in the City of New York, New York, or San Francisco, California, by and pursuant to the Commercial Arbitration Rules then in effect of the American Arbitration Association ("AAA").

Third & Fourth Partnership Agreements §§ 8.9.1.  Early in the litigation, another partner defendant in a similar lawsuit moved to compel arbitration, and the Trustee vigorously opposed. This Court sustained the Trustee's objection, primarily on the ground that the Trustee could not be compelled to arbitrate claims alleging fraudulent conveyances based on a contractual arbitration clause. [Court's Order, entered April 30, 2014, memorializing oral decision read into the record on April 17, 2012].  An appeal was taken, and the District Court affirmed the order rejecting arbitration. *Geron v. Cohen*, 2013 U.S. Dist. LEXIS 188737 (S.D.N.Y. March 21, 2013).  The parties in that suit and in the instant consolidated action thereafter litigated the fraudulent

5

conveyance issues, and as noted above the Court rendered a decision denying partial summary judgment to the Trustee on the two issues he presented for decision. *Geron v. Fontana*, 2014 WL 2178156. At the end of that decision, the Court suggested that the parties might reconsider arbitration as a method of bringing this protracted litigation to an end, especially as it now appeared that contract issues predominated. Both parties, thereafter, reversed their positions – the Trustee endorsed arbitration and the Defendants, who had earlier advocated arbitration, strongly opposed. In the Defendants' words, "the Trustee's strategy of pursuing litigation has visited prejudice on the Defendants in forcing their time, effort and attention to defending claims where their liability for the Trustee's claims was very much at risk." Memo in Opposition to Motion to Compel Arbitration, p. 18. They agreed that "arbitration at the onset of these proceedings would likely have accelerated resolution of the controversy." *Id*. at 26. Nevertheless, they continued:

> Now, after this Court has invested much time, attention and resources in coming to grips with the issues of this action, and after the remaining Defendants have litigated for some time, including facing the Trustee's motion for summary judgment on some of the claims, the Trustee wants to discard the Court's expertise, its knowledge and experience and instead, start over with an arbitration that will proliferate expense for the Estate, but with the express purpose of saddling Defendants with an expense that is manifestly intended to coerce payment to the Trustee, irrespective of the merits of the claim, but economically the lesser of two evils.

*Id*.

Without endorsing Defendants' attribution of improper motives to the Trustee, they are unquestionably right on the law. "[A] party waives its right to arbitration when it engages in protracted litigation that prejudices the opposing party." *Crysen/Montenay Energy Co. v. Shell Oil Co. (In re Crysen/Montenay Energy Co.)*, 226 F.3d 160, 162 (2d Cir. 2000). Prejudice can be found where a party continues litigation and later seeks to arbitrate the same issues, where

6

unfairness would result because of "delay, expense, or damage to a party's legal position." *Id*. at 162-63. As the Second Circuit said in *Thyssen, Inc. v. Calypso Shipping Corp.*, 310 F.3d 102, 105 (2d Cir. 2002), quoting *Kramer v. Hammond*, 943 F.2d 176, 179 (2d Cir.1991):

> Prejudice can be substantive, such as when a party loses a motion on the merits and then attempts, in effect, to relitigate the issue by invoking arbitration, or it can be found when a party too long postpones his invocation of his contractual right to arbitration, and thereby causes his adversary to incur unnecessary delay or expense.

*See also PPG Indus. Inc. v. Webster Auto Parts, Inc.*, 128 F.3d 103, 107 (2d Cir. 1997).

A determination whether there has been waiver of the right to arbitrate involves a fact-intensive inquiry of such factors as:

- the time elapsed from the commencement of the litigation to the request for arbitration.
- the amount of litigation, including any substantive motions and discovery
- proof of prejudice.

*Thyssen* at 163. Here, the adversary proceeding was commenced in 2011, and the Defendants have been forced to litigate substantive motions, including a partial summary judgment motion and various motions seeking consolidation. The parties have invested time, attention and resources to the litigation before this Court. A referral to arbitration, at this point, would not only impose substantial costs on the Defendants but would impose costs on an estate that cannot afford them. It would likely delay resolution of key and determinative issues, which have been fully briefed and are ripe for decision. The Court finds that the Trustee has waived his contractual right to arbitrate the contract claims as against these Defendants.

