**GARY L. FONTANA**
Law Offices of Gary L. Fontana
650 Lighthouse Avenue, Suite 220
Pacific Grove, CA  93950
Telephone: (831) 204-8215
Email: gary@garyfontana.com
*Pro se*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>  THELEN LLP,<br><br>                              Debtor | Chapter 7<br><br>Case No. 09-15631 (MEW) |
| YANN GERON, Chapter 7 Trustee of the<br>Estate of Thelen LLP,<br><br>                    Plaintiff,<br><br>           *v.*<br><br>GARY L. FONTANA,<br><br>                    Defendant | Adv. Pro. No. 11-02648 (MEW) |

<u>**DEFENDANT'S TRIAL BRIEF**</u>

# TABLE OF CONTENTS

A.    Issues to Be Decided ………………….…………………………………………… 1

B.    Thelen Was Obligated to Refund $80,000 to Mr. Fontana as of
      January1, 2008 As a Result of His Overfunded Capital Account ……………………… 1

C.    The Appropriate Date for Comparing Mr. Fontana's Draws with his
      Share of Net Income is November 30, 2008 ..…………..……………………….……... 5

D.    Unauthorized Bonuses and Guaranteed Payments Made to Offset Negative Capital
      Accounts Should Not Reduce Defendant's Share of Net Income ……………………... 9

      1.   More than $9.0 million in Unauthorized Guaranteed Payments Were
           Made to Equity Partners During 2008 ……………………………..……….……. 10

      2.   Changes Required to Correct for the Unauthorized Guaranteed Payments and
           Properly Compute Mr. Fontana's Share of Net Income ………..………………… 13

E.    Personal Account Payments for Long Term Disability Insurance Were
      Not Requested or Authorized ………………………………….................................. 16

F.    Pre-judgment Interest Should Not Be Awarded in this Case ……..…………..……... 16

# TABLE OF AUTHORITIES

## CASES

*Adelphia Recovery Trust v. Goldman Sachs & Co.,* 748 F.3d 110 (2d Cir. 2014) ……………. 7

*Barnhill v. Robert Saunders & Co.,* 125 Cal. App. 3d 1, 177 Cal. Rptr. 803 (1981) …….….. 4 n.5

*Employers Mutual Cas. Co. v. Philadelphia Ind. Ins. Co.,* 169 Cal. App.4th 340 (2008) ……. 16

*Harrison v. Adams,* 20 Cal.2d 646, 128 P.2d 9 (1942) …………………………..…….. 4 n.5

*KGM Harvesting Co. v. Fresh Network,* 36 Cal. App.4th 376, 42 Cal. Rptr.2d 286 (1995) …. 16

*Kruger v. Wells Fargo Bank )* 11 Cal.3d 352, 113 Cal. Rptr. 449, 521 P.2d 441 (1974) ….. 4 n.5

*Newberry Electric Corp. v. Fireman's Fund Insurance Co.,* 95 F.3d 1392 (9th Cir. 1996) … 4 n5

*New York State Electric & Gas Corp. v McMahon,* 129 F.3d 93 (2d Cir. 1997) ……………… 6

*U.S. Bank, N.A. v. United Air Lines, Inc.,* 438 F. 3d 720 (7th Cir. 2006) ……………..……. 4 n.5

*Wight v. BankAmerica Corp.,* 219 F.3d 79 (2d Cir.2000) ………………………………….. 7

*Wisper Corp. v. California Comm. Bank,* 49 Cal. App.4th 948, 57 Cal. Rptr.2d 141 (1996) …... 7

## STATUTES

California Corporations Code section 16401(d) ………………………………..…. 2, and n. 1

Bankruptcy Code §101(5)(A) ………………………………………………….……….. 4 n.6

Bankruptcy Code § 101(12) …………………………….…………………….……… 4 n.6

## OTHER AUTHORITIES

"Judicial Estoppel and Inconsistent Positon of Law Applied to Fact and Pure Law"
    89 CORNELL LAW REVIEW 192 (2003) ………………………………………….. 7 n. 12

Internal Revenue Service, Publication 541 "Partnerships" ……………………………… 9 n.15

**A.  <u>Issues to Be Decided</u>**

There are five issues or groups of issues to be decided at the trial of this matter.  Three of them will have a significant impact on the Trustee's damages claims.  All are listed in Appendix A in rough, descending order of their financial impact on damages.  The following sections discuss the evidence and applicable law in the same order as the issues appear in Appendix A.

