| | |
|---|---|
| **REID COLLINS & TSAI LLP** | **Trial Date:** |
| Angela J. Somers | **July 14, 2015** |
| Jeffrey E. Gross | |
| Yonah Jaffe | |
| One Penn Plaza, 49th Floor | |
| New York, New York  10119 | |
| 212.344.5200 (telephone) | |

*Special Counsel for Yann Geron, Chapter 7 Trustee
of the Estate of Thelen LLP*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X   Chapter 7
In re:
                                                                                        Case No. 09-15631 (MEW)
            THELEN LLP,

                      Debtor.
----------------------------------------------------------------X
Yann Geron, Chapter 7 Trustee of the Estate         Adv. Pro. No. 11-02648 (MEW)
of Thelen LLP,
                      Plaintiff,
          - v –

GARY L. FONTANA, *et al.*,
                      Defendants.
----------------------------------------------------------------X

## TRUSTEE'S TRIAL BRIEF IN SUPPORT OF DAMAGE JUDGMENT

      Yann Geron, as chapter 7 Trustee of Thelen LLP, submits this Trial Brief in Support of Damage Judgment, and in response to the points made in Defendant's Trial Brief as follows:

## INTRODUCTION

      The Trustee's case is simple and clear and will be presented in Court. The Trustee nevertheless wishes to set forth certain points to clarify confusion Defendant seeks to create.

Defendant is the only Thelen partner who has not settled his claim with the Trustee. In trying to construct a defense, Defendant's theories are ever-changing. Defendant now seems to deemphasize that he actually received a return of capital during 2008 (knowing he would never prevail) and has recast his setoff contention. After repeatedly arguing that he should be entitled to set off of all amounts from his capital account balance, he now argues for setoff of only his excess capital balance.[1] He tries to recast his capital balance general ledger entry as a debt, and argues that Thelen incorrectly closed its books, improperly accounted for payments to partners, and erroneously brought negative capital accounts to positive levels, among other things.

It is time that this Court see Defendant's arguments for what they are—attempts to attack anything and everything presented by the Trustee, no matter how illogical or unfounded Defendant's allegations may be—in order to avoid payment of his claim.

I. **Defendant Cannot Use Excess Capital Balance to Offset the Trustee's Claims**

Defendant contends that, despite not having filed a proof of claim, he has a right of setoff for $80,000 in excess capital. He calls this "the largest single issue in the damages portion of this case." Defendant's Trial Brief at 1. Notably, Defendant fails to mention that he has the burden of proof on this issue, which he cannot meet. "[A] creditor bears the burden of proving that it has satisfied the requirements for setoff in bankruptcy." *E. Airlines, Inc. v. Chem. Bank, Inc.*, No. 95 CIV. 3981 (JSR), 1997 WL 282264, at *2 (S.D.N.Y. May 28, 1997).[2] Thus, for example, in

---

[1] Defendant, however, essentially uses identical "evidence" to that which supported his former argument. Defendant previously claimed that, because the firm chose to set off debts owed to it prior to dissolution, it should do so in this action. Now, Defendant uses "evidence" that Thelen returned capital in prior years to support the conclusion that a debt is owed to him. Defendant then adds a few recrafted arguments and single-handedly deviates from his Expert's Report to support them. That is his entire argument.

[2] *See also In re Bennett Funding Grp., Inc.*, 212 B.R. 206, 212 (B.A.P. 2d Cir. 1997), *aff'd*, 146 F.3d 136 (2d Cir. 1998) ("A creditor bears the burden of proving a right of setoff and must establish the following three criteria: (1) the debtor must owe a debt to the creditor which arose pre-petition; (2) the debtor must have a claim against the

*Eastern Airlines*, the Court affirmed the denial of a claim for setoff where the creditor failed to meet its burden of proving factual basis for setoff. *Id.*[3]

