UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____

|  |  |  |
|---|---|---|
| | : | |
| In re: | : | Chapter 7 |
| | : | |
| THELEN LLP, | : | Case No. 09-15631 (MEW) |
| | : | |
|         Debtor. | : | |
| | : | |
| Yann Geron, Chapter 7 Trustee of the Estate | : | |
| of Thelen LLP, | : | |
| | : | |
|         Plaintiff, | : | |
|    v. | : | Adv. Pro. No. 11-02648 (MEW) |
| | : | |
| | : | |
| GARY L. FONTANA, et al., | : | |
| | : | |
|         Defendants. | : | |

_____

## **<u>MEMORANDUM OPINION</u>**

APPEARANCES:

LAW OFFICES OF GARY L. FONTANA
*Pro Se*
650 Lighthouse Avenue
Suite 220
Pacific Grove, CA 93950

REID COLLINS TSAI LLP
*Counsel to Yann Geron, Chapter 7 Trustee*
One Penn Plaza, 49th Floor
New York, NY 10119

   By:   Angela J. Sommers, Esq.
          Jeffrey E. Gross, Esq.
          Yonah Jaffe, Esq.

     This matter is before the Court following a trial held on July 14, 2015.  The Court has

considered the parties' pre-trial and post-trial submissions and the record of prior proceedings

and decisions in this action.  For the reasons set forth below, the Court finds that Plaintiff Yann

Geron, as Trustee of the Chapter 7 estate of Thelen LLP (the "**Trustee**"), is entitled to judgment

against Defendant Gary L. Fontana ("**Fontana**") in the amount of $56,691.55, representing a

debt owed (after offsets) in the amount of $40,886.02 plus prejudgment interest from October 10,

2011 through August 21, 2015 in the amount of $15,805.53.

### Background

Fontana was a partner at Thelen LLP ("**Thelen**") and its predecessors.  During most of

2008, the rights and obligations of Thelen's partners were governed by the Third Amended and

Restated Limited Liability Partnership Agreement of Thelen Reid Brown Raysman & Steiner

LLP (the "**Third Partnership Agreement**").  On October 28, 2008 the partners voted to

dissolve the firm, at which time they approved a plan of dissolution (the "**Dissolution Plan**") and

adopted the Fourth Amended and Restated Limited Liability Partnership Agreement of Thelen

LLP (the "**Fourth Partnership Agreement**").  The Dissolution Plan provides that in the event

of any conflict between the Dissolution Plan and the Fourth Partnership Agreement, "the

provisions of the [Dissolution] Plan shall govern."

The Third Partnership Agreement and the Fourth Partnership Agreement provided that

full equity partners of Thelen would divide the "Net Income" of the partnership in accordance

with their respective "Sharing Ratios."  Each partner's Sharing Ratio depended on the number of

equity points assigned to that partner.  Section 4.2 of the Third Partnership Agreement and the

Fourth Partnership Agreement further provided that each partner would be entitled to receive

periodic "draw" payments "as []advance[s] against such Partner's share of Net Income . . . ."

Thelen filed a voluntary bankruptcy petition under chapter 7 of title 11 of the United

States Code (the "**Bankruptcy Code**") on September 18, 2009.  On September 15, 2011, the

Trustee filed an adversary proceeding against Fontana.  On December 17, 2013, an order was entered consolidating this adversary proceeding with other adversary proceedings against other partners (collectively the defendants in the consolidated action referred to themselves as the "**Whitmer/Fontana Group**"), and an amended complaint was filed on January 22, 2014 (the "**Complaint**").  The Trustee reached settlements with the other members of the Whitmer/Fontana Group, and only the claims against Fontana remained for trial.   The Trustee contends that Fontana is obligated to repay $129,844, representing the amount by which the periodic draw payments made to Fontana by Thelen during 2008 exceeded Fontana's share of Net Income for 2008.  The Trustee also contends that Fontana is obligated to pay $9,044, representing amounts charged to his personal account at Thelen.  The Trustee seeks prejudgment interest with respect to the amounts owed.

Judge Gropper issued a memorandum decision dated November 20, 2014 (the "**Summary Judgment Decision**") [ECF # 97] and an order dated December 9, 2014 (the "**Order**") [ECF # 104] that granted summary judgment in favor of the Trustee on his contention that the members of the Whitmer/Fontana Group were obligated to repay, to the Trustee, the amount by which their actual draw payments during 2008 exceeded their shares of Net Income. This Court denied Fontana's motion for reconsideration of that decision in a memorandum decision dated June 9, 2015 [ECF # 118], and in an order issued the same date [ECF # 119].

The parties agree that Fontana received periodic draw payments during 2008 in the total amount of $262,500.  *See* Joint Pretrial Order ¶ (C)(7) [ECF # 130].  They also agree that Fontana had a personal account at Thelen in which at least $7,044 of personal expenses were incurred.  *Id.* ¶ (C)(10).  They also agreed that, as an accounting matter, Fontana's capital

account at Thelen showed a balance of $336,000 at the beginning of 2008. *Id.* ¶ (C)(9). The following issues remained for resolution at trial:

      1.    <u>Treatment of Excess Capital</u>. The parties agree that the balance shown in Fontana's capital account at the beginning of 2008 exceeded his required capital by $80,000. Fontana contends (a) that some of the payments he received during 2008 were returns of his excess capital, or (b) that any excess capital balance is a debt owed by Thelen to him, which should be offset against any claims the Trustee has against Fontana.