*Summary Judgment on the Contract Claims*

Summary judgment under Federal Rule of Civil Procedure 56, made applicable by Federal Rule of Bankruptcy Procedure 7056, is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

7

Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Morenz v. Wilson–Coker*, 415 F.3d 230, 234 (2d Cir. 2005). The moving party bears the burden of demonstrating the absence of any genuine issue of material fact, and all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). However, once there is a showing of the absence of an issue of fact, the opposing party must produce specific evidence that raises a genuine issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A fact is "material" if it might affect the outcome of the suit under the governing substantive law, and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Partial summary judgment may be granted on a discrete issue if the party identifies "each claim or defense – or the part of each claim or defense – on which summary judgment is sought . . . [and shows that] there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). As noted, the Defendants seek partial summary judgment on their assertion that they have no contractual obligation to repay any draws received in excess of their allocable share of net income for 2008.

The Trustee argues in response that the Partnership Agreements clearly obligate the individual Partners to repay excess draws as a personal liability owed to the Partnership. Even though the Trustee has not filed a cross-motion seeking summary judgment, he contends in his brief that "Based on the true uncontested facts, rather than judgment in favor of the Defendants, this Court should grant summary judgment in favor of the Trustee." Memo in Opp. To Motion for

8

11-02648-mew    Doc 97    Filed 11/20/14    Entered 11/20/14 17:12:58    Main Document
Pg 9 of 17


Summary Judgment, p. 7. Indeed, a motion for summary judgment "searches the record" and, pursuant to Fed. R. Civ. P. 56(f), made applicable by Fed. R. Bankr. P. 7056, a court can grant summary judgment in favor of a nonmovant, so long as it provides notice and an opportunity to marshal evidence on the motion to the opposing party. *See In re Musicland Holding Corp.*, No. 06-10064 SMB, 2012 WL 769473 at *1 (Bankr. S.D.N.Y. Mar. 7, 2012). At oral argument, Defendants agreed that they had been given adequate notice and opportunity to be heard under Rule 56(f), and the Court accordingly finds as a matter of procedure that it may grant summary judgment to the Trustee.

*Discussion*

At issue in this case is the right of the Defendants to retain draws that were paid as advances against partnership income and, because of the dissolution of the firm or other reasons, exceeded the Partners' Allocable Share of Net Income for the calendar year 2008 (or relevant portion thereof) ("Final ASNI"). The question is thus whether draws and other advances that exceeded Final ASNI for the period at issue must be repaid to Thelen. It is not contested that in 2008, Defendants were Partners, defined in the Agreements as "Equity Partners," and that Thelen in 2008 paid Equity Partners semi-monthly draws at a rate of $1,000 per equity point per month, with a minimum draw of $21,000 per month for Full Equity Partners (16 points or higher). These draw payments ("Draw Advances") were made in the middle and at the end of each month, and two additional payments were made in March and June of 2008. The advances paid to the Partners were provided for in § 4.2.1 of the Partnership Agreements, quoted above, which described them as advances against "such Partner's share of Net Income of the Partnership on a

periodic basis under a policy determined from time to time by the Office of the Chair."[3] Section 4.2.2 further provided that

> The Partnership shall distribute to the Partners from time to time, in proportion to their Sharing Ratios, all or a portion of the Net Income of the Partnership, reduced by prior draws or other advances against Net Income paid to such Partners pursuant to Section 4.2.1, under a policy determined from time to time by the Office of the Chair.

Defendants in substance assert that they can keep the advances they received against anticipated Net Income that was never earned.

The Partnership Agreements when read in conjunction with applicable law are clear that they could not. As the Court said recently in connection with another law firm bankruptcy, partners have no right, absent a contract, to income in excess of the earnings of the Partnership. *See Jacobs v. Altorelli (In re Dewey & LeBoeuf LLP)*, ___ B.R. ___, Case No. 12–12321, Adv. Pro. No. 14–1797 (MG), 2014 WL 5463302 at *14 (Bankr. S.D.N.Y. Oct. 29, 2014) (New York law). California law is the same. *See Bardis v. Oates*, 119 Cal.App.4th 1, 14, 14 Cal.Rptr.3d 89 Cal.App. 3 Dist., May 28, 2004 (the general rule is that for services performed for a partnership, unless there is an express agreement providing for compensation, a partner is only entitled to his share of profits).[4] This principle was reflected in §§ 4.2.1 and 4.2.2, which make it clear that Defendants are only entitled to share in the partnership Net Income.[5] As further discussed below,

---

[3] Neither party has provided the Court with evidence as to the policies adopted by the Office of the Chair.