**B.  <u>Thelen Was Obligated to Refund $80,000 to Mr. Fontana as of
January 1, 2008 As a Result of His Overfunded Capital Account</u>**

This is the largest single issue in the damages portion of this case.  For more than a decade prior to 2008, Defendant had been a 21 point partner at Thelen.  As of January 1, 2008, his share of firm revenue was reduced from 21 to 16 points.  See "Final 2008 Compensation Report" (Defendant's Trial Exhibit I at page 7).  It is undisputed that Thelen's capital policy required that equity partners maintain $16,000 per point in their capital accounts.  As of January 1, 2008 the Defendant's "permanent capital account" was fully funded and had a balance of $336,000.  See Defendant's Trial Exhibit K at page 1.  Because the capital account balance required of 16 point partners was only $$256,000, Mr. Fontana was entitled to a "refund" of the $80,000 excess capital in his account when his points were reduced.

Thelen's obligation to return the excess capital in Mr. Fontana's account is spelled out in section 3.1.2 of the Thelen Partnership Agreements.  In both the 3rd and 4th Partnership Agreements, the final sentence of section 3.1.2 provides, "[c]apital contributed by individual Partners in excess of the amount required to be contributed [under the Capital Policy] shall be refunded in accordance with the Capital Policy." (Plaintiff's Trial Exhibit 8 at page 8; Plaintiff's

Trial Exhibit 9 at page 8.)  It is also a specific requirement of California law. *See* California Corporations Code section 16401(d).[1]

Mr. Fontana will testify that Thelen's capital policy required that excess capital be refunded to the contributing partner during the year in which the capital account became "overfunded."  His testimony in this regard is corroborated by various capital account entries that appear in Defendant's Trial Exhibit H.  *See, E.G.,* DX #H at page 1, entries showing the return of "overfunded capital" totaling $138,048 to Partner "0133" on four occasions during 2006 and 2007.[2]

The Trustee, alternately, claims that Thelen did not owe $80,000 to Mr. Fontana or that Thelen had five years to repay this debt based on the Trustee's interpretation of language in section 6.6.2.  His position is untenable.  In the first place, the obligation to refund Mr. Fontana's excess capital is explicit both in the Partnership Agreement and under California law.  Second, the Trustee's argument that Thelen had no immediate obligation to repay the money is irrelevant to the issue of damages due to the right of setoff and the principle of recoupment.

Thus, while the Trustee relies on language which gives the law firm up to 5 years to pay a "former partner" the "Value" of his interest in the Partnership, his reading completely ignores the preamble to section 6.6 which states, "[e]xcept as otherwise expressly provided herein, the Partnership shall make payments to each Former Partner as set forth in this Section 6.6."[3]  Quite

---

[1]  California Corporations Code section 16401(d) provides "A partnership shall reimburse a partner for an advance to the partnership beyond the amount of capital the partner agreed to contribute."

[2]  The data that appears in DX #H will be explained by Mr. Fontana during his testimony. Similar entries showing a return of "overfunded capital" to partners appear throughout the exhibit.  See pages 3, 5, 6, 11, 12, 15, 19, 20 and 21.  In addition, see discussion at pp. 6-7, *infra*.

[3]  The term "Value" is defined in section 1.10.14 of the Partnership Agreement as "the amount of such Partner's Capital Account, if any, as of the date on which such Former Partner ceased to be a Partner . . . ."

plainly, the provision in section 3.1.2 creating the obligation to refund excess capital is one such "except[ion]" to the 5 year rule.

To the extent that further evidence is required to demonstrate that the Trustee is incorrect about the timeframe, one need only examine entries in the Thelen capital accounts for partners who had been paid the overfunded amounts in the capital accounts well before they left the law firm. Defendant's Trial Exhibit H contains a small subset of such capital account entries. It displays the capital accounts for 36 partners that left Thelen during 2007. Ten of those partners received payments from Thelen to "return . . . overfunded capital" from their permanent capital accounts. While the Trustee has redacted the names of those partners from this exhibit, the partners are identified by their partner numbers as Partners 0133, 2698, 3141, 3201, 3500, 3509, 3655, 6219, 6315 and 6345. If the Trustee was correct that Thelen did not have to refund excess capital until five years <u>after</u> a "former partner" left the law firm, why was Thelen making these payments to people who were still partners and, in some cases, several years before the partner left the law firm?[4]