Defendant cannot prove his $80,000 offset claim. First, Defendant never had a capital account in which cash or anything else of value was held. Instead, the alleged excess was nothing more than a general ledger entry of his capital balance. As such, there was nothing that could have been returned to him as capital, and thus no debt exits. Second, as addressed further below, the capital policy of the firm could not be clearer. It was spelled out in the Dissolution Agreement which provides that there will be no return of capital until creditors are paid in full. As this court is aware, that has not occurred, and under no realistic projection will it occur. Third, Defendant cannot prove setoff by reasserting the general setoff argument that he made in his Motion for Partial Summary Judgment. Defendant points to returns of capital in 2006 and 2007 (DX-H) to prove his case. As to 2008, the most he can do is rehash his former setoff argument that has already been rejected by this Court.[4] All evidence Defendant presents reiterates or reframes his argument that he is generally entitled to set off from his capital account, an argument Defendant has repeatedly made and lost.

---

creditor which arose pre-petition; and (3) the debt and claim must be mutual"); *In re Lehman Bros. Inc.*, 458 B.R. 134, 139 (Bankr. S.D.N.Y. 2011); *Global Cable, Inc. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, No. 02 CIV. 9770 (RCC), 2006 WL 1559437, at *4 (S.D.N.Y. June 7, 2006).

[3] Moreover, even if the technical requirements for setoff are met, "a court may invoke equitable considerations and deny set-offs in the interests of justice." *Geron v. Travelers Cas. And Surety Co. (In re Manshul Const. Corp.)*, No. 96B44079(JHG), 2000 WL 1228866, at *56 (S.D.N.Y. Aug. 30, 2000); *see also E. Airlines*, 1997 WL 282264, at *2 ("the decision to allow or deny setoff lies within the sound discretion of the bankruptcy court.").

[4] To the extent any other "policy" was established by past setoff practices, this Court rejected the conclusion that Defendant has a general right of setoff from his capital account.

A. <u>Defendant Cannot Seek to Elevate his Excess Capital to a Debt</u>

Defendant seeks to give importance to the general ledger capital balances maintained by Thelen to suggest that there was value in accounts that can be offset. But this entry represents no real value to be returned or refunded. A capital balance is the cumulative effect of journal entries rolling the book value of equity from year to year. The testimony of Ms. DuVal will show that in early 2008, Thelen paid the balance of it 2007 distributable net income.[5] Therefore, Defendant cannot be refunded what never existed.

Moreover, Defendant seeks to transform his claimed entitlement to $80,000 in excess capital as a debt in a belated attempt to circumvent the Court's determination that his capital account constitutes equity and cannot be used to offset his debts to Thelen. However, in *In re Dewey & LeBoeuf LLP*, 518 B.R. 766, 789-90 (Bankr. S.D.N.Y. 2014), the Bankruptcy Court made clear that amounts held by a law firm as capital cannot subsequently be re-characterized as debt even if the applicable partnership agreement requires that such amounts be repaid. In that case, the former partners attempted to defeat a preference action by claiming that amounts that became due to former partners pursuant to the relevant partnership agreement were "debts," and thus preferential payments that they received were merely the repayment of those debts. The Bankruptcy Court rejected that contention, finding that notwithstanding a contractual obligation to return capital, a contractual right to payment that "arises out of the original capital

---

[5] Rather than funding its operations from the value remaining (such as Defendant's alleged capital account), Thelen funded its operations from bank borrowings until June 2008 when net income became available to partially subsidize distributions previously funded from debt. Under these circumstances, any amount in a capital account, excess or otherwise, is at best notional.

4

contribution which was made in connection with obtaining an equity interest in the partnership" cannot "transform[ ] these equity distributions into consideration satisfying antecedent debts." Here too, Defendant cannot offset his debts to the firm with amounts that were initially characterized as his equity in the firm.

      B.  <u>The Capital Policy of the Firm Requires that Excess Capital Not Be Returned to Defendant</u>

Defendant tries to make the issue of return of his alleged excess capital a timing issue. It is far from that. Defendant simply has no right to a return of capital. Defendant remained in the Thelen partnership through the adoption of the Fourth Amended and Restated Partnership Agreement, and the adoption of the Dissolution Agreement. As such, he is subject to the capital policy set forth therein.