      2.    <u>Calculation of Fontana's Share of Net Income</u>. Thelen contends that Fontana's share of Net Income should be calculated as of December 31, 2008 and that such share of Net Income was $136,160. Fontana contends that his share of Net Income should be calculated as of November 30, 2008, which would have the effect of avoiding certain accounting charges that were booked in December 2008 and of increasing Fontana's share of Net Income for 2008. Alternatively, Fontana contends that certain expenses that were recognized in the calculation of Net Income as of December 31, 2008 were improper and should be reversed.

      3.    <u>Personal Account</u>. The Trustee seeks payment of personal expenses of $9,044.45; Fontana disputes a portion of this amount ($1,959.96), which represents charges for disability insurance premiums, but does not dispute the rest.

      4.    <u>Prejudgment Interest</u>. The Trustee seeks 10% prejudgment interest, computed from and after October 10, 2011 with respect to the excess draw claim and from and after February 19, 2009 with respect to the claim to recover unpaid personal charges. Fontana contends that interest is owed, if at all, only with respect to the undisputed amount of agreed personal expenses.

The Trustee offered various exhibits and the testimony of an accounting expert, Esther Duval, in support of his contentions at trial.  Fontana offered various exhibits, his own testimony, and the testimony of an accounting expert, Will Essig.  The parties submitted pre-trial and post-trial briefs on various issues, including certain issues that are addressed in this Opinion and as to which the Court requested further briefing at the conclusion of the trial.

## Rulings

### 1.    Jurisdiction/Ability to Render a Final Judgment

In the final Joint Pretrial Order, Fontana contended that this Court lacks the power to issue a final judgment with respect to the Trustee's claims.  The Trustee disagrees (and has also consented to the issuance of a final judgment by this Court), and further argues that Fontana previously consented to the issuance of a final judgment by this Court.

In *Stern v. Marshall*, 564 U.S. ___ (2011), the Supreme Court found that bankruptcy judges are constitutionally prohibited from finally adjudicating certain claims even if statutorily authorized to do so (so-called "*Stern* Claims").  In the recent *Wellness* decision, the Supreme Court confirmed that a bankruptcy judge may hear and finally determine a *Stern* Claim if the parties to the proceeding knowingly and voluntarily consent.  *Wellness International Network, Ltd., et al. v. Sharif*, 575 U.S. ___ (2015); *see also* 28 U.S.C. § 157(c)(2).

The Trustee maintains that this is a core proceeding and has also consented to this Court entering a final judgment to the extent the Court would not otherwise have that power.  *See* Am. & Consolidated Compl. ¶ 8 [ECT # 40].  In the Joint Pretrial Order, Fontana argued that this is not a core proceeding and asserts that he has not consented to this Court entering a final order.  *See* Joint PreTrial Order ¶ B(2)(b).  Fontana points to paragraph 8 of his answer dated March 7, 2014, which argued that the Trustee's allegations regarding "core" proceedings were legal

conclusions to which Fontana did not need to respond.  *See* Answer to Am. & Consolidated

Compl. ¶ 8 [ECF # 44].

The Court need not resolve disputes as to whether the claims asserted here are *Stern*

Claims or whether they are claims that are merely "related to" the Thelen bankruptcy case,

because Fontana unequivocally consented to the final adjudication of the claims in this Court.  In

2013, the Whitmer/Fontana Group sent a letter to the Trustee's counsel that included a demand

that any claims against them be subject to arbitration.  The Trustee's counsel responded in a

letter dated September 20, 2013 that the Trustee did not believe arbitration was available or

appropriate, but that the Trustee would be happy to agree upon procedures if the

Whitmer/Fontana Group would "agree to litigate the disputes in the Bankruptcy Court."

Trustee's Mot. to (a) Compel Arbitration & (b) Stay Adversary Proceeding, Ex. A & B,

September 25, 2014 [ECF # 78].  The litigation subsequently proceeded in this Court (without

defendants filing a motion to compel arbitration) until September 2014, when the defendants

filed a motion for summary judgment.  At that point the Trustee attempted to reverse his prior

position and filed a belated motion to compel arbitration of the parties' disputes.  [ECF # 78].

The Whitmer/Fontana Group opposed the Trustee's motion; they argued that they had previously

accepted the Trustee's request that they agree to resolve the parties' disputes in the Bankruptcy

Court and that the Trustee therefore should be estopped from seeking arbitration.  The

Whitmer/Fontana Group filed papers that quoted the Trustee's request that they "agree to

litigate" in the Bankruptcy Court, and then stated as follows:

> Several points need to be made from these excerpts.   First, the
> Whitmer/Fontana Group *did* agree to litigate the disputes in the Bankruptcy
> Court as offered by the Trustee when he rejected arbitration; the
> Whitmer/Fontana Group *did* agree to consolidate all the claims the Trustee
> had made against the members of that group into one adversary proceeding;
> and the Whitmer/Fontana Group *did* agree to defend the Trustee's motion for

6

> summary judgment on the fraudulent conveyance claims, which put the Whitmer/Fontana [Group] at risk, potentially, for liability as a result of litigating *in the Bankruptcy Court*.    Conversely, of course, the Whitmer/Fontana Group never brought a motion seeking to compel arbitration.

Mem. of Whitmer/Fontana Group in Opp'n to Trustee's Mot. to Compel Arbitration 10 [ECF # 87] (emphasis in original).  Based on the prior history, the Whitmer/Fontana Group argued that the action should "stay, be heard, tried and decided" in the Bankruptcy Court.  *Id*. at 24.  Judge Gropper agreed with the Whitmer/Fontana Group and held that the Trustee was barred by his prior agreements and conduct from seeking arbitration of the claims.  [ECF # 97].