[4] In California, which has adopted the Uniform Partnership Act of 1994, a partner may be entitled to "reasonable compensation for services rendered in winding up the business of the partnership." Cal. Corp. Code, § 16401, subd. (h).

[5] Net Income is defined in § 1.10.9 of the Third Partnership Agreement as "the net income of the Partnership as determined by the cash receipts and disbursements method of accounting as used for federal income tax purposes." In the Fourth Partnership Agreement, in renumbered § 1.9.10, the words "(positive or negative)" were added after the word "Partnership" for obvious reasons.

10

Defendants do not rely on any individual contractual right to receive income in excess of their share of Net Income, nor have they identified any provisions of the Partnership Agreements that would give them this right.[6]

If a party receives advances to which he or she has no right, there is an implied agreement to repay them. For example, in *Sunniland Fruit, Inc. v. Verni*, 233 Cal. App. 3d 892, 899, 284 Cal. Rptr. 824, 827 (Ct. App. 1991), which involved the return of an advance paid by a marketer of grapes to the crop grower, the Court construed the contract and concluded that "The words 'advance' and 'loan' generally connote an agreement to reimburse the one providing the funds. . . . In the absence of evidence to the contrary, these words must be given their ordinary meaning." The *Sunniland* court interpreted the contract provisions to "*impliedly* express an intent that the risk of the market remains with the grower." *Id*. at 901-02. (emphasis added). Similarly, in *Steinhebel v. Los Angeles Times Commc'ns*, 126 Cal. App. 4th 696, 705, 24 Cal. Rptr. 3d 351, 357 (Ct. App. 2005), which involved commissions earned in addition to a minimum statutory wage for the sale of newspaper subscriptions, the Court determined that if the commissions were not earned, they could be charged-back to the employees. Just as the commissions in *Steinhebel* were subject to contingencies, the partners' Final ASNI in the instant case was subject to the contingency that profits would be realized sufficient to justify the amounts advanced to the partners.

The contract in the *Sunniland Fruit* case characterized the advance there as both an advance and a loan. The court did not, however, find that the use of the word "loan" was critical to its determination that the parties intended that the defendant would repay funds he did not earn. The California courts have in fact treated the words "advance" and "loan" as virtually

---

[6] Defendants in other suits brought by the Trustee did rely on separate contracts they had with the firm, but they are not parties to this proceeding.

interchangeable.   As the California Supreme Court stated in another case involving an advance,

> the Complaint sets forth an agreement that defendant was to "advance" such sums as should be necessary to purchase property.   The word "advance" implies, when used in this connection, "to furnish money for a specific purpose, understood between the parties, the money or some equivalent to be returned." (Black's Law Dict.)   The allegation of an advance, upon a mutual agreement of one to take and pay for property for another in his own name, implies an agreement upon the part of the beneficiary of such payment, to reimburse the one who made the advancement. Such a loan, unless expressly stipulated in writing, is presumed to be made upon interest.

*Semi-Tropic Spiritualists' Ass'n. v. Johnson*, 163 Cal. 639, 642, 126 P. 488 (1912).

Defendants' obligation to repay draws in excess of the Net Income of the Partnership is confirmed by § 6.6.3 of the Agreements, which provided:

> The Partnership shall be entitled to recover any amount owed to it by a Former Partner on the date such Partner ceases to be a Partner by offset against amounts otherwise required to be paid to such Former Partner pursuant to this Section 6.6. Unless otherwise agreed, the excess, if any, of such amount over the amount otherwise payable to such Former Partner shall become payable immediately on the date such Former Partner ceases to be a Partner.