In addition to everything else, even if the Trustee were correct that Thelen had five years to return the overfunded capital, it would not change the outcome because Mr. Fontana would still be able to apply the $80,000 via setoff or recoupment against the Trustee's damages claims. The obligation to refund excess capital created a "right to payment" on the part of Mr. Fontana

---

[4] DX #H shows that 6 of the 10 partners received payments totaling more than $320,000 from Thelen to "return overfunded capital" during 2005 or 2006, despite the fact that the partner was still a member of the firm in 2007. Those 6 partners and the year(s) in which they received such payments are as follows: #0133 (2006); #3141 (2006); #3201 (2006); #3500 (2006); #3509 (2006); and #3655 (2005 and 2006).

which arose from the same contract as the Trustee's alleged damages claims. As such, the

obligation may be set off or "recouped" against the Trustee's damages claims in this case. [5]

The obligation to repay the $80,000 arose when Mr. Fontana's share of firm income was

reduced from 21 to 16 points. At that point, the $80,000 no longer represented a portion of his

"capital" in the law firm. Instead, it became a "claim" against Thelen and, therefore, a "debt"

within the meaning of the Bankruptcy Code.[6]

For the foregoing reasons, this Court should conclude that Mr. Fontana is entitled to a

credit for the $80,000 that Thelen owed him as a result of his overfunded capital account. For

these purposes, it does not matter if the Court concludes that $80,000 of the payments that Mr.

Fontana received during 2008 were intended to satisfy this obligation via a return of capital or if

the Court concludes that the debt remains unpaid.

Either way, the result is the same. To the extent that $80,000 of the amounts that Mr.

Fontana received during 2008 were a "return of capital" to satisfy this obligation, neither Thelen

nor the Trustee has suffered any damage because the payments reduced a pre-petition debt. If

the debt remains unpaid, the Trustee's damages claim must be reduced by $80,000 by way of

---

[5] The right of set off is well-established under California law. *See U.S. Bank, N.A. v. United Air Lines, Inc.,* 438 F. 3d 720, 730 (7th Cir. 2006)(applying California law); *Kruger v. Wells Fargo Bank )* 11 Cal.3d 352, 362, 113 Cal. Rptr. 449, 521 P.2d 441 (1974); *Harrison v. Adams,* 20 Cal.2d 646, 128 P.2d 9 (1942); *Barnhill v. Robert Saunders & Co.,* 125 Cal. App. 3d 1, 4, 177 Cal. Rptr. 803 (1981). Since the right to a refund of excess capital and the Trustee's overcompensation claim arise from the same contract, the doctrine of "recoupment" is also applicable here. *See Newberry Electric Corp. v. Fireman's Fund Insurance Co.*, 95 F.3d 1392, 1399 (9th Cir. 1996) ("[Recoupment is the] setting up of a demand arising from the same transaction as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim.")

[6] Section 101(5)(A) of the Bankruptcy Code defines "claim" as "a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Section 101(12) of the Act specifies that "[t]he term 'debt' means liability on a claim."

offset or recoupment "to avoid the unjust result that would occur if a debtor who has been

overpaid pre-petition by a party in a contract is permitted post-petition to make a claim under the

contract against that party without regard to the overpayment it has received." *New York State*

*Electric & Gas Corp. v McMahon*, 129 F.3d 93, 96 (2d Cir. 1997) (applying recoupment).


### C. The Appropriate Date for Comparing Mr. Fontana's Draws with his Share of Net Income is November 30, 2008

The second major issue which the Court must decide is the proper date for determining

Mr. Fontana's share of net income.[7]  Thelen was a calendar year tax payer and the Trustee insists

that December 31, 2008 is the proper date for determining Mr. Fontana's share of net income

despite the fact that he ceased working for Thelen during November 2008 and the final draw

payment that he received was issued on October 30, 2008.[8]

Like most law firms, Thelen computed net income on a monthly basis every year.