Section 3.1 of both the Third and Fourth Partnership Agreements provide:

> **No Preference or Interest**. Except as otherwise expressly set forth in the Agreement, and in the Capital Policy, no Partner shall be entitled to the return of such Partner's capital contributions or Capital Account, or to any interest thereon.

Fourth Partnership Agreement (PX 9) at § 3.1.2; Third Partnership Agreement (PX 8) at § 3.1.3. These Partnership Agreements also provide that:

> Capital contributed by individual Partners in excess of the amount required to be contributed shall be refunded *in accordance with the Capital Policy*.

Fourth Partnership Agreement at 3.1.1; Third Partnership Agreement at 3.1.2. (emphasis added). Defendant claims that the Capital Policy of the firm established that he was entitled to a return of his capital. By November of 2008, the firm had adopted a Dissolution Agreement which became effective October 30, 2008. Pursuant to that agreement, the Administrative Committee was operating Thelen, and it was crystal clear

5

that the policy of the firm was to pay creditors before partners received *any* return of capital. Section XI. E of the Dissolution Agreement (PX 24)[6] provides:

> Return of Capital. There will be *no return of capital* to any Partner or former Partner and/or retired Partners and no payment of any kind made to any Partner or former and/or retired Partners until such time as Citibank is repaid in full and all of the other legal obligations of the Partnership to third party creditors are satisfied, except to the extent permitted by Citibank…

(emphasis added).[7]

Due to Thelen's insolvency, creditors have not been paid. Thelen's capital policy thus does not allow Defendant to use his alleged excess capital to offset his liability.

C. Defendant Only Has Evidence of Past Practices in Prior Years

Like Defendant's capital offset argument, all that Defendant can say to prove that he is entitled to offset of excess capital is provide evidence that in 2006 and 2007, excess capital was returned to partners. The fact that capital was returned to partners in prior years when the firm had an entirely different level of net income, and may have had equity value, is not evidence that it is due to Defendant now. The policy of Thelen is not established by the practice of distributing excess equity in years when the firm's financial situation was very

---

[6] The purpose of the dissolution plan was "to windup the business and affairs of the Partnership to cause the ultimate dissolution of the Partnership in accordance with the Plan and the PA and related documents (collectively, the "Governing Documents") and applicable law. ***To the extent that there are any conflicts between any provisions of any other of the Governing Documents and the provisions of the Plan, the provisions of the Plan shall govern.*** (emphasis added)

[7] Defendant claims Thelen's Capital Policy provides that partners were entitled to a refund or reimbursement for any amount in their capital account in excess of that required by the firm's capital policy. This is incorrect in that the Capital Policy, dated December 7, 2005 (PX 26), is completely silent on the treatment and repayment of excess capital.

6

different. Defendant cannot avoid the clear policy set forth in the Dissolution Agreement in reliance on this "evidence."

## II. Defendant Did not Receive a Return of Capital in the Form of Draw Payments

Defendant seems to have demoted his earlier argument set forth in his expert report that he actually received a return of capital and that the amount of his draw payments were in fact $80,000 less, to an alternative argument to which he gives scant treatment. This is likely because it is not in any way credible. Defendant received draw payments in the exact amount and according to the exact formula that draw payments were paid to all Thelen partners. Further, he did not receive them by check (the regular method of receiving return of capital, *see* DX H), but by distribution through the ADP system (*see* PX 2). As will be demonstrated at trial, all relevant accounting entries show that Defendant received no return of capital (*see, e.g.*, PX 4 at 7, PX 22).

## III. The Correct Date to Calculate Allocable Share of Net Income is December 31, 2008

Defendant claims that the use of November 30, 2008 point value to calculate his allocable share of net income is appropriate because (i) Thelen's books should have been closed on November 30, 2008; (ii) that date calculates net income under more normalized circumstances, and (iii) as a former partner of Thelen, Defendant should be treated like a partner who departed prior to dissolution. Defendant is severely misguided on all points.