Ironically, after Fontana and his co-defendants strenuously argued that the Trustee could not be permitted to change his mind about litigating the claims in the Bankruptcy Court (based on estoppel, efficiency, waiver, and numerous other theories), and after the Whitmer/Fontana Group obtained a decision by Judge Gropper that enforced the parties' prior "agreement" to litigate in this Court, it is now Fontana who is attempting to change his own position and who wishes to argue that no "agreement" to litigate in this Court was ever made.  The Court rejects that contention.  Fontana and his former co-defendants consented, unequivocally, to a final resolution of the Trustee's claims by this Court.  Fontana may not change his position at the last instant for the same reasons the Trustee was not allowed to change his position in connection with the motion to compel arbitration.

## 2.    Treatment of the Excess Capital Balance

The parties agreed at trial that Thelen had a capital policy that required full equity partners to maintain capital balances equal to $16,000 per equity point (the "**Capital Policy**") The parties also agreed that Fontana was entitled to 21 equity points prior to 2008 and had accumulated a required capital balance of $336,000 prior to 2008.  As of January 1, 2008, however, Fontana's point allotment was reduced from 21 points to 16 points.  There was no

dispute that Fontana's required capital was only $256,000 after January 1, 2008, or $80,000 less than the balance shown in Thelen's accounting records.

Fontana contends that some of the payments that he received during 2008 actually were refunds of this excess balance. This contention is without foundation. The Trustee's accounting expert presented records and testimony showing that Thelen's accounting records reflected no repayment in 2008 to Fontana of any excess capital. Nor was there any evidence that Fontana ever requested a refund of excess capital in his capital account. The evidence at trial showed that the actual payments that were made to Fontana during 2008 consisted of the periodic draw payments that were made to Thelen partners during that year pursuant to regular policies that the Thelen firm had established. *See* Joint Pretrial Order ¶ (C)(6)–(7). It is true that for tax reporting purposes the items were netted in reporting Fontana's overall capital in his K-1 statement. *See* Pl.'s Trial Ex. 3(d). However, there was no such netting in the accounting records, which showed a balance of $336,000 in Fontana's permanent capital account throughout 2008. There also was no suggestion in any of the evidence that either party considered any of Thelen's payments to be a refund of Fontana's excess capital.

Fontana contends (alternatively) that the excess balance is a debt that is owed to him and that may be offset against the Trustee's claims. Fontana relies on a provision of the Uniform Partnership Act of 1994 as adopted in California, which states (in relevant part):

> (a) Each partner is deemed to have an account that is subject to both of the following:
>
> (1) Credited with an amount equal to the money plus the value of any other property, net of the amount of any liabilities, the partner contributes to the partnership and the partner's share of the partnership profits.
>
> (2) Subject to Sections 16306 and 16957, charged with an amount equal to the money plus the value of any other property, net of the amount of

8

> any liabilities, distributed by the partnership to the partner and the partner's share of the partnership losses.
>
> . . . .
>
> (d) A partnership shall reimburse a partner for an advance to the partnership beyond the amount of capital the partner agreed to contribute.
>
> (e) A payment or advance made by a partner that gives rise to a partnership obligation under subdivision . . . (d) constitutes a loan to the partnership that accrues interest from the date of the payment or advance.

Cal. Corp. Code § 16401. During closing arguments, the Trustee's counsel did not dispute that, in the absence of contrary terms in the partnership agreements, sections 16401(d) and (e) requires that the excess capital contributed by Fontana be treated as a debt owed by Thelen to Fontana. However, the Trustee contended that California law permits partners to modify such requirements in their partnership agreements and that Thelen allegedly had done so here.

The Trustee is correct that California allows partners to modify the requirements of sections 16401(d) and (e). *See* Cal. Corp. Code § 16103. The question, therefore, is whether the Thelen partnership agreements did so.

The Third Partnership Agreement was submitted in evidence as Plaintiff's Exhibit 8. Section 3.2 of the Third Partnership Agreement for the most part mirrors the provisions of the California statute rather than modifying them. It states as follows:

> 3.2 **Capital Accounts**. A separate capital account in the Partnership (a "**Capital Account**") shall be maintained for each Partner. . . . Such Capital Account Balances shall thereafter be: (x) increased by the aggregate amount of such Partner's cash contributions to the Partnership, the fair market value of property contributed by such Partner to the Partnership . . . , positive Net Income and items of income and gain allocated to such Partner pursuant to Section 4.1, and such Partner's share (determined in accordance with his or her Sharing Ratio) of Partnership income which is not taken into account in computing Taxable Income; and (y) decreased by cash distributions (including draws made pursuant to Section 4.2.1) to such Partner from the Partnership, the fair market value of property distributed in kind to such Partner . . . , negative Net Income and items of loss or deduction allocated to such Partner pursuant to Section 4.1, and such Partner's share (determined in

9

accordance with Section 4.2.2) of Partnership disbursements which are not deductible in computing Net Income or which are made for the direct benefit of such Partner. . . .

Pl.'s Trial Ex. 8 § 3.2.  A separate section (Section 3.1.2) described the capital contribution requirement that each Partner was expected to meet, as follows:

> 3.1.2  **Capital Contributions or Retentions**.  The Office of the Chair shall from time to time determine, and notify the Partners in writing of, the capital policy of the Partnership, including the provisions of such policy regarding the requirements of Partners to contribute capital to the Partnership (the "**Capital Policy**").  The Capital Policy shall thereupon be implemented in accordance with its terms, including, to the extent set forth in such policy, by requiring contributions of capital by Partners, or by the Partnership retaining as contributed capital amounts otherwise distributable to Partners under this Agreement.  ***Capital contributed by individual Partners in excess of the amount required to be contributed shall be refunded in accordance with the Capital Policy.***

Pl.'s Trial Ex. 8 § 3.1.2 (emphasis added).  Section 3.1.3 of the Third Partnership Agreement then stated as follows:

> 3.1.2 **No preference or Interest**.  Except as otherwise expressly set forth in this Agreement and in the Capital Policy, no Partner shall be entitled to the return of such Partner's capital contributions or Capital Account, or to any interest thereon.