Defendants dispute that they are "Former Partners," which the Partnership Agreements define as "an individual, who having been a Partner, has ceased to be a Partner for any reason."   (Third, § 1.10.3; Fourth § 1.9.4).   They point to Article 6, which delineates the various ways in which a partner could cease to be a partner, and contend that because they do not come within any of the listed categories, they did not become Former Partners and instead remained as Dissolution Partners.   They also point out that they have continued to receive tax forms since 2008 as partners of Thelen LLP, although they have not asserted that they have incurred any tax liability as a consequence.

The short answer to Defendants' contention is that, if it were necessary, each of the Defendants could be made a "Former Partner" by expulsion from the firm.   The Trustee said at

12

oral argument that he was prepared to take this step, and he can decide in connection with the settlement of orders on the instant motion whether he wishes to do so.   There seems no doubt that the Trustee has the authority under § 6.4 of the Partnership Agreement to expel each of the Defendants at any time if this were necessary to make them Former Partners.[7]   Beyond the formality of expelling the Defendants, there is no doubt that the Defendants have been acting as if they were Former Partners of the firm since 2008.   As a partner of Thelen, they were each obliged by law and by § 2.2 of the Third Partnership Agreement to maintain an "exclusive relationship" with Thelen and not compete by practicing law with another firm.   *See In re Dewey & Le Boeuf*, 2014 WL 5463302 at * 14, ("[P]artners are expected to devote their efforts to the partnership business, not to individual endeavors").   Admittedly, § 4.1.2.1 of the Fourth Partnership Agreement deleted the exclusivity provision and permitted Thelen's remaining partners to work at other firms.   In Count VI of the Amended Complaint, the Trustee attacks this "Exclusivity Waiver Provision" as a fraudulent conveyance, enacted on the eve of dissolution.   Without reaching this issue, which has not been briefed by the parties, it may have been entirely appropriate for certain of the remaining partners to remain connected to the firm to close up the business.   There is no basis, however, to assume that this entitled Defendants to retain advances in excess of Final ASNI.   As a matter of substance, the record is that Defendants were "Former Partners" bound to repay their debts to the firm, including advances in excess of Net Income.

Defendants cite numerous cases for the "majority rule" adopted in California and elsewhere that has relieved employees of an obligation to repay payments received as "advances,"

---

[7] Defendants make the argument that they can only be expelled by a vote of the general partners (primarily themselves).   The Trustee succeeded to the administration of the partnership and, in connection with his liquidation duties, to the expulsion of partners.   11 U.S.C. § 704.

13

where income has proved insufficient to cover them. The cases on which they rely, however, deal with *employee* wages or commissions. In most of those cases, the employees were paid by commissions and received advances against commissions, and the courts found that the employee had not assumed the risk that there would be insufficient commissions to cover earlier advances or that the business enterprise would have no income. *See e.g.*, *Agnew v Cameron*, 247 Cal.App.2d 619, 624 55 Cal.Rptr. 733 Cal Ct. of App., 4th Dist. 1967). In requiring an explicit written agreement to repay excess commissions of this nature, these cases speak of the strong public policy that favors protection of *employee* wages. *Sciborski v. Pacific Bell Directory*, 295 Cal.App.4th 1152, 1167 (Cal. Ct. of App., 4th Dist. 2012); *Harris v. Investor's Business Daily, Inc.*, 138 Cal.App.4th 28, 41 (Ca. Ct. of App., 4th Dist. 2006). These cases are also predicated on the superior bargaining power of the employer, which places on the employer the duty to make explicit its right to demand that the employee return payments made. *Agnew*, 247 Cal.App.2d at 624. In this case, by contrast, the partners have not contended that they had unequal bargaining power, and they have not identified any legal right to income in excess of Final ASNI. They assumed the risk that the Partnership would not have income to cover their advances. Thus, the facts of the case at bar are closer to the California cases, discussed above, that recognize that an express or *implied* obligation to repay an advance is all that is required in cases such as the one at bar.