Defendant's Trial Exhibit B includes Thelen "point value" calculations for each month during

2007.  Defendant'sTrial Exhibit E includes similar data for 2008.[9]  In addition to the desire to

monitor financial performance, the firm was obligated to calculate net income on a monthly basis

in order to determine how much compensation "Former Partners" were entitled to receive for the

period of time that they worked at the firm.  Pursuant to the terms of the Partnership Agreements,

partners who left the firm were entitled to compensation for their share of net income "for the

---

[7]  This issue, standing alone, has a $42,192 impact on the damages which the Trustee seeks to collect.

[8]  Thelen applied the draw payment that would have been made to partners on November 15, 2008 to pay down the balances in partner personal accounts.

[9]  While the small print makes it difficult to read, Defendant's Trial Exhibit X is a one page summary of net income and point value for each month during 2008.

period beginning on January 1 of the calendar year in which such Former Partner ceased to be a

Partner and ending at the close of business on the day such Former Partner ceased to be a partner

. . . ." Partnership Agreement section 6.6.1.

The firm used the monthly point value calculations to prepare an "Estimated

Compensation Due Partner" report for each partner who left the firm.  Copies of the 2007

estimated compensation reports are included in Defendant's Trial Exhibit A.  The 2008 estimated

compensation reports are in Defendant's Trial Exhibit D.

As explained in greater detail in Defendant's Motion *in Limine* No. 3, the Trustee has

spent much of the past four years claiming that Mr. Fontana and Thelen's other "dissolution

partners" were "Former Partners" as defined in the Partnership Agreements.[10]  Having persuaded

Judge Gropper to adopt this argument as a central element of his reasoning granting the Trustee's

motion for partial summary judgment last fall,[11] the Trustee now seeks to disavow that position

by insisting that Mr. Fontana is not entitled to invoke the Partnership Agreement section 6.6.1

which states that a "Former Partner" is entitled to his share of net income for the period "ending

at the close of business on the day such Former Partner ceased to be a Partner . . ." which, in this

case, would be November 30, 2008.

The Trustee's attempt to "have his cake and eat it, too" should be rejected by this Court

on grounds of "judicial estoppel."  Furthermore, his position is contrary to basic accounting

---

[10]  See Defendant's Motion *in Limine* and Memorandum in Support, filed June 17, 2015, at pp.
16-19.

[11]  In his Memorandum Decision Granting Summary Judgment to the Trustee on His Contract
Claim, filed on November 20, 2014, Judge Gropper cited section 6.6.3 and the Trustee's
argument that the Defendants were "Former Partners" and, thus, subject to that provision.
Memorandum Decision at 12.  He then adopted the Trustee's position and found "[a]s a matter of
substance, the record is that Defendants were "Former Partners" bound to repay their debts to the
firm, including advances in excess of Net Income."  See Memorandum Decision at 13.

principles and is inconsistent with the manner in which other Thelen partners were treated when

they left the law firm.  There are scores of judicial estoppel cases that could be cited in addition

to those in the Defendant's Motion *in Limine*.  One recent case, applying judicial estoppel in the

context of bankruptcy, is *Adelphia Recovery Trust v. Goldman Sachs & Co.,* 748 F.3d 110 (2d

Cir. 2014) where the court concluded that a failure to enforce the principles of judicial estoppel

to prevent parties from adopting inconsistent positions,

> would threaten the integrity of the bankruptcy process by encouraging parties to
> alter their positions as to ownership of assets as they deem their litigation needs to
> change, leaving courts to unravel previously closed proceedings. Doing so would
> allow parties an opportunity to "play[] fast and loose" with the requirements of
> the bankruptcy process and inject an unacceptable level of uncertainty into its
> results – exactly the result that the doctrine of judicial estoppel is intended to
> avoid.

*Adelphia Recovery Trust v. Goldman Sachs & Co.,* 748 F.3d 110, 119, *citing Wright v.*

*BankAmerica Corp.*, 219 F.3d 79, 89 (2d Cir. 2000).[12]

In addition to the impropriety and unfairness of allowing the Trustee to change his

position on this issue, it is undisputed that Thelen dissolved as of November 30, 2008 and ceased

to function as a law firm.  In the ensuing months any number of actions were taken and decisions

were made that had nothing to do with the operation of the firm as a going concern.  Defendant's

accounting expert, William Essig, will testify that it as a matter of basic accounting principles,

when the law firm dissolved, it should have closed the books on its normal business operations

and begun a new set of accounting books and records for the period following dissolution while

it was winding up its affairs.