First, Defendant raises the issue of closing of Thelen's books based on a mistaken assumption regarding how Thelen kept it books and records. Defendant suggest that the books and records of Thelen were kept according to a GAAP method of reporting. GAAP is irrelevant

7

here. Thelen used a Modified Cash Basis[8] Method consistent with accounting used for Federal Income Tax purposes (the "**Modified Method**"). As a result, Thelen closed its books at year-end, and all former Thelen partners who stayed through dissolution were notified by Thelen's Administrative Committee and its accountants that their share of net income would be calculated at year-end point value. (*See* PX 12 at 3, PX 7 at 1).

Second, there was nothing normalized about Thelen's November 30, 2008 net income number. Under Thelen's Modified Method, cash was recorded when received but expenses were not matched with this revenue.  In November, all partners were told to exert efforts to collect on outstanding bills.  Therefore, a large amount of collections were received against which matching expenses had not been yet charged. As can be seen through a month by month analysis, Defendants' point value derived from allocable share of net income was as follows:

- $8,253 for month end in October, 2008
- $11,192 for month end in November,
- $8,510 for the end of December.

Therefore nothing was "normal" about November.

---

[8] Thelen used the Modified Cash Basis of accounting which is commonly used by professional service firms and consistent with accounting used for federal income tax purposes. The Modified Cash Basis of accounting combines elements of the two major accounting methods, the cash method and the accrual method. The cash method recognizes income when it is received and expenses when they are paid, whereas the accrual method recognizes income when it is earned and expenses when they are incurred. The Modified Cash Basis method typically uses accruals for long-term Balance Sheet elements (such as capitalizing and depreciating furniture consistent with tax regulations) and the cash basis for short-term Balance Sheet items (such as accounts receivable and accounts payable). It this does not match expenses and revenues in the manner that would be matched under GAAP.

<u>Third</u>, Defendant cannot use labels to make his case. This Court found that Defendant is no longer a partner of Thelen, but it is clear that he was one when the Dissolution Agreement was adopted, and thus agreed to be bound by the rules applicable to those remaining partners—called "Dissolution Partners."[9] The evidence will show that this group's net income was to be calculated at year end. This Court should thus adopt the December 31, 2008 date for calculation of net income.

### IV. <u>Defendant Cannot Seek to Retroactively Increase His Allocable Share of Net Income by Characterizing Certain Payments by Thelen as "Unauthorized"</u>

A. <u>Under the Fourth Partnership Agreement Negative Capital Accounts are Required to be Brought Positive</u>

Defendant contends in his Trial Brief that Thelen made certain "unauthorized" payments made to offset negative capital account balances. However, Defendant ignores that under the Fourth Partnership Agreement, among other things, Thelen was *required* to perform such offsets. Section 4.1.1.3 of the Fourth Partnership Agreement (PX 9) provides:

> **Qualified Income Offset.** If any Partner unexpectedly receives an adjustment, allocation, or distribution of the type contemplated by Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of income and gain shall be allocated to all such Partners (in proportion to the amounts of the respective deficit balances in their Adjusted Capital Accounts) *in an amount and manner sufficient to eliminate the deficit balance* in the Adjusted Capital Account of such Partner as quickly as possible. It is intended that this Section 4.1.1.3 qualify and be construed as a "qualified income offset" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(d).

---

[9] When Thelen was dissolving, according to the Plan of Dissolution, the firm gave partners two names. One group was *called* Former Partners, the other Dissolution Partners, because at the time, Thelen was still operating but about to go into dissolution. This was not a legal determination of their status under the Partnership Agreement, and no leap can be made about their substantive rights based on these labels.

Fourth Partnership Agreement (emphasis added). Thelen could not distribute net income without complying with these regulations. Thus, for tax reporting purposes, the method used by Thelen under the Modified Method of accounting, negative accounts were required to be brought positive before distributions could be made.