*Id.* § 3.1.2.  The Fourth Partnership Agreement included the same provisions, except that Sections 3.1.2 and 3.1.3 were renumbered as Sections 3.1.1 and 3.1.2, respectively.  *See* Pl.'s Trial Ex. 9.

The Capital Policy of Thelen was set forth in a document that is in evidence as Plaintiff's Exhibit 26.  It required each partner to make annual capital contributions equal to 6% of their equity-based income until the partner reached a maximum of $16,000 per point.  The Capital Policy stated that a partner "will no longer make capital contributions" after reaching the $16,000 per point cap.  *See* Pl.'s Trial Ex. 26.

10

Nothing in the foregoing provisions refer to the terms of the California statute regarding the treatment of excess capital contributions or state an intention to modify them. The Trustee's argument to the contrary is based on the fact that the Capital Policy itself does not specify a mechanism for a refund of excess capital. In the Trustee's view, this means that there can never be a refund of excess capital that is "in accordance with" the Capital Policy, and the references in the partnership agreements to the refund of "excess" capital are therefore without any potential operation. That is not a reasonable interpretation of the relevant provisions.

First, the Trustee's argument is based on too narrow an interpretation of the circumstances under which a refund of excess capital is "in accordance with" the Capital Policy. The Capital Policy sets a cap on required capital. A refund of excess capital is "in accordance with" that cap and therefore is "in accordance with" the Capital Policy.

Second, the Trustee's interpretation of the relevant provisions would mean that "excess" capital could never be refunded. If that were the case, then the explicit statements in the partnership agreements that "excess" capital "shall" be refunded would have no possible application, and would be mere surplusage. It is a cardinal rule of contract construction that an agreement should not be interpreted in such a way as to render one of its provisions without any meaning or application. *See* Cal. Civ. Code § 1641; Cal. Code Civ. Proc. § 1858; *Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* 80 Cal.Rptr.2d 329, 348–49 (1998); *Estate of Petersen*, 34 Cal.Rptr.2d 449, 458 n.4 (1994).

Third, the partnership agreements refer to the Capital Policy as determining the amount of equity that each partner was required to maintain. The Capital Policy, in turn, made clear that each partner was only required to contribute equity capital that was not in excess of $16,000 per distributable equity point. If the Trustee's interpretation were correct (and if a partner could

11

never obtain a refund of excess capital), then in effect no cap would ever exist, and partners would be required to maintain capital in whatever amounts the Thelen accountants had previously recorded in Thelen's books.  That is not a reasonable interpretation of the partnership agreements and the Capital Policy that was incorporated into them.  If a partner could not demand a refund of an excess contribution, then the whole notion of imposing a cap on required capital would be thwarted.

Taken together, the plain meaning of section 3.1.2 of the Third Partnership Agreement (and section 3.1.1 of the Fourth Partnership Agreement), and the Capital Policy, is that partners were entitled to refunds of excess capital contributions—the amounts contributed in excess of the cap set in the Capital Policy—just as the California statute envisioned.  This conclusion is reinforced by the accounting records offered in evidence.  The accounting records reflect numerous instances in which partners received payments of the excess balances in the relevant partners' capital accounts.  The Trustee's witness also acknowledged that Thelen regularly issued checks to repay such excess balances if partners so requested.  The Trustee attempted to portray this as merely a prior practice of Thelen (rather than as a right that partners had under the partnership agreements and under California law), but the Trustee's argument is not consistent with the wording of the partnership agreements and is not a reasonable interpretation of the evidence as to the firm's practices.

Permitting Fontana to recover his excess capital is also consistent with other policies that were adopted by Thelen in connection with its dissolution.  Thelen and its accountants issued statements confirming that partners who had received draws in excess of their share of Net Income would be permitted to offset those amounts against their capital account balances.  *See e.g.*, Pl.'s Trial Ex. 7 and 12.  This Court has previously held that these policies likely were

improper to the extent that they purported to allow partners to offset excess draws against their required capital contributions.  [ECF #118].  However, there was no similar prohibition against an agreement to offset excess draws against excess capital.  To the contrary: such an offset was consistent with the treatment of excess capital as a debt owed to the relevant partner, as envisioned by the California statute.

The Trustee also argues that Thelen's books showed a capital balance for Fontana in the amount of $336,000 and that this entire amount should be treated as equity and not as a debt because no part of it was reflected as a debt on Thelen's books.  However, that contention relies too much on Thelen's internal accounting treatment of Fontana's prior contributions and not enough on the reality of what constituted Fontana's equity investment in Thelen.  It is true that Thelen did not recharacterize Fontana's permanent capital contribution in early 2008, after Fontana's points had been reduced and his required capital therefore had also been reduced.  However, the failure of the internal accountants to re-label or to re-book the excess capital contribution is not sufficient to convert that excess into an involuntary equity contribution that Fontana is required to forego upon the dissolution of Thelen.  The partnership agreements and the Capital Policy and practices of Thelen did not modify the provisions of the California statute and instead reinforced the notion that excess capital was a debt recoverable by a partner, and that is true no matter how Thelen reflected the balance in its accounting records.