Defendants also contend that any obligation they had to repay advances in excess of Net Income was dealt with exclusively by an adjustment to their respective capital accounts, and that any obligation to account for draw advances was effected only through such an adjustment. Defendants do not cite a provision in the Partnership Agreements that states explicitly that a cash

14

obligation could be satisfied by a bookkeeping entry.  They contend only that, pursuant to Article 3 of the Partnership Agreements, each Defendant was obligated to make capital contributions to the firm and that a separate capital account was maintained for each partner, and that under § 6.3 of the Agreements, a partner's share of Net Income (or lack thereof) would affect the calculation of the Partner's capital account.  In any event, the effect that payments to or from a Partner might have on his or her capital account would not satisfy a Partner's liability to the firm for an unearned advance.  A capital account tracks something else altogether – the extent of a partner's equity interest in the firm.  Just as the Defendants were entitled to receive cash rather than merely an adjustment to their capital accounts when the firm had income, so they are obligated to repay cash when the firm had no income.  Indeed, Defendants' contention that a decrease to their equity accounts could substitute for the repayment of a debt would wholly undermine the priorities of the Bankruptcy Code.[8]

Finally, Defendants make the entirely spurious contention that they do not have to return advances in excess of Final ASNI because "an express provision of California law explicitly immunizes a Partner in a registered limited liability partnership from any such obligation." (Defendant's Memo in Support of Motion for Partial Summary Judgment, p.15).  Defendants refer to those sections of the California Uniform Partnership Act that shield a partner of a registered limited liability partnership from the liabilities of the partnership to creditors generally.  The Trustee is not, however, seeking to have the Defendants cover the Partnership's liabilities.  It

---

[8] This is especially true in this case because, in Defendants' words, the Fourth Partnership Agreement "relieves any Partner with a negative Capital Account Balance from being required to replenish the Capital Account Balances to zero" (referring to § 7.4.5.2 of the Fourth Agreement, as amended).  (Defendants' Memo in Support of Motion for Partial Summary Judgment, p.4).  The Trustee has challenged this provision in Count II of the Complaint in this case, as against certain Defendants, but there is no occasion here to reach this issue.

appears that Defendants and their partners left their firm in desperate condition, owing $6.9 million to a secured lender who has been paid the bulk of all receivables and other assets collected. The firm is now in chapter 7 liquidation, it is questionable whether the firm will be able to pay all employee priority expenses, and the Trustee plans to distribute nothing at all to unsecured creditors. In any event, the Trustee is not seeking funds from the Defendants to pay its liabilities generally. The Trustee is pursuing the Defendants because they breached their contracts by failing to repay advances in excess of Final ASNI that they did not earn and that they accordingly owe to the Partnership. *See Dewey & LeBoeuf*, 2014 WL 5463302 at *9 ("The fact that limited partners of limited partnerships and partners of LLPs are not 'jointly and severally' liable for partnership debts has nothing to do with those partners' personal liability for transfers the partnership made directly to them.")

Based on the foregoing, Defendants' motion for summary judgment is denied and, pursuant to Fed. R. Civ. P. 56(f), the Court grants the Trustee summary judgment finding that the Defendants breached the Partnership Agreements by failing to repay advances in excess of Final ASNI.[9]

*Conclusion*

The Trustee's motion to compel arbitration is denied. The Defendants' motion for summary judgment is denied except as to Count IV, which is dismissed. The Trustee is granted summary judgment finding that the Defendants breached the Partnership Agreements by failing to repay advances in excess of Final ASNI. The Trustee is directed to settle separate orders or

---

[9] Defendants are, however, correct when they seek summary judgment dismissing Count IV of the Amended Complaint, which seeks recovery on a theory of unjust enrichment. Since the Court finds that the matter was dealt with by contract, the Trustee cannot maintain a claim for unjust enrichment. *Cal. Med. Ass'n, Inc. v. Aetna US. Healthcare of Cal., Inc.*, 114 Cal. Rptr. 109, 94 Cal.App.4th 151 (2001).

judgments in his favor, on five business days' notice, setting forth each Defendant's individual liability; if further proceedings are necessary to resolve issues as to the amount of damages, they shall be held expeditiously.  The Trustee's proposed orders or judgments may specify whether the Trustee finds it expedient to expel any of the Defendants from the Partnership.

Dated: New York, New York
      November 20, 2014

                                **s/Allan L. Gropper**
                                UNITED STATES BANKRUPTCY JUDGE