---

[12]  For a general review of the doctrine and its application across the United States see "Judicial
Estoppel and Inconsistent Positon of Law Applied to Fact and Pure Law" 89 CORNELL LAW
REVIEW 192 (2003).

Many things happen during the post dissolution period which have nothing to do with the normal business of the partnership.  In this particular case, one of those events was a decision made in late December 2008 to abandon and, thus, "write off" $10.0 million worth of leasehold improvements and other property that it had previously used to support its business operations. See Defendant's Trial Exhibit X.  This write off produced a significant net loss for the month of December 2008 which the Trustee seeks to invoke to reduce Mr. Fontana's net income and increase the Trustee's alleged damages.

Leaving aside the issue of judicial estoppel, it is illogical and unfair to interpret the Partnership Agreement to measure draws paid during a period of normal business operations against financial results during a period that includes post-dissolution write-offs and losses.  It would be as if comparing apples and oranges.  There is nothing in the Partnership Agreement to suggest that this is what was intended.  Section 4.2.1 of the Partnership Agreement merely states:

> **Periodic Draws.**  Each Partner shall be entitled to receive a draw as an advance against such Partner's share of Net Income of the Partnership on a periodic basis under a policy determined from time to time by the Office of the Chair.  Such draws need not be equal among Partners.

Surely, there is nothing in those words to suggest that the Partners intended to measure draws from one period against income from another.  Furthermore, there is no reason to believe that the partners who drafted the Partnership Agreements intended to use <u>consistent</u> periods for comparing income and draws for Former Partners while intending something fundamentally different, and potentially unfair, for themselves.

The unfairness of including post-dissolution expenses is obvious when one reviews Thelen's financial results for December 2008.  As shown in Defendant's Trial Exhibit X, but for dissolution expenses, Thelen would have posted net income of $5.784 million in December

2008.  Mr. Fontana's share of that net income would have been $42,255.[13]  However, post-dissolution write offs and a post-dissolution decision to use nearly $1.6 million in firm profits to offset negative balances in partner capital accounts turned the net profit for December 2008 into a $6.080 million loss.  Neither of those events had anything to do with the firm's normal business operations.

Just as Mr. Fontana is not seeking to include post-dissolution revenue in calculating his net income for these purposes, neither should the Trustee be allowed to include these post-dissolution losses.  For all the foregoing reasons (including judicial estoppel), we urge the Court to conclude that the relevant period for measuring Mr. Fontana's net income when he left the firm and when Thelen ceased normal business operations – i.e., November 30, 2008.

### D. Unauthorized Bonuses and Guaranteed Payments Made to Offset Negative Capital Accounts Should Not Reduce Defendant's Share of Net Income

The final issue with a significant impact on the Trustee's damages claims is the treatment of unauthorized bonuses and the unauthorized use of "guaranteed payment" to offset negative capital accounts.[14]  "Guaranteed payments" (including bonuses) are amounts paid to partners that are not based on the partner's share of net income. [15]

---

[13]  Mr. Fontana's share of Thelen's net income in 2008 was .730527%.  See Defendant's Trial Exhibit C, part II, section J.

[14]  This issue must be decided regardless of the date the court uses to compute Mr. Fontana's net income.  It could reduce the Trustee's damages claims by as much as $39,152 if November 30, 2008 is the measuring date.  If December 31, 2008 is used as the measuring date, the impact could be as much as $66,752.

[15]  According to the Internal Revenue Service, "Guaranteed payments are those made by a partnership to a partner that are determined without regard to the partnership's income. A partnership treats guaranteed payments for services, or for the use of capital, as if they were made to a person who is not a partner."  IRS Publication 541 "Partnerships," at 7 (December 2013).

Guaranteed payments made to equity partners require special scrutiny because they are deducted from net income as if the payment had been made to a 3rd party.  As a result, such payments reduce the net income of all other partners in the firm.

1.  More than $9.0 million in Unauthorized Guaranteed Payments
    Were Made to Equity Partners During 2008

Guaranteed payments are authorized, under certain circumstances, in section 4.1.3 in both the 3rd and 4th Partnership Agreements.  However, the Partnership Agreements require that such payments be approved by "a Majority of the Voting Partners" before they can be made.  Thus, section 4.1.3 provides:

> 4.1.3  **Bonuses and Guaranteed Payments.**  The Partnership may pay bonuses, make guaranteed or liquidating payments pursuant to Code section 707 or 736, or make other similar payments, in each case to Partners and Former Partners, as approved from time to time by a Majority of the Voting Partners upon recommendation of the Partnership Council.  (emphasis added).