### B. Bonuses and Commissions Were Standard And Should Not Subject to Reinterpretation

Defendant seeks to point to ordinary course items that appear in Thelen's books and records, and argue that net income is incorrect. Although Defendant attempts to assign some nefarious motivation to certain payments and accounting entries made in 2008 by Thelen, there is no basis for this conclusion. Consistent with past practices, Thelen's books and records reflected the following:

- "If a partial equity partner who had a combination of guaranteed income and equity income departed and that partner was overcompensated in draws but underpaid in guaranteed income, Thelen reclassified a portion of their excess draws as guaranteed payments, in order to adequately state guaranteed compensation paid to them.

- Former partners who did consulting work for Thelen for a fee received payments.

- Income partners who had a fixed salary received payments.

- Partners who had a contract with Thelen that provided for specified payments received payments.

- Associates who made partner in 2008 and were entitled to bonuses for 2007 received payments.

All the activity above appears ordinary and appropriate. In any event, this Court should not attempt to deconstruct Thelen's operations in order to calculate net income. Instead, the ordinary

course books and records of Thelen should be reviewed and such calculation made in accordance with their practices.

## V. The Appropriate Rate of Interest is 10% Under California State Law

Defendant also seeks to avoid any interest payments whatsoever on claims that both Thelen and the Trustee have been alerting him to for years. Civil Code section 3287, subdivision (a), reads in relevant part: "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day. . . ." Section 3287(a) is satisfied where the defendant either "(1) actually knows the amount of damages owed plaintiff, or (2) could have computed that amount from reasonably available information." *KGM Harvesting Co. v. Fresh Network*, 36 Cal. App. 4th 376, 391 (1995). "Under subdivision (a) the court has no discretion, but must award prejudgment interest upon request, from the first day there exists both a breach and a liquidated claim." *N. Oakland Med. Clinic v. Rogers*, 65 Cal. App. 4th 824, 828, 76 Cal. Rptr. 2d 743, 746 (1998). "Courts generally apply a liberal construction in determining whether a claim is certain, or liquidated." *Howard v. Am. Nat. Fire Ins. Co.*, 187 Cal. App. 4th 498, 535, 115 Cal. Rptr. 3d 42, 74 (2010).

Defendant has been fully aware of the Trustee's claims against him for his personal account balances due and his overcompensation received since no later than February 19, 2009 and October 10, 2011, respectively. On February 19, 2009, David Graybeal, then the chair of Thelen's Administrative Committee, sent a memo to all partners setting forth the amounts owed on their personal accounts and demanding that such amounts be repaid. (Plaintiff's Exh. 11). Indeed, Defendant acknowledges in his Trial Brief that the unpaid balance in his personal account falls within section 3287(a). *See* Fontana Trial Brief at 16 ("With the exception of the

11

unpaid balance in Defendant's personal account, there is nothing here that falls within the scope of Cali fomi a Civil Code section 3287(a)").

On October 10, 2011, the Trustee sent demand letters to the Debtor's former dissolution partners setting forth the precise amounts due from the Defendant. (Defendant's Exh. U).[10] The demanded amount in that letter, $138,888, is precisely the same as the amount now sought as part of the simple calculation of the amounts that Defendant owes as the amount he was overcompensated in excess of his allocable share of net income.

## CONCLUSION

For the foregoing reasons, this Court should grant the Trustee a Damages Judgment in the full amount sought.

Dated: New York, New York
       July 13, 2015

By: */s/Angela J. Somers*
    Angela J. Somers
    Jeffrey E. Gross
    Yonah Jaffe

**REID COLLINS & TSAI LLP**
One Penn Plaza, 49th Floor
New York, New York 10119
212.344.5200 (telephone)
212.344.5299 (facsimile)

---

[10] While the Trustee could seek interest back to March 2, 2009, when Graybeal sent an e-mail to all dissolution partners informing them that they were overcompensated for 2008 (*see* PX 12 at 3), the Trustee has chosen only to seek interest on overcompensation from the date of his letter.