As to Fontana's claimed offset rights: Section 553 of the Bankruptcy Code expressly permits a creditor "to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case . . . ."  11 U.S.C. § 553(a).  The Trustee does not dispute that a setoff right would exist under California law if the excess capital obligation were treated as a debt owed by Thelen to Fontana.  However, the Trustee argues that the Court has discretion as to

whether to allow a setoff and that the Court should decline to permit a setoff in this case on

equitable grounds.  Perhaps there are some circumstances under which a setoff may be barred for

equitable reasons, though that proposition is not free from doubt.  *See* 5 Collier on Bankruptcy ¶

553.02[3] (16th ed. 2015) ("The Bankruptcy Code provides no general equitable mechanism for

disallowing rights of setoff that are expressly preserved by section 553.  Consistent with the text

of section 553, the best statement of modern law and practice is that . . . a right of setoff should

be recognized in bankruptcy unless the right is invalid in the first instance . . . or unless it is

otherwise proscribed by some express provision of the Code.") (footnotes omitted).  The Court

need not resolve that legal issue, because there are no circumstances present here that would

justify a denial of the offset right, even if the Court had discretion to do so.  The Trustee argues

that Fontana failed to file a proof of claim, but the clearly prevailing view in the case law (as the

Trustee has acknowledged) is that a proof of claim is not required in order to assert setoff as a

defense to a claim made by the estate.  *See* Trustee's Post Trial Br. Supp. Damage J. 5 n.6 [ECF

# 135]; *see also Geltzer v. Bloom (In re M. Silverman Laces, Inc.)*, 404 B.R. 345, 365 (Bankr.

S.D.N.Y. 2009) (and cases cited therein); 5 Collier on Bankruptcy ¶ 553.07[1] (16th ed. 2015)

("The prevailing view is that the failure to file a proof of claim does not prevent the creditor from

asserting the [setoff] right as a defensive matter, although the creditor may be barred from

collecting a dividend with respect to the amount of the claim that exceeds the creditor's offsetting

debt to the debtor.") (footnote omitted).  The Trustee also argues that Fontana's refusal to pay the

amounts sought by the Trustee is conduct that makes it inequitable to allow Fontana to assert the

setoff defense, but that contention would punish Fontana merely for disputing the Trustee's

claims.  Being a pesky adversary in litigation does not warrant a suspension of the setoff rights

that section 553 expressly preserves, and that is particularly true where (as here) the Court has sustained some of the defenses that the litigant asserted.

The Court therefore concludes that under California law the $80,000 of excess capital that Fontana contributed to Thelen is a debt that should be offset against amounts that Fontana may owe to Thelen.

**3.      Fontana's Share of Net Income**

Fontana raised three issues that affect the calculation of his share of Net Income.

**A.      The Measuring Date**

Section 6.2.1 of the Third Partnership Agreement provided that partners who withdrew from the firm would cease to be partners as of the effective dates of their withdrawals. Sections 6.6 and 6.6.1 of the Third Partnership Agreement also stated that "[e]xcept as otherwise expressly provided" in the partnership agreement a former partner's share of Net Income would be determined based on the portion of the calendar year ending with the date of the partner's withdrawal from the firm.

In October 2008, however, the Thelen firm decided to dissolve. Section 6.2.1 of the Fourth Partnership Agreement was modified, and it states expressly that any partner who elected to withdraw later than 90 days prior to the dissolution of the firm would retain the partner's liabilities and economic rights "as if there had been no withdrawal." Section 4.1.2 was also modified to add a new Section 4.1.2.1 that described the manner in which Net Income would be allocated to partners in the event of a dissolution. Section 4.1.2.1 states that the Sharing Ratio and other economic rights of each partner in effect on the effective date of dissolution would continue "through the winding up and liquidation of the Partnership and any withdrawal by a Partner post-dissolution will be treated merely as a relinquishment of the withdrawing Partner's

other rights associated with the Partnership, including the Partner's right to vote on Partnership issues and right to access the Partnership's books and records."

Consistent with section 4.1.2.1 of the Fourth Partnership Agreement, the Administrative Committee advised partners on March 2, 2009 that any partner who had not withdrawn from the firm prior to October 28, 2008 (the date on which the Dissolution Plan was adopted) would be designated a "Dissolution Partner" and would be entitled to a share of Net Income that would be computed as of December 31, 2008. *See* Pl.'s Trial Ex. 12. By contrast, each partner who withdrew prior to October 28, 2008 would be treated as a "2008 Former Partner" and would have his or her share of Net Income calculated "using the closing of the books method as of the effective date of such 2008 Former Partner's departure consistent with the firm's prior practice." *Id.*

Fontana contends that he ceased being an active partner of Thelen during November 2008 and that his share of Net Income should be determined as of November 30, 2008. However, that result would be inconsistent with the terms of the Fourth Partnership Agreement, which contemplated that Fontana would continue to retain his economic rights and liabilities even if his active partnership status terminated.

Fontana argues that the Trustee is estopped from seeking to calculate Net Income as of December 31, 2008 because the Trustee previously argued (in connection with summary judgment motions) that Fontana should be treated as a "Former Partner" of Thelen for purposes of section 6.6.3 of the Fourth Partnership Agreement, which obligated "Former Partners" to repay certain amounts they owe to Thelen. However, there was nothing in the Trustee's prior submissions that suggested that Fontana became a Former Partner prior to October 28, 2008 or that Fontana qualified for treatment as a "2008 Former Partner" as that term was defined in the

March 2, 2009 email communication from the Administrative Committee, as opposed to being treated as a Dissolution Partner. Instead, the Trustee merely argued (in the summary judgment briefing) that Fontana was a Former Partner of Thelen as of the time the Trustee demanded payment from Fontana and therefore was subject to the obligation, in section 6.6.3 of the Fourth Partnership Agreement, to repay sums that he owed to Thelen.