As Mr. Fontana will testify, the only occasion during 2008 when such a vote took place was the approval of the 2008 Final Compensation Report (Defendant's Trial Exhibit #I) in March 2008.  Pages 8-10 of that report recommend the payment of guaranteed compensation totaling approximately $20.8 million to 101 "partial equity" partners who are specifically identified in the report by name and proposed compensation.  As it turns out, some of those partial-equity partners left the firm during the course of 2008.  As a result, according to the year-end "2008 Reconciliation of Payments to Equity Partners" report (Defendant's Trial Exhibit DX #Y) slightly less than $17.8 million of that "guaranteed compensation" was actually paid.[16]

---

[16]  The actual amount paid in guaranteed compensation to those partners during 2008 was $17,791,609.14.  See Defendant's Trial Exhibit Y at page 7 (TH 003914).

10

However, when one examines the accounting books and records that the Trustee has produced it becomes clear that Thelen made <u>substantially</u> greater guaranteed payments to equity partners during 2008 than were authorized by the 2008 Final Compensation Report.  Because the Trustee has redacted names and refused to produce complete copies of the 2008 tax returns (including the partner K-1 reports) we have no way of knowing the magnitude of the guaranteed payments that were made to specific partners or the reasons for those payments.  We do, however, know the aggregate amounts which are hugely larger than the partnership ever approved.

The accounting records that the Trustee has produced show that more than $9.1 million in unauthorized payments were made to equity partners (other than Mr. Fontana) during 2008.  Thus, the "2008 Net Income and Point Value by Month" report (Defendant's Trial Exhibit X) shows that a total of $29,958,665 was paid in "Guaranteed Payments to Partners" during 2008.  The year-end data in that summary (DX #X) is fully consistent with Thelen's 2008 "Statement of Revenue & Expense" which the Trustee produced as TH 002874 and with Thelen's 2008 income tax returns (TH 002051-TH002084).  That summary contains the same data that the Trustee has used as the basis for his damage claims.

Without access to more complete accounting records, including the partner K-1 reports, we do not know where all this money went.  What is absolutely clear, however, is that (a) millions of dollars in guaranteed payments beyond what was authorized by the 2008 Final Compensation Report were made by Thelen during 2008, and (b) those

---

unauthorized payments reduced Mr. Fontana's share of 2008 net income by tens of thousands of dollars.

On the basis of data in the "2008 Reconciliation of Payments to Equity Partners" report (Defendant's Trial Exhibit Y), we know that some of this money ($1.7 million) was paid out in "bonuses" to equity partners despite the prohibition in the Partnership Agreement and statements by David Graybeal, the Chairman of the Partnership Council and the head of the Administrative Committee, that "no bonuses will be paid for 2008."[17]

The same Reconciliation report (DX #Y) also shows that nearly $2.5 was used to make guaranteed payments to equity partners "to Reclassify Negative Capital" accounts and more than $380,000 was used to "Reclassify Equity Draws." However well-intentioned those payments might have been, there were never presented to the Partnership and were never approved by a vote of the partners. There is no legitimate basis for the Trustee (and his damages expert, Ms. DuVal) to use these unauthorized payments, much less the additional $3 million in unauthorized, guaranteed payments shown on Defendant's Trial Exhibit X, as a basis for claiming damages in this case.

This is a breach of contract case. It is utterly improper for the Trustee to pretend that Thelen has been damaged when the only way that he can demonstrate damages is by calculating them in a manner that violates the language of the contract he is seeking to enforce. Unless and until the Trustee can establish that all of the "Guaranteed Payments to Partners" shown on Defendant's Trial Exhibit X that exceed the amounts approved in the March 2008 Final Compensation report were authorized and paid in compliance with

---

[17]  See Graybeal Memo dated March 2, 2009 (Defendant's Trial Exhibit M at page 4).

the terms of the Partnership Agreements, the excess amounts should be restored to net

income <u>before</u> calculating Mr. Fontana's share.