Sections 6.2.1 and 4.1.2.1 of the Fourth Partnership Agreement stated that partners who withdrew after a certain date would continue to retain their economic rights and liabilities, notwithstanding the termination of their partnership status. Similarly, the definition of Dissolution Partner in the March 2, 2009 email included partners who withdrew from Thelen after October 28, 2008. In each of these ways the documents made clear that certain partners whose active partnership ended (and who became Former Partners) nevertheless would have their shares of Net Income determined as of December 31, 2008. Accordingly, there is no inconsistency between the Trustee's arguments that Fontana's share of Net Income should be calculated as of December 31, 2008 and the Trustee's prior arguments (during summary judgment briefing) that Fontana should be regarded as a Former Partner of Thelen for purposes of section 6.6.3 of the Fourth Partnership Agreement, and there is no basis for an estoppel.

It should also be noted that Fontana's proposed calculations would produce results that are incorrect from an accounting perspective and that would exaggerate his share of Net Income. The Court finds (based on the testimony at trial) that Thelen recorded some income and expenses in November 2008 but did not officially close its books at the end of that month. Certain expenses (associated with the closing of certain offices) were recorded only in December 2008. The parties disputed the date when the offices had been closed, but the Court finds based on the evidence that the offices had actually been closed during November 2008. The Court further

17

finds that the expenses associated with those closures were properly chargeable to November

2008 (when the closures occurred), though the expenses were not actually recorded in Thelen's

books until December 2008.

The effect (if Fontana's contentions were to be upheld) is that Fontana would be the

beneficiary of income received during November 2008 as the result of Thelen's collections of

receivables during that month, but that Fontana would avoid the accounting effect of losses

incurred upon the closing of offices that occurred in November simply because those expenses

were not booked until December 2008.  That outcome would arbitrarily overstate Fontana's

actual share of Net Income.

Fontana's share of Net Income (using December 2008 figures) indisputably is higher than

it would have been if Fontana had withdrawn as a partner prior to the end of October 2008 and if

his share of Net Income had been calculated as of October 2008 or as of an earlier month.

Fontana therefore has benefited by not terminating his economic interests in the partnership as of

October 2008.  Fontana would like more, but the Court cannot endorse an intermediate

calculation that would be contrary to the terms of the Fourth Partnership Agreement and that

would also have the effect of recognizing income received through November 2008 but of

ignoring losses that could and should have been attributed to the same time period.

### B.    Guaranteed Payments to Partners

Thelen had three classes of partners:  (a) equity partners who received compensation

solely in accordance with their Sharing Ratios, (b) other equity partners who received smaller

Sharing Ratios but whose compensation was subject to certain guaranteed levels, and (c) income

partners who had no equity shares and whose compensation was determined solely by contract.

In March 2008 Thelen adopted a Final Compensation Report that approved a total of

$20,827,700 of "guaranteed" compensation for the equity partners in the second class of partners
that is described above.  At trial, Fontana contended that the "guaranteed" payments to equity
partners had allegedly been overstated in calculating Net Income for 2008, and that such
payments had exceeded amounts that the partners had officially approved.  He pointed to a line
item in an excel spreadsheet that listed "guaranteed expenses to partners" as having totaled
$28,451,374, Def.'s Trial Ex. X, and argued that the excess expenses should not be counted as
valid expenses of the firm and that Fontana's share of Net Income should be recalculated.

    A closer review of the accounting records submitted in evidence, however, does not
support Fontana's contention.  The gist of his argument is that equity partners were paid more in
guaranteed compensation than the partners of the firm had approved.  However, the accounting
records make clear that there were many types of payments, in addition to guaranteed payments
to equity partners, that fell into the general category of guaranteed payments to partners.  More
particularly, the monthly trial balances, *see* Pl.'s Trial Ex. 18, list nine separate general ledger
accounts that reflect compensation to partners that ultimately is rolled up into the category of
"guaranteed payments to partners."  A separate spreadsheet, entitled "2008 Reconciliation of
Payments to Equity Partners," shows that only one of those nine general ledger accounts
(account number 5013) includes payments of guaranteed compensation to equity partners of the
kind that was approved by Thelen's partners in March 2008.  Pl's Trial Ex. 14.  Exhibit 14
further shows that the amount of such guaranteed compensation to equity partners (excluding
certain reclassifications that are described in the next section) was approximately $18.4 million,
which was well within the amount approved in the March 2008 compensation program.

    Accordingly, there is no evidence to support Fontana's suggestion that the overall line
item for guaranteed compensation that appears in Defendant's Exhibit X is somehow at odds

with the approved amount of guaranteed compensation to equity partners that had been approved in March 2008.  Instead, the guaranteed compensation to equity partners was merely one of many items that rolled up into the larger guaranteed compensation line item, as the trial balances make clear.