    2.   Changes Required to Correct for the Unauthorized Guaranteed Payments
          <u>and Properly Compute Mr. Fontana's Share of Net Income</u>

      While the Trustee redacted the names of the partners when he produced the 2008

Reconciliation of Payments Report Defendant's (Defendant's Trial Exhibit Y), there are

entries for 205 full and partial-equity partners in that report which is the same number of

partners identified in the 2008 Final Compensation Report (Defendant's Trial Exhibit #I).

The last 3 pages of DX #Y appears to contain information on the partners who left Thelen

sometime during 2008.  By examining that portion of DX #Y, we can see that those

departures included 16 partial equity partners (i.e., those for whom specific amounts of

"guaranteed compensation" had been approved in the 2008 Compensation Report).  We

also know that even the partial-equity partners who remained at the firm did not work

during December 2008, thus some portion of their "approved" compensation would never

have been paid.

      However, even if we assume that Thelen had authority to spend all of the $20.8

million in guaranteed compensation approved in the 2008 Final Compensation Report,

the difference between that and the guaranteed payments actually made is more than $9.1

million.[18]  All of that represents payments to equity partners that was never authorized by

---

[18]  The arithmetic is as follows:
    $29,958,665  Guaranteed Payments made to Equity Partners per DX #X and DX #Y.
    <u>-20,847,700</u>  Guaranteed Compensation Approved in 2008 Compensation Report (DX #Y)
    $ 9,110,965   Excess Guaranteed Payments (unauthorized)

a "Majority of the Voting Partners" as required by section 4.1.3 of the Partnership

Agreements.

The Trustee's expert, Ms. DuVal, used a year-end point value of $8,510 as the

basis for her calculation of Mr. Fontana's share of net income.  See DuVal Amended

Expert Report (Plaintiff's Trial Exhibit 30) at page 11 and fn. 12.  That is the same figure

that appears in the 2008 Net Income and Point Value by Month Report (Defendant's Trial

Exhibit X) for December 31, 2008.

That figure includes <u>all</u> of the guaranteed payments that were made during 2008

in violation of the terms of the Partnership Agreement.  In order to correct for those

unauthorized payments, net income must be increased by the same amount <u>before</u>

calculating Mr. Fontana's share.  It is undisputed that point value for November and

December 2008 was based on a total of 2190.2 points.[19]  Therefore, in order to determine

the impact of the unauthorized payments on point value, one simply divides the

unauthorized amounts by the total points, which produces a figure of $4,172 per point. [20]

Since Mr. Fontana was a 16 point partner in 2008, his share of net income,

adjusted for the unauthorized payments should be $202,912 rather than the figure of

$136,160 which Ms. DuVal has used.[21]  The information in DX #X also makes it equally

simple to adjust the November 30, 2008 point value figures.

---

[19]  Among the documents that confirm this are Defendant's Trial Exhibit J and Plaintiff's Trial
Exhibit 30, Exhibit E.

[20]  The arithmetic is $9,137,965/2190.2 = $4,172 per point.

[21]  The arithmetic is as follows:
     $8,510  December 31, 2008 point value
     <u>+4,172</u>  Increase to correct for unauthorized payments to equity partners
     $12,682  Corrected point value @ 12/31/08

As of November 30, 2008, about $3.8 million of the unauthorized guaranteed payments had yet to be made.  While, the necessary adjustment to point value for November 30, 2008 is only $2,447 per point, November point value was substantially higher than December.  Using the data from DX #X the adjusted point value and Mr. Fontana's share of net income as of November 30, 2008 when he left the law firm should be $217,504.

The arithmetic is as follows:

$9,137,965 total amount of unauthorized guaranteed payments to equity partners
-3,778,616 guaranteed payments to equity partners made in December 2008
$5,359,349 unauthorized payments as of November 30, 2008


$5,359,349/2190.2 total points = $2,447 per point correction


$11,147 November 2008 point value
+  2,447 correction to adjust for unauthorized payments
$13,594 corrected November 2008 point value

$13,594 x 16 points = $217,504


Unless the Trustee has evidence which he has yet to reveal to demonstrate that these payments were actually authorized, there are no damages in this case because Mr. Fontana's net income, properly calculated, plus the $80,000 refund to which he was entitled, exceed the amounts that he received in draws by an amount in excess of his personal account balance.

---

16 points x $12,682 = $202,912 Corrected net income.