Fontana also argued that he had not received sufficient discovery to allow him to challenge the guaranteed payments or to reconcile the foregoing amounts.  However, even the smaller subset of the accounting records that was actually submitted in evidence is sufficient to explain the differences between the two items that Fontana sought to compare.  As noted above, the trial balances show the actual general ledger accounts that were included in the guaranteed payments line item, and Plaintiff's Exhibit 14 shows that the guaranteed compensation to equity partners was less than the amount approved in March 2008.  Thelen apparently did not provide a partner-by-partner breakdown of the guaranteed payments that had been made, but that was not necessary to address the issue raised by Fontana, which was whether the actual payments to equity partners had exceeded the approved amounts.  The Trustee's expert also testified credibly that sufficient details about the payments had been provided to Fontana in the foregoing records and in other accounting documents that had been provided.  The Trustee's expert testified that the tax allocation schedule:

> . . . shows all items of income and expense that flow up to the equity partners or anyone who had a capital account and received a K-1.  And, [Mr. Fontana] also received all of the monthly trial balances, which would detail all of the items that they classified as guaranteed comp in the point value schedule. But, as I listen, I realize - - I - - I think the discrepancy is because there was [sic] three classes of partner and the third class of partner, who did not get a K-1, did not have a capital balance - - their compensation was called guaranteed comp, and that is likely the difference between the $28 million presented [in Defendant's Exhibit X] - - for the computation of the point value and what rolls up into a K-1.  So, really, it's just their ordinary compensation. . . . They were not partners who had capital balances. . . . They were likely just partners in title and that was their compensation.

20

### C.    Reclassifications of Negative Capital Balances as Guaranteed Payments

Fontana also challenged Thelen's accounting treatment, at the end of 2008, of partner

capital accounts that had negative balances.  Section 4.1.1.2 of the Fourth Partnership Agreement

Thelen provided that if any allocation of "negative Net Income" to a partner (in accordance with

that partner's share of equity points) would have the effect of creating or increasing a deficit in

the partner's capital account, then such negative Net Income would not be allocated to such

partner but would instead "be allocated to the other Partners in accordance with their relative

Sharing Ratios . . . ."  The evidence at trial showed that Thelen had reclassified $2,469,021.99 of

negative capital balances as guaranteed income payments to partners, and for similar reasons had

reclassified $380,212.45 of prior equity draws as guaranteed income.  The effect of these

reclassifications (from an accounting perspective) was to treat the reclassified sums as expenses

of Thelen that altered the Net Income calculations for other partners, including Fontana.

The Trustee argues that the foregoing accounting charges were in accord with the terms

of the Fourth Partnership Agreement.  That contention appears to be correct.  However, the

Trustee acknowledged at trial that he has previously challenged those same adjustments in other

lawsuits, and has sought to recover the reclassified amounts from at least some of the affected

partners, contending that the allocations of guaranteed income had the effect of improperly

forgiving the partners from their obligations to repay negative capital balances.  It is not

consistent for the Trustee (a) to file suits against some former partners on the theory that the

forgiveness of their negative capital balances was improper, and (b) to contend in suits against

Fontana and others that Thelen's accounting was proper and that Fontana and others must bear

the costs of the excess income that was allocated to the partners with negative capital balances.

In fact, if both positions were allowed (and were to be sustained), the Trustee would receive a

21

double recovery: he would recover the negative capital balances from former partners, while at the same time calculating other partners' shares of Net Income as though such negative balances had properly been reclassified as guaranteed income expenses of the firm.

Accordingly, the Court will reverse these particular expenses in computing Fontana's share of Net Income for 2008. The record showed that the expense associated with these items was $2,849,234.44. *See* Pl.'s Trial Ex. 14. If that expense deduction were reversed, then net sharing income would have increased by the same amount. The evidence showed that Fontana's share of Net Income was .730527%. *See* Pl.'s Trial Ex. 3d (Fontana's K-1 for 2008). Accordingly, a reversal of this expense would increase Fontana's share of Net Income by $20,814.43. The Trustee calculated that Fontana was entitled to Net Income of $129,844; the adjusted figure would be $150,658.43. The draws received by Fontana ($262,500) exceeded that adjusted amount by $111,841.57.

### 4.      Fontana's Personal Account

The only item charged to Fontana's personal account that Fontana challenged was a charge for disability insurance premiums. However, at trial Fontana offered no evidence at all on this point. The Trustee offered evidence showing that Fontana had paid for similar disability insurance premiums in prior years without complaint. The accounting records showed that the premiums had actually been paid, and Fontana did not dispute that fact. Based on the evidence, the Court finds that the disability insurance premiums were properly chargeable to Fontana and that the amount he owes based on his personal account is $9,044.45, as the Trustee contended.

### 5.      Prejudgment Interest

The claims against Fontana are based on the Thelen partnership agreements and are governed by California law. California law therefore determines the extent (if any) to which the

Trustee is entitled to prejudgment interest with respect to the Trustee's claims. *Pereira v. Marshall & Sterling, Inc. (In re Payroll Express Corp.)*, No. 92-43150, 2005 Bankr. LEXIS 3147, at *6–7 (Bankr. S.D.N.Y. July 28, 2005) ("State law is applicable to questions of prejudgment interest on claims arising out of or based on State law, even where the action was brought in Federal court pursuant to the court's exclusive jurisdiction.").

California law grants a right to prejudgment interest in cases in which damages are capable of clear calculation. California Civil Code, section 3287(a) provides, in pertinent part:

> A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day, except when the debtor is prevented by law, or by the act of the creditor from paying the debt

Cal. Civ. Code § 3287(a). Determining whether damages are "certain," and capable of clear calculation, is not as straightforward as one might think. The parties may dispute their respective liabilities for certain amounts, but ultimately it appears that under California law the question (in determining whether damages can be calculated with certainty) is not whether liability is disputed, but whether the underlying figures are readily known and whether the judgment (once liability is resolved) is capable of calculation based on known figures. *See Children's Hosp. & Medical Ctr. v. Bonta*, 118 Cal.Rptr.2d 629, 654 (2002) (noting that prejudgment interest can be recovered when the defendant either "actually knows the amount owed or from reasonably available information . . . [can compute the] amount," but not where the determination of the amount is based upon conflicting evidence that must await a judgment); *Wisper Corp. N.V. v. Cal. Commerce Bank*, 57 Cal. Rptr.2d 141, 147 (1996) (citing *Esgro Central, Inc. v. Gen. Ins. Co.*, 98 Cal.Rptr. 153, 157 (1971)) (noting that, ordinarily, damages are considered certain when the parties do not dispute the basis of the computation of any damages that may be awarded but instead their dispute is concerned with the issue of liability); *see also Block v. Lab. Procedures*

23

*Inc.*, 87 Cal.Rptr. 778, 780 (1970) (noting that where damages can be established by reference to set market values, they are considered as being calculable); *Chesapeake Indus., Inc. v. Togova Enter., Inc.*, 197 Cal.Rptr. 348, 352 (1983) (noting that courts have disallowed interest in instances where an accounting is required to ascertain the amount due).

Furthermore, the existence of an offset (Fontana's claim to a refund of excess capital), and a dispute over that offset, is not enough to create an uncertainty in the calculation of damages under California law. *Hansen v. Covell*, 24 P.2d 772, 775 (1933) ( "a debtor may not defeat the creditor's right to interest on a liquidated sum by setting up an unliquidated claim as an offset"); *Fluor Corp. v. United States ex rel. Mosher Steel Co.*, 405 F.2d 823, 830 (9th Cir. 1969) ( "even though the existence of an unliquidated counterclaim or set-off necessarily puts the amount payable in doubt, . . . it does not render the claim itself uncertain or deprive the claimant of the right to prejudgment interest"). Instead, an offset is treated as a reduction to the "certain" amount otherwise owed, with the balance accruing interest from the date it came due. *Cal. Lettuce Growers v. Union Sugar Co.*, 289 P.2d 785, 793 (1955) (citing *Lineman v. Schmid*, 195 P.2d 408, 413 (1948)) (noting that if there is a "certain or determinable debt owing to the plaintiff," an unliquidated counterclaim is treated as a discount, not as a "payment[] made at the time the debt is due," and further noting that the unliquidated counterclaim does not "affect the liquidated or unliquidated character of the debt"). *Hansen*, 24 P.2d at 631 (noting that, ordinarily, if an offset is allowed on a debt, prejudgment interest is awarded "only on the balance found to be due after deduction of such offset[]").

While section 3287(a) controls the extent to which a party has a *right* to recover prejudgment interest, section 3287(b) gives the Court the *discretion* to award prejudgment interest in contract cases where the claim was unliquidated. Section 3287(b) states:

24

> Every person who is entitled under any judgment to receive damages based
> upon a cause of action in contract where the claim was unliquidated, may
> also recover interest thereon from a date prior to the entry of judgment as the
> court may, in its discretion, fix, but in no event earlier than the date the action
> was filed.

Cal. Civ. Code § 3287(b).

The parties to this adversary proceeding vigorously disputed (a) Fontana's entitlement to

an offset, (b) the date as of which Fontana's share of Net Income would be calculated and the

expenses to be taken into consideration in making that calculation, and (c) the total amount of

Fontana's obligation to repay personal charges.  However, the underlying accounting records

provide clear answers as to the amounts owed once such disputes are resolved.  Under California

law, then, the damages were sufficiently "certain" to entitle the Trustee to prejudgment interest.

Furthermore, the Court finds that an award of interest, as a discretionary matter, is appropriate

pursuant to section 3287(b), even if section 3287(a) were not otherwise applicable.  There has

been a substantial delay in the Trustee's recovery and interest is appropriately awarded to

compensate the Trustee for that delay.  *See Lewis C. Nelson & Sons, Inc. v. Clovis Unified

School Dist.*, 108 Cal.Rptr.2d 715, 718 (2001) (noting that section 3287(b) allows interest as a

matter of discretion to "balance the concern for fairness to the debtor against the concern for full

compensation to the wronged party").  Such interest will accrue at the statutory rate (10%).

The Trustee asked that interest be computed from February 2009 with respect to

Fontana's personal account and from and after October 10, 2011 with respect to the excess

capital draws.  However, given that Fontana's offset ($80,000) applied to the amount owed with

respect to the personal account as well as to any amount owed with respect to excess draws, it is

proper to treat the net obligation as a single claim and to compute prejudgment interest from a

single date.  The Trustee suggests that the overall sum was sufficiently quantified to permit an

interest accrual beginning October 10, 2011, and the Court will compute prejudgment interest

25

from and after that date.  Notably, that date is *after* the date on which the Complaint was filed and therefore is also within the period for which interest may be awarded as a matter of discretion under section 3287(b).

### Conclusion

For the foregoing reasons, the Court determines:  (a) that Fontana is indebted to the Trustee in the amount of $120,886.02; (b) that Thelen is indebted to Fontana in the amount of $80,000; (c) that Thelen's debt to Fontana can and should be offset against Fontana's debt to the Trustee, leaving a balance due of $40,886.02; (d) that the Trustee is entitled to prejudgment interest on the balance due of $40,886.02 from October 10, 2011 to and including the date of judgment at the simple interest rate of 10% percent per annum, which amounts to $15,805.53 through August 21, 2015; and (e) that judgment should be entered in favor of the Trustee as of August 21, 2015 in the total amount of $56,691.55.

Dated: New York, New York
        August 21, 2015

                                    **s/Michael E. Wiles**
                                    UNITED STATES BANKRUPTCY JUDGE