**E.  Personal Account Payments for Long Term Disability**
    <u>**Insurance Were Not Requested or Authorized**</u>

This is a minor issue involving less than $2,000.  Mr. Fontana does not believe that he requested long term disability insurance or ever authorized Thelen to purchase such insurance on his behalf.  To date, the Trustee has been unable to provide any evidence that these payments were specifically requested or authorized.  If such evidence does exist, it is unclear why the Trustee has refused to produce it.  Mr. Fontana does not dispute any of the other charges in his personal account.

**F.  <u>Pre-judgment Interest Should Not Be Awarded in this Case</u>**

This is a case involving a very real and very substantial disagreement about the interpretation of a partnership agreement.  With the exception of the unpaid balance in Mr. Fontana's personal account, there is nothing here that falls within the scope of California Civil Code section 3287(a) which applies only to cases where damages are "certain, or capable of being made certain by calculation."  This is not such a case.

"The test for recovery of prejudgment interest under section 3287, subdivision (a) is whether the defendant (1) actually knows the amount of damages owed plaintiff, or (2) could have computed that amount from reasonably available information."  *KGM Harvesting Co. v. Fresh Network,* 36 Cal. App.4th 376, 390-391, 42 Cal. Rptr.2d 286 (1995).  *See Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co.*, 169 Cal. App.4th 340, 354-355 (2008) ("Damages are deemed certain when, though the parties dispute liability, they essentially do not dispute the computation of damages, if any."), *citing Wisper Corp. v. California Commerce Bank,* 49 Cal. App.4th 948, 958, 57 Cal. Rptr.2d 141 (1996).

In this case, both the interpretation of the partnership agreements and the methodology for calculating damages have been vigorously disputed.  It is not one where either party has

sought to benefit by delay.  If, despite the evidence and legal arguments summarized above, this

Court awards damages in any amount to the Trustee, we ask that the award not include

prejudgment interest.

      Respectfully submitted.

New York, New York

July 12, 2015,

                /s/ Gary L Fontana

                GARY L. FONTANA, *pro se*

# APPENDIX A

## LIST OF ISSUES TO BE DECIDED

**Issue No. 1 – <u>Return of Overfunded Capital</u>**

    a.  Was Thelen obligated to refund $80,000 to Defendant as of January 1, 2008 due to "excess capital" in his capital account;

    b.  Should $80,000 of the draws that the Defendant received during 2008 be treated as a "refund" of excess capital; and

    c.  If the $80,000 refund was not paid to the Defendant as a "return of capital" during 2008 may he use that amount by way of setoff or recoupment to reduce the Trustee's alleged damages?

**Issue No. 2 – <u>The Proper Date to Measure Defendant's Share of Net Income</u>**

    a.  Should the Defendant's share of net income be measured as of November 30, 2008 when he ceased to practice law at Thelen, or some other date;

    b.  Is the Trustee precluded by principles of judicial estoppel from treating the Defendant as a "former partner" and using November 30, 2008 as the appropriate date; and

    c.  Should events that occurred after Thelen's dissolution and after Defendant left the firm be included in the calculation of damages for purposes of the Trustee's overcompensation claims?

**Issue No. 3 – <u>Whether Unauthorized Bonuses and Guaranteed Payments Made to Equity Partners to Offset Negative Capital Accounts Should Reduce Defendant's Share of Net Income</u>**

    a.  Should unauthorized bonuses paid by Thelen to equity partners during 2008 reduce Defendant's share of net income;

    b.  Should "guaranteed payments" made by Thelen to equity partners during 2008 to offset those partner's negative capital accounts reduce Defendant's share of net income; and

    c.  Should Thelen's decision to "reclassify" certain draw payments to equity partners as "guaranteed income" reduce Defendant's share of net income?

**Issue No. 4 – <u>Defendant's Personal Account</u>**

    a.  Did the Defendant request or authorize Thelen to purchase long term disability insurance for him during 2008 or at any other time; and

    b.  If not, is he liable to reimburse Thelen for $1960 in such charges that the Trustee seeks to collect?


**Issue No. 5 – <u>Prejudgment Interest</u>**

    a.  Is there a *bona fide* dispute in this case regarding the interpretation of the Partnership Agreements such that would preclude the award of prejudgment interest;

    b.  When did the Trustee first assert a right to collect prejudgment interest; and

    c.  Has the Trustee waived the right to collect prejudgment interest by asserting excessive damages